Kevin J. Nash, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10036
Telephone: (212) 221-5700
*Attorneys for Defendant Rabbi Aryeh Zaks*

Michael Levine, Esq.
**LEVINE & ASSOCIATES, P.C.**
15 Barclay Road
Scarsdale, NY 10583
Telephone (914) 600-45288
*Litigation Attorneys for Mosdos Chofetz Chaim, Inc.,
Defendant/Reorganized Debtor*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
In re:                                                           :   Chapter 11

**MOSDOS CHOFETZ CHAIM INC.,**                                    Case No. 12-23616(rdd)
                                                                 :   Post-Confirmation
---------------------------------------------------------X
**MOSDOS CHOFETZ CHAIM INC., RABBI MAYER ZAKS,**                  :
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,                  Adv. Pro. No. 20-08949-rdd
**SIMA WEINTRAUB,** derivatively on behalf of MOSDOS              :
**CHOFETZ CHAIM INC., DANIEL ROSENBLUM,**
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,              :
**JOSEPH GRUNWALD,** derivatively on behalf of MOSDOS
**CHOFETZ CHAIM INC., and YISROEL HOCHMAN,**
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,              :

                                    Plaintiffs,                   :

                    - against-                                    :
**MOSDOS CHOFETZ CHAIM INC., CHOFETZ CHAIM**                      :
**INC., TBG RADIN LLC, SHEM OLAM LLC.,**
**CONGREGATION RADIN DEVELOPMENT INC., ARYEH**                    :
**ZAKS, BEATRICE WALDMAN ZAKS, HENOCH ZAKS,**
**MENDEL ZAKS, GITTEL ZAKS LAYOSH, SAMUEL**                       :
**MARKOWITZ and STERLING NATIONAL BANK,**
                                                                 :
                                    Defendants.
---------------------------------------------------------X

<u>**CERTIFICATION OF HENOCH ZAKS**</u>

Henoch Zaks hereby certifies under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1. I am a Defendant in the within action and, as such, am fully familiar with all of the facts and circumstances as are hereinafter set forth.

2. This Certification is submitted in support of the omnibus motion by Defendants for *in limine* relief stemming from repeated litigation misconduct, discovery transgressions and fraudulent actions on the part of Rabbi Mayer Zaks and his minions. The complete scope of those activities are spelled out in the accompanying memorandum of law, and I make this Certification to explain to the Court only one of those matters of which I have personal knowledge.

3. I am the interim manager acting on behalf of CRDI (Cong. Radin Development Inc.), the current owners of the Kiryas Radin Property, and act as my father's personal assistant in many matters. Among them is the conclusion of the within bankruptcy proceeding and the motion to hold my father in contempt of court.

4. In the basement area of Unit Number 18 on Kiryas Radin Drive (on the Kiryas Radin Campus) there is an office that had been used by my father for many years and is currently also used for the CRDI management. For many years, there has been a closed-circuit video system monitoring the building where the office is located. The system is hooked up to a hard drive that stores videos of the scene and also is hooked up to our computer system. The hard drive stores documents that we have created over the years and goes back at least a decade.

### I.    *The original burglary in early 2020*

5. Sometime around the beginning of this year (2020), Mayer Zaks' son, Joseph T. Zaks (a/k/a Tzvika Zaks), arrived at the Kiryas Radin Campus driven by his sister Leah T. (Zaks) Brody in a black Toyota Sienna. Mayer's son thereafter walked towards the exposed CCTV wires at the

2

edge of Unit Number 18, took a device from his coat akin to a wire cutter, cut all the CCTV camera wires at that location.

6. I study at the Yeshiva located on the Kiryas Radin Campus, as the main building is about 100 feet away from the location of the wires. On that date, I saw Joseph Zaks cut the wires and, when I started to approach, he fled by way of this same sister driving him off the campus.

7. Other than the cutting of the wires, Joseph Zaks was not able to commit any other acts of vandalism, nor did he attempt to enter the locked office, most likely because he saw me there. In any event, I attributed it to an act of vandalism and resolved to simply have the wires repaired.[1] When I got to a location where I could view the CCTV system, I did so and saved the video of Joseph Zaks approaching the area where the wires were located, appear to take something out of his coat. Then the video went black.

8. A physical copy of the entire video (on a thumb drive) is being submitted herewith and labeled Exhibit "1". As can be seen therefrom, Joseph Zaks (the person depicted in the video) walked toward the area where the wires for the CCTV system are located and reached into his jacket pocket for something (which turned out to be the wire-cutting device). He continued to approach the area when the screen went black (after the wires were cut). A photo capture from the video showing Joseph Zaks' initial approach toward the wires depicts the following:



---

[1] I did not report the matter to the police (or to this Court) because it is prohibited under the tenants of my religion to take actions which might subject another Jew to potential criminal prosecution.

9. The person who is pointed to by the arrow is Joseph Zaks. I have watched Joseph grow up and I can state without hesitation that the picture is of him. As is the following photo capture from the video, this one showing Joseph Zaks reaching into his jacket for the wire cutter device:



10. As I indicated, I attributed Joseph's activities (as caught on the video) to be a simple act of vandalism. However, a few days later, I received a notice from the superintendent of the property that, over the ensuing weekend, the deadbolted lock to the Office in Unit Number 18 had been smashed open, the door frame had been broken, and various items had been stolen. Of course, with the wires cut, there was no video evidence of who approached the office or who broke in.

11. When I went to inspect the room, I found to my horror that the *entire* CCTV system (comprised of a monitor and other peripherals), the external computer hard drive that the system downloaded to (and also contained many of the archived records of Mosdos and the Yeshiva), and the Wi-Fi router had been stolen – ripped from the closet where they were had been hooked up.

12. Although I assumed (as was an obvious deduction) that it was Joseph Zaks (or others acting with him) who broke into the office (since only Joseph Zaks knew that the wires to the camera system had been cut and he could approach the office without detection), (i) I did not have

sufficient proof that it was him to take any action, and (ii) I could not file a police report due to my religious belief.

13. What I did do was temporarily have the CCTV system repaired; I had the wires reattached, and I purchased a new monitor, hard drive and Wi-Fi router. Over the course of the next two months (March and April of 2020), I also had a completely new CCTV system installed, securing all wires in PVC pipe, and placing wires underground where possible. In addition, the main CCTV unit was separately installed in a new secure location, and a separate camera with a view of the only hidden access point for Wire maintenance was installed in a manner that wouldn't be affected if someone were to find and vandalize that access box. That additional, secret, camera was situated so that it pointed directly to the outside wires where the new CCTV system entered the Unit so that I would have direct video evidence if anyone tried to cut those wires again.

II. *The second burglary on May 24, 2020*

14. Unfortunately, that did happen again, as it turned out, on May 24, 2020. On that day, Mayer's son yet again arrived on the Kiryas Radin site, approached his father's Black Toyota Sienna, and had a several minute discussion with him. The photo capture from the video depicting Rabbi Mayer Zaks arriving at the premises is as follows:



15. Then, Joseph Zaks entered Unit number 2 (where his siter Leah Brody resides) and exited the unit shortly thereafter. A few minutes later, Mayer Zaks' wife, Plaintiff Sima Zaks (Weintraub), exits and heads to Mayer Zaks' car:



16. Shortly thereafter, Joseph Zaks goes back to his father's car, has a conference for several minutes, and then exits as his mother enters:



6

17. Joseph then proceeds directly to the building of Unit 18 (where the office is located), approaches the area of the access box for the new CCTV system, looks around nervously, and then leaves:



7

18. About 2 minutes later, Joseph Zaks returned with what appears to be a wire cutter in hand and attempted to break into the wiring system (all the while looking around to make sure that he is not being spotted). He was unable to cut through the PVC pipe, however, and returns several more times before he is finally able to figure it out:



19. The video depicting the above, and several other attempts by Joseph Zaks, is included on the thumb drive marked Exhibit "1". Ultimately, he was successful and cut what he believed to be all the wires to the CCTV system.

20. About a half hour later, after being informed that the camera wires were cut yet again, I went to investigate and found that someone (assumedly Joseph) had broken into the office located at Unit 18 yet again, right after the wires were cut. This time, all of the hard-copy documents that were stored in the basement office were taken, including but not limited to, hard-copy mortgage applications that Mosdos had made.

### III. *The ever-changing cover-up attempts*

21. When I reported to counsel for Mosdos what had happened and advised that we were religiously prohibited from taking any criminal action, Mosdos' counsel immediately prepared subpoenas for service on Joseph Zaks. The first was a *duces tecum* subpoena which required Joseph Zaks to produce, *inter alia*, on July 13, 2020, the materials he had taken from the office. A copy of the same is annexed hereto and labeled Exhibit "2". As can be seen therefrom, the second request (on page 3) was for "[a]ll hard-copy or electronic documents that you removed from the office located in the basement of #18 Kiryas Radin Drive, or any other location on the Kiryas Radin Campus, in Spring Valley NY ..." Similarly, the third request sought "all hard drives that you removed for the office ...;" the fourth was for "all documents which you believe or contend gave you authority to enter the office ...;" and the fifth was for documents "which you believe or contend gave you authority to destroy the door frame, and damage the lock from the front door of the office ..."

22. The second subpoena sought Joseph Zaks' deposition testimony on Jule 21st, the week after production was due. After service of notice of those subpoenas on all counsel on June 15,

2020, the first cover-up reaction came from Rabbi Mayer Zaks through his attorney, Stanley Lane, Esq.[2] That took the form of an e-mail from Mr. Lane to Mosdos' counsel on June 16, 2020, which read as follows: "The document requests attached to your proposed subpoena to Joseph Zaks appears to assume the occurrence of events that I am led to understand never occurred. Putting that aside, I assume you are aware that Joseph Zaks is 15 years old. I didn't think harassing minor children was your style." A copy of that e-mail is annexed hereto and labeled Exhibit "3".

23. So, the first reaction to Joseph Zaks' cutting of the CCTV wires and burglary was to pretend that it never happened. Who "led" Mr. Lane to "understand" that it "never happened," is not specified but, in view of the fact that Rabbi Mayer Zaks is his client, can reasonably be inferred? In any event, Mosdos counsel responded as follows (Exhibit "4" annexed hereto), in relevant part:

> … if you are representing to me that Joseph Zaks did not cut the wires to the CCTV system located on the premises referred to in the subpoena, break the door lock, enter the premises, and remove materials from the same, or commit any of those acts (and give me a certification to that effect from Joseph Zaks and Mayer Zaks, then I believe that I will be able to persuade my client to withdraw the subpoenas.

24. Of course, no such certifications were forthcoming. Instead, Rabbi Mayer Zaks just slipped into plan 2, which also took the form of an e-mail from his attorney, that one on March 16, 2020. In that one, Mr. Lane advanced the new proposition that took the form (paraphrased) that "well … maybe it happened, but the kid was only 15 and Mayer Zaks knew nothing about it." Specifically, Mr. Lane represented that: (i) "my understanding after some research is that there was a dispute about the campus security cameras being operated on Shabbos and Joseph apparently

---

[2] I do not intend to cast any aspersions on Mr. Lane as I relate the sequence of events here, as I assume that Rabbi Mayer Zaks simply lied to him about the theft.

10

decided to exercise some self-help several months ago;" and (ii) "Rabbi Mayer assures me he knew absolutely nothing about his son's actions until now and is not at all happy about them."

25. Of course, there was never any "dispute" regarding cameras being operated on Shabbos; that was a complete fabrication. And that is *precisely* Rabbi Mayer's *modus operandi*. He makes up whatever story works for hm at that moment and worries about changing it later if necessary. First, it was "it never happened." Then, it was "it happened, but Rabbi Mayer did not know anything about it, and nothing was taken."

26. The story took an even more bizarre twist during the depositions of Rabbi Mayer Zaks himself and his wife, Sima Weintraub, in this case. ***Both Rabbi Mayer Zaks and his wife actually denied even having a son named Joseph***. In Rabbi Mayer Zaks' deposition, the following took place (Tr. 130:8-12, Exhibit "5"):

> Q. Is Joseph Zaks your son?
> A. Joseph Zaks, no. I don't have a son Joseph Zaks.
> Q: You don't know a Joseph Zaks?
> A. No. Joseph? No.

27. And in Sima Weintraub's deposition, she testified in the same manner (Tr. 60:10-23, Exhibit "6"):

> Q. And you have a son named Joseph Zaks, correct?
> A. No, I do not.
> Q. Tell me the names of each of your male sons.
> A. I have an Abraham Gershon. I have Shimmy. I have Ari. I have Henoch, and I have Tzvika.
> Q. And none of them uses the English name Joseph, is that right?

11

A. Nope.

Q. That's not right or none of them does?[3]

A. None of them do.[4]

28. What was even more bizarre was that Sima Weintraub denied that she could recognize her son in the photographs and video shown to her (as depicted above). In fact, she professed to be unable to even recognize her own car when it was shown to her in the photographs. Specifically, she was asked the following questions and gave the following answers:

[Tr. 61:2-62:24]:

Q: Let me show you what's been marked as Deposition Exhibits 22A and B.

Q. This is Exhibit 22A. Can you see that?

A. Yes.

Q. Can you see the person that's standing right over here in the middle of the picture?

A. I see a person, yes.

Q. Can you tell me who that person is?

A. I can't tell you for sure, no.

Q. Does it look like one of your sons?

---

[3] When asked what her son "Tzvika's full name was, Sima Weintraub responded "Yoseph Tzvika," yet denied that "Yosef" was the Hebrew equivalent of Joseph" in English (Tr. 84:15-85:9). However, not only can I testify from firsthand knowledge for two decades that Yoseph is, in fact, Joseph, but it is also common knowledge that Yoseph "is the Hebrew equivalent of the English name Joseph. The name appears in the Book of Genesis. Joseph is Jacob's eleventh son and Rachel's first son, and known in the Jewish Bible as Yossef ben-Yaakov." https://en.wikipedia.org/wiki/Yosef#:~:text=Yosef%20%28Hebrew%3A%20%D7%99%D7%95%D6%B9%D7%A1%D6%B5%D7%A3%20%E2%80%8E%2C%20lit.%20%27he%20will%20add%27,English%20name%20Joseph%2C%20and%20the%20Arabic%20name%20Yusuf].

[4] It is "interesting" that Rabbi Mayer Zaks and Sima Weintraub both denied that they had a son named Joseph since two of their attorneys specifically referred to their son by that name. Mr. Lane, in his email of June 15th [Exhibit 3 referred to above] stated "I assume you are aware that Joseph Zaks is 15 years old," and Ms. Cyganowski, in an email to this Court on July 20, 2020, stated: "non-party Joseph Zaks who is the 15-year old son of Rabbi Mayer Zaks" (see Exhibit "7", emphasis added).

12

A. It could look like many different people that are floating around Kiryas Radin.

Q. Does it look like one of your sons?

A. Nope. Not especially.

What about 22B, do you recognize that person? That's the same screen-shot, just a couple of seconds later. Do you recognize that?

A. Nope. Could be anybody.

Q. Don't recognize that to be one of your sons who uses the name Joseph, right?

A. Nope.

Q. Okay. Do you recognize the surroundings where this person is standing?

A. It could be anywhere in Kiryas Radin.

Q. You believe it's in Kiryas Radin?

A. Yes.

Q. And is that true for 22B as well?

A. It could be in -- yes.

Q. So it's some person who is in Kiryas Radin who you do not recognize to be one of your sons, is that right?

A. Yes, that's right.

[Tr. 62:25-63:

Q. Okay. Let me show you what's been marked as 23A through G.

Q. All right. So this is 23A. Do you recognize this location?

A. That's Kiryas Radin. Yes.

Q. All right. Do you see this black SUV where I'm circling right over here?

A. I see a black car, yes.

Q. Do you know whose car that is?

A. No, I do not.

Q. Do you have a black SUV that looks similar to that?

A. Yes, I do. As many people do.

Q. Right. Okay. You don't know whether that's your car or not?

A. No, I do not.

Q. Okay.

A. Could be any car in Kiryas Radin.

13

[Tr. 74:5-74:12]:

Q. You don't recognize the car, the people or anybody in any of the photographs I'm showing you, right?

A. Absolutely not. There are millions -- there are millions of cars that go through Kiryas Radin. There are a lot of people that live there. And there are a lot of people that visit there. No.

29. So, when the first phase of the Joseph burglary cover-up ("let's pretends it never happened") fell by the wayside, and Phase 2 ("well ... it happened but we didn't know about it") didn't fly in the face of videos of Rabbi Mayer Zaks and his wife being present with Joseph immediately before he committed the act, Phase 3 became: "we don't have a son named Joseph, and that is certainly not him (or our car) in those pictures."

30. So that the Court understands the absolute frivolity of Sima Zaks refusal to identify her son (or her car) in the photos and video, I present to the Court the following excerpt from another video, this one from a security camera at a local grocery store. Joseph Zaks apparently used my father's personal in store account to purchase his personal groceries at that store. When my father got the bill for that, he indicated that he were not aware of any such purchase and the grocery store provided the video to establish that the same had actually been purchased. An excerpt from that video shows Joseph Zaks' unique visage and appearance:



Joseph Zaks

14

31. A copy of the bill my father received from the grocery store for Joseph Zaks' purchase is annexed hereto and labeled Exhibit "8". In any event, Phase 4 of the burglary coverup eventually came into play during the deposition of Rabbi Mayer Zaks in this case. Realizing that he was not going to escape by just claiming that "I don't have a son named Joseph," or "he didn't take anything," Rabbi Mayer Zaks slid into the new Phase on the fly. It took the form of "ok, ok, Joseph *did* take something from the office, but all he took was a camera." Specifically, Rabbi Mayer Zaks testified as follows:

[Tr. 138:14-19]:
A. Yosef told me maybe -- he may have taken a -- he took a camera and threw it out or something.
Q. He may have done what?
A. Took a camera and threw it out, a camera of some sort.

[Tr. 146:15-24]:
Q. So he admitted to you that he, because of that, went and destroyed the wires --
A. Not destroyed.
Q. You don't think cutting wires is destruction?
A. He told me he cut the wire for the purpose of it shouldn't desecrate the Shabbos.

[155:18-157:10]:
Q. I said did he cut wires in the building that he knew you didn't own, yes or no?
A. I don't own anything.
Right, okay. Thank you.
A. I'm just Mosdos Chofetz Chaim -- I'm the leader --
Q. Thank you.
A. -- and the leader of the yeshiva. And the halachic --
Q. So then --
A. -- halachic rules were always followed by me.
Q. And then your son told you that he took what, the camera?

15

A. He mentioned to me he took the camera and threw it out or something.

Q. He mentioned to you that he took a camera?

A. He took a camera and threw it out. I didn't question him any further. I didn't want to --

Q. Took the camera off the wall?

A. I didn't ask him anything. I just said to him, listen to me, I'm not going to -- I wasn't looking to do any damage.

Q. No, no, I'm not asking you --

A. Again --

I'm not asking you what you said to him. I'm asking you did he tell you --

A. I didn't speak --

Q. -- that he took a camera?

A. I didn't allow him to tell me.

A. Only what he told me. Told me I took a camera, threw it out. That's all he told me.

[Tr. 161:13-20]:

Q. Did he tell you where he got the camera from?

A. He said I took the camera and I threw it out.

Q. From where?

A. Probably from somewhere that it would have been. I have no idea. I didn't request from him.

[Tr. 167:2-8]:

Q. Did he tell you that he took anything else from the basement besides a camera?

A. I didn't ask him how -- what he was carrying. Maybe -- but the camera could have been in a box or -- what do I know? I have no idea.

32. The Phase 4 story that Joseph Zaks took "only a camera" is significant in two regards. First, it was admitted (for the first time since Mr. Lane's June 16th assertion on behalf of Rabbi Mayer Zaks that the wire cutting and break-in "never happened") that *something* was taken from

16

the office. Secondly, as is clear from the photos above, there is no way that any "camera" could have been taken because they were all at least twenty feet above the ground. Just so that the Court fully understands that, I will refer the Court's attention again to this picture:



33. As can be seen, it is physically *impossible* for Joseph Zaks to have taken a "camera." What he actually took (during his first break-in), and what he allegedly "threw out" was, as I stated, a hard drive, a monitor and a Wi-Fi router. While the monitor and the Wi-Fi router were of no major consequence (other than the expense of replacing them), the hard drive is an entirely different story. On that hard drive, aside from important archived busines records evidencing the configuration of Mosdos' Board of Trustees at various times (some of which we had in hard copy format and some of which we did not), the hard drive contained videos showing numerous meetings of the Board of Trustees – meetings which Rabbi Mayer Zaks now denies ever took place.

34. Of utmost importance were the meetings of the Mosdos Board of Trustees in 2018 and 2019. While we maintained hard-copy minutes or resolutions regarding those meetings, Rabbi

17

Mayer Zaks is now claiming that those documents are "fabricated" and that those meetings never took place. Of course, the best corroborative evidence of the same would be the video (which would be time and date-stamped) showing that the same actually took place.

35. Moreover, I do not know what physical records Joseph Zaks took during his second break-in of our offices. There were numerous documents that we were going through in connection with this case, but I cannot truthfully say exactly what they were. And that is precisely why that theft is so troublesome. There may have been hard-copy documents beneficial to me, my father and/or the other defendants, but I simply cannot say that for sure. We have been literally robbed of the opportunity to determine that.

36. As such, the theft (and apparent destruction) of Mosdos' hard drive containing the videos and archival records, as well as the theft of Mosdos' hard-copy records, has seriously affected Mosdos ability to litigate this case and effectively rebut the contentions of Rabbi Mayer Zaks, let alone prove the many changes that have occurred to the Mosdos Board over the last seventeen years, subjects critical to a determination of the Contested Issues before this Court. The claim by Rabbi Mayer Zaks that his son acted without his knowledge or consent is extremely farfetched – his sons typically do not do anything without his permission or consent. Moreover, the video that places him and his wife on the scene when his son broke into the office (despite their denial that they do not recognize their car or themselves in the video), and the "fluid" coverup attempts – ranging from "we don't have a son named Joseph" to "we don't recognize him in pictures," to "he cut the wires but he didn't take anything" to "he broke in but he only took a camera" (which was physically impossible to access) – render Rabbi Mayer Zaks' claim that he was not aware of his son's conduct just one more in a series of falsehoods that he has been spewing since day one.

18

37. He has damaged more than just a CCTV system; he has damaged our ability to litigate this matter on a fair playing field. He should not be able to get away with this.

_____
Henoch Zaks

Affirmed to me this
1st day of September, 2020

_____

Michael Levine
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02LE4972017
Qualified in Westchester County
Commission Expires September 17, 2022