Kevin J. Nash, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10036
Telephone: (212) 221-5700
*Attorneys for Defendant Rabbi Aryeh Zaks*

**Michael Levine, Esq.**
**LEVINE & ASSOCIATES, P.C.**
15 Barclay Road
Scarsdale, NY 10583
Telephone (914) 600-45288
*Litigation Attorneys for Mosdos Chofetz Chaim, Inc.,*
*Defendant/Reorganized Debtor*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

In re:                                                    :  Chapter 11

MOSDOS CHOFETZ CHAIM INC.,                                 Case No. 12-23616(rdd)
                                                          :  Post-Confirmation
-------------------------------------------------X
MOSDOS CHOFETZ CHAIM INC., RABBI MAYER ZAKS,              :
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,      Adv. Pro. No. 20-08949-rdd
SIMA WEINTRAUB, derivatively on behalf of MOSDOS          :
CHOFETZ CHAIM INC., DANIEL ROSENBLUM,
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,      :
JOSEPH GRUNWALD, derivatively on behalf of MOSDOS
CHOFETZ CHAIM INC., and YISROEL HOCHMAN,
derivatively on behalf of MOSDOS CHOFETZ CHAIM INC.,      :

                                    Plaintiffs,           :

                              - against-                  :

MOSDOS CHOFETZ CHAIM INC., CHOFETZ CHAIM                  :
INC., TBG RADIN LLC, SHEM OLAM LLC.,
CONGREGATION RADIN DEVELOPMENT INC., ARYEH                :
ZAKS, BEATRICE WALDMAN ZAKS, HENOCH ZAKS,
MENDEL ZAKS, GITTEL ZAKS LAYOSH, SAMUEL                   :  .
MARKOWITZ and STERLING NATIONAL BANK,

                                                          :

                                    Defendants.           :
-------------------------------------------------X

## CERTIFICATION OF MICHAEL LEVINE

**MICHAEL LEVINE**, an attorney duly admitted to practice law in the Southern District of New York, affirms the truth of the following, under the penalty of perjury:

1.   I am counsel to Defendant Mosdos Chofetz Chaim in the within action and, as such, am fully familiar with all of the facts and circumstances as are hereinafter set forth.

2.   This Affirmation is submitted in support of the omnibus motion by Defendants for *in limine* relief stemming from repeated litigation misconduct, discovery transgressions and fraudulent actions on the part of Rabbi Mayer Zaks and his minions. The complete scope of those activities are spelled out in the accompanying memorandum of law, and I make this Certification to present to the Court certain of those matters.

## BACKGROUND

### I.   *The Mosdos Bankruptcy Filing*

3.   On July 17, 2019, Mosdos filed a Plan of Reorganization in this Court [DE-267]; on August 9, 2019, Mosdos filed an Amended Plan of Reorganization [DE-277]; and on August 16, 2019, Mosdos filed a Second Amended Plan of Reorganization [DE-283]. The Second Amended Plan provided, at §4.3 that (emphasis added):

> [I]n full satisfaction and settlement of the TBG Radin Secured Claim, the Holder of the TBG Radin Secured Claim shall continue to receive payments pursuant to (i) the Note and the Amended and Restated Mortgage by and between Mosdos and TBG Radin LLC as provided for in the June 21 Stipulation, or (ii) such other treatment as may otherwise be agreed to in writing by the Debtor and the Holder of the TBG Radin Secured Claim. Provided that, in the event the Debtor believes it is unable to make payments to the Holder of the TBG Radin Secured Claim, the Debtor ***shall be authorized to sell the Property***, subject to section 363(d)(1) of the Bankruptcy Code, including New York Attorney General approval under New York Religious Corporations Law, to a qualified religious corporation or not for profit corporation under New York Religious Corporations Law or New York Not for Profit Law, in full and final satisfaction, release and discharge of the Allowed TBG Radin Secured Claim, which is currently $24,755,000. In the event that the Property is sold, the Holder of the TBG Radin Secured Claim shall receive payment on account of the Allowed TBG Radin Secured Claim sufficient to pay the TBG

Radin Secured Claim in full or such other amount as agreed to in writing by the Debtor and the Holder of the TBG Radin Secured Claim.

4. The Second Amended Plan further provided that the $24,755,000 debt to TBG [the "TBG Claim"] would be extinguished via monthly payments of $128,000 for ten years, with a balloon payment in 2028. It further provided that, if Mosdos believed it was unable to make those payments, it could "sell the Property to a qualified religious corporation or not-for-profit corporation." Specifically, the Second Amended Plan provided (emphasis added):

> **Implementation**. The Plan shall be implemented by (i) the funding of approximately $900,000.00 to pay all Allowed Claims (other than TBG Radin Secured Claim) and (ii) monthly payments under the Note (in the amount of $125,857) to pay the TBG Radin Secured Claim each month for ten years (with a balloon payment in 2028), *or if the Debtor believes it is unable to make payments to the Holder of the TBG Radin Secured Claim, the sale of the Property to a qualified religious corporation or not-for-profit corporation to pay the TBG Radin Secured Claim. Any such sale shall be subject to any necessary approval under section 363(d)(1) of the Bankruptcy Code, including any such approval by the New York Attorney General under New York Religious Corporations Law.* The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan, including obtaining any such approval. The Confirmation Order shall contain appropriate provisions, consistent with Section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property required by the Plan (if necessary) or subsequent court order and to perform any act that is necessary for the consummation of the Plan.

5. On October 2, 2019, this Court approved the Debtor's Second Amended Plan of Reorganization (the "Approved Plan") and signed a confirmation order (the "Confirmation Order," DE-308). As part of the Confirmation Order, among other things, this Court ordered that Mosdos was "authorized to sell the Property pursuant to and under the Plan … in full and final satisfaction, release and discharge of the [TBG Claim], which is currently $24,755,000". Specifically, the Confirmation Order provided, at ¶ 22 on page 5:

3

The Plan provides for its implementation through (i) the funding of approximately
$900,000.00 to pay all Allowed Claims (other than TBG Radin Secured Claim) and
(ii) monthly payments under the Note (in the amount of $125,857) to pay the TBG
Radin Secured Claim each month for ten years (with a balloon payment in 2028),
or if the Debtor believes it is unable to make payments to the Holder of the TBG
Radin Secured Claim, the sale of the Property to a qualified religious corporation
or not-for-profit corporation to pay the TBG Radin Secured Claim. Any such sale
shall be subject to any necessary approval under section 363(d)(1) of the
Bankruptcy Code, including any such approval by the New York Attorney General
under New York Religious Corporations Law.

6.   Paragraph 22 of the Confirmation Order (the fourth ordering paragraph on page 10 of
the same) specifically authorized the sale of the Debtor's property.  The latter paragraph provided
as follows (emphasis added):

ORDERED, that the Debtor/Reorganized Debtor, a religious corporation, *is hereby
authorized to sell the Property* pursuant to the Plan to *any* qualified religious
corporation or not for profit corporation formed under New York Religious
Corporations Law or New York Not for Profit Law, pursuant to section 363(d)(1)
of the Bankruptcy Code, and pursuant to the requirements of New York State
Religious Corporations Law in Article 2, Section 12 of the Religious Corporations
Law, in full and final satisfaction, release and discharge of the Allowed TBG Radin
Secured Claim, which is currently $24,755,000.  In the event that the Property is
sold, the holder of the TBG Radin Secured Claim shall receive payment on account
of the Allowed TBG Radin Secured Claim sufficient to pay the TBG Radin Secured
Claim in full or such other amount as agreed to in writing by the Debtor and the
Holder of the TBG Radin Secured Claim …

7.   TBG assigned the TBG Claim to Shem Olam, LLC ("Shem Olam"), whose sole member
is Chofetz Chaim Inc.  That assignment (the "TBG Assignment") was recorded in the Office of the
Rockland County Clerk on October 11, 2019.  Shem Olam, as a result, became the holder of the
TBG Claim.

8.   On October 25, 2019, Mosdos, pursuant to the above-cited provisions of the Confirmed
Plan and the Confirmation Order, sold the Property to Congregation Radin Development Inc.

4

("CRD") for a purchase price of $25,700,000.  From that purchase price, $23,700,000 was paid to Shem Olam to discharge the TBG Claim.[1]

## I.     The State Court Action

9.    On November 8, 2019, a few days after Mosdos sold the Property to Radin Development and paid off the TBG debt, Rabbi Mayer Zaks ("Mayer") filed a summons and complaint, purportedly in the name of Mosdos, against Mosdos, TBG and Shem Olam, in the New York Supreme Court, Rockland County, under Index No. 03069/2019 (the "State Court Action"). Although the pleadings are difficult to decipher, it appears that Mayer attempted to assert a claim to "undo" the assignment of the TBG Mortgage from TBG to Shem Olam.  The sole "basis" asserted by Mayer for that relief was the allegation that "on information and belief that Assignment of Mortgage herein noted was effected without the authorization or knowledge of the Plaintiff, the religious corporation Mosdos Chofetz Chaim, Inc."[2]

10.   On November 25, 2019, the Court in the State Court Action issued an order to Show Cause directing Mayer to show cause why, *inter alia*, an Order dismissing the Complaint should not issue.  That Order to Show Cause was made returnable on February 7, 2020.  Less than one month later, on December 5, 2019 (and while the motion to dismiss was pending in the State Court Action), Rabbi Mayer Zaks filed an "emergency" motion in this Court seeking, *inter alia*, an Order "enforcing" the Confirmation Order and holding Rabbi Aryeh Zaks in contempt for allegedly

---

[1]  The $25,700,000 purchase price was clearly the fair market value of the Property, and no one has contested that issue.  Some $15,000,000 of the purchase price was financed through a loan by CRD from Sterling National Bank, which was granted a mortgage in that amount on the Property.

[2]  Rabbi Mayer Zaks (whether individually or on purported behalf of Mosdos) clearly does not have any standing to challenge a mortgage assignment from TBG to Shem Olam, nor is there any requirement that a property owner "authorize" the assignment of a mortgage.

violating the Confirmation order by transferring "the deed to the Debtor's Property … to [CRD] …
without (i) approval of the Debtor's board, (ii) Bankruptcy Court approval under Section 363 of the
Bankruptcy Code as required under the Confirmation Order, or (ii) NYS Attorney General approval,
also as required under the Confirmation Order." [Motion, DE-319, p. 2].[3]  The said "emergency"
motion was "supported" by, among other things, the December 4, 2019 Declaration of Rabbi Mayer
Zaks [DE-319-1].  In that Declaration, Rabbi Mayer Zaks represented that "I could have found
numerous other donors, including a trustee of the Debtor, who would have been willing to step in
and advance the $4.2 million instead of this particular donor – to guarantee the return of the
mortgage to the Debtor."  Thus, on December 5th, Rabbi Mayer Zaks asserted that there some
"Trustee" of Mosdos (obviously other than the original "founding" Mosdos Trustees) who was
willing to "advance" $4.2 million to Mosdos.

## II.  **The Blisko Declaration**

11.  After objections to the contempt motion were filed by Rabbi Aryeh Zaks and numerous
other interested parties – which objections asserted *inter alia* that Mosdos Board of Trustees
approval *was* obtained for the sale of the subject property – Rabbi Mayer Zaks' attorneys filed a
December 16, 2019 Declaration from non-party Mark Blisko [DE-333], wherein Mr. Blisko
represented that "I am a ***board member of the Debtor***, and have been intimately involved in the
Debtor's organization and decision-making process." [See Exhibit 9, Blisko Dec., ¶ 1, emphasis
added].  Mr. Blisko went on to allege that the sale of the Debtor's property "was done without my
knowledge and, to my knowledge, without any ***other member of the board*** of the Debtor's
approval" [Blisko Dec., ¶8, emphasis added].

---

[3] The "emergency" motion also sought extraordinary and unprecedented relief against Henoch
Zaks (Rabbi Areyeh Zaks' son), who is not (and at no time was) a trustee of Mosdos – a freezing
of his bank accounts – despite the fact that Henoch was not a party to the bankruptcy case.

12. That Declaration was bizarre when it was filed because, in a April 6, 2017 deposition in another case that Rabbi Maye Zaks gave, he was specifically asked "are there any other trustees of Mosdos that you can identify right now?  His response was "I am not sure.  You know, Mr. Blisko, I don't think he is on" [Exhibit 21, Tr. 38:23-39:2].  How sworn testimony that Mr. Blisko left the board sometime prior to 2017 translated into the filing of a Declaration that Mr. Blisko was a Board Member in 2020 was, on its face, odd.  Nonetheless, it was understandable that Rabbi Mayer Zaks needed to take the position that there was some Board member who claimed that there was no Board approval for the sale of property that this Court had already approved.  Hence, Rabbi Mayer Zaks' Blisko Story Version #1 from 2017 (that Mr. Blisko was "off the Board"), somehow conveniently morphed into Blisko Story Version #2 in 2020 (that Mr. Blisko was miraculously "on the Board").

13. In any event, it was quite clear that, as of December 16, 2019, that Rabbi Mayer Zaks' position – as advanced in Mr. Blisko's Declaration filed *by Rabbi Mayer Zaks' attorneys*, and the creation of which was participated in by Rabbi Mayer Zaks,[4] -- was that Blisko Story Version 2 (that Mr. Blisko was a member of the Board of Trustees of Mosdos when the sale of Mosdos' property took place) was what he was going with.

14. When the parties subsequently appeared before this Bankruptcy Court on December 17, 2019 for a hearing on Rabbi Mayer Zaks' contempt motion, this Court stated that it "read among other things, the declaration of Mark Lesko [actually meaning Mr. Blisko], dated yesterday, which says that the board changed" [Tr. 10:8-10], and inquired of Plaintiffs' counsel: "are you alleging that the board changed?" [Tr. 10:12-13].  One of Plaintiffs' counsel (Mr. Twersky) then responded:

---

[4] Mayer Zaks' participation in the creation of the Blisko Declaration is discussed in more detail below.

"Mark [Blisko] has asserted in his declaration that he filed with the Court yesterday, [that he] was a member of the board. He was never at the last board meeting." [Tr. 10:18-21].

15. Thus, not only did Plaintiffs file a declaration from Mr. Blisko swearing under oath that he was on the Board of Trustees of Mosdos, but Mr. Twersky specifically confirmed that representation on the record. The Court then, making it clear that the issue of the composition of the Board of Trustees was the key issue to resolution of the motion, stated [Tr. 22:11-21, emphasis added]:

> Well, *given Mr. [Blisko's] declaration*, I think there's clearly a factual issue that I need to get to the bottom of ... Mr. [Blisko] says he was on the board and he would never have approved this transaction or series of transactions on an integrated basis.

16. On January 15, 2020 (while the motion to dismiss in the State Court Action was still pending), Rabbi Mayer Zaks filed an amended complaint in the State Court Action. This time, Rabbi Mayer Zaks included a number of additional plaintiffs and defendants, including Henoch Zaks, and also asserted several other causes of action, among them, ones seeking (i) to set aside the transfer of the Property from Mosdos to Radin (notwithstanding that this Court's prior Confirmation Order specifically authorized a transfer of the Property by Mosdos), and (ii) "reversing" the mortgage given by Radin Development to Sterling Bank (notwithstanding that the proceeds of the Sterling Bank loan were used to pay the TBG Mortgage, which payment was specifically authorized in this Court's Confirmation Order).

17. On February 6, 2020, Mosdos filed a Notice of Removal of the State Court Action to this Court (by way of the District Court) and it was assigned Adversary Proceeding No. 20-08949. On March 6, 2020, Rabbi Mayer Zaks brought an "emergency motion" to this Court for remand of that Adversary Proceeding to the State Court or, alternatively, for the appointment of a receiver for the Property that Mosdos had sold to CRD in September of 2019." On March 15, 2020, Mosdos

8

and Rabbi Aryeh Zaks filed an Objection to remand and/or the appointment of a receiver. In a

March 16, 2020, responsive Declaration by Rabbi Mayer Zaks filed in that Adversary Proceeding,

Rabbi Mayer Zaks slid back into Blisko Story Version #1, taking a diametrically opposed position

to that which he took in his submission of the Blisko Declaration. In that Declaration (Exhibit "10"

annexed hereto), Rabbi Mayer Zaks stated (emphasis added):

> 3.    The founding trustees and members of the board of Mosdos were myself,
> Rabbi Aryeh Zaks, Sima Weintraub, Beatrice Waldman Zaks and Berl Shakovin.
>
> 4.    None of these people ever resigned from the board of Mosdos. However,
> Berl Shakovin has since passed away.
>
> 5.    The board never held a meeting to vote in a replacement for Berl Shakovin
> after he passed away, nor did the board ever vote in a replacement for Berl
> Shakovin.
>
> 6.    Similarly, Mosdos never held a membership meeting to vote in new trustees
> or board members since the initial founding meeting of Mosdos.
>
> 7.    My attorneys have informed me that *the original board members who are
> still alive remain the board members of Mosdos* pursuant to the New York
> Religious Corporation Law and the New York Not-for-Profit Corporation Law.
>
> 8.    Therefore, *the board of Mosdos currently consists of myself, Rabbi Aryeh
> Zaks, Beatrice Waldman Zaks and Sima Weintraub*.

18.    Given what appeared to be the clear conflict between what Rabbi Mayer Zaks asserted

(through the submission of the December 16, 2019 Declaration of Mr. Blisko [that Mr. Blisko was

a Trustee of Mosdos when the Confirmed Plan was submitted]), and the March 6, 2020 Declaration

of Rabbi Mayer Zaks [asserting that the *only* Trustees of Mosdos from day one to day last were

the original "founding" Trustees], the issue of the veracity of the Blisko Declaration (*the very

document upon which this Court relied in directing that an Evidentiary hearing take place*) became

a key issue.

19.    This Court conducted a hearing on that "emergency" motion on March 16, 2020, after

which (by order dated March 26, 2020), this Court denied Rabbi Mayer Zaks' motion for remand

or the appointment of a receiver. However, the Court raised two issue *sua sponte* during the hearing

9

of that motion, *to wit*, (i) whether the corporate governance of the Reorganized Debtor and the identity of the Reorganized Debtor's Board of Trustees on the Confirmation Date and the post-Confirmation Date of the transfer of the Property by the Reorganized Debtor were in compliance with the Plan and Confirmation Order, and (ii) whether the Confirmation Order approved the Reorganized Debtor's post-Confirmation Date transfer of the Property without the requirement of any additional approval under applicable New York law, and, if not, whether such approval was obtained. Specifically, the Court stated (at Tr. 37:2-10) that an evidentiary hearing would take place that:

> will go to the composition of the board on the confirmation date, and whether the board thereafter remained the same and authorized the transfers that are at issue here. And what the parties understood and presented to the Court with regard to whether AG approval was required or consistent with the bankruptcy law, including *In re HHH Choices Health Plan LLC*, 554 B.R. 697 (Bankr. S.D.N.Y. 2016), the bankruptcy judge can approve the matter. And in fact, that is what I did. So, those are the two issues.

20. Because the Court made it clear that whether the composition of the Board of Trustees of Mosdos changed between the Confirmation Date and the Sale date was the key issue, we attempted to obtain discovery on that issue. Consequently, on March 30, 2020, counsel for Defendant Mosdos served, among other things, a demand for production seeking, *inter alia*, "[a]ll documents reflecting or evidencing the composition of the Board of Trustees of Mosdos Chofetz Chaim, Inc. at any time [between January 1, 2003 and the date of the response]." After objecting to the request, Rabbi Mayer Zaks made clear that he was sticking with his March 6, 2020 Declaration, claiming that the Board of Trustees of Mosdos were initially, and remained for all time, the remaining living founding Trustees: Rabbi Mayer Zaks, Sima Weintraub, Rabbi Aryeh Zaks, and Beatrice Waldman, and did ***not*** include Mr. Blisko.

21. Stanley Lane, Esq., Rabbi Mayer Zaks' attorney, confirmed in subsequent telephone conversations, that Rabbi Mayer Zaks' position was that the Board of Trustees *never* changed from its inception in 2003. Again, in subsequent discussions with Rabbi Mayer Zaks' counsel, he confirmed that it was Rabbi Mayer Zaks' position that Mr. Blisko was *never* a trustee of Mosdos, however with a twist, and a new Blisko Story Version #3 emerged: that Mr. Blisko was "mistaken" in believing that he was *ever* a Trustee of Mosdos and in making that representation in his Declaration. So, notwithstanding that this Court relied on the accuracy of the Blisko Certification, submitted *by Rabbi Mayer Zaks* to the Court, to determine that the same created an issue of fact that required an Evidentiary Hearing, Rabbi Mayer Zaks, in March of 2020, took the contrary position – in his Declaration, in discovery responses, and through counsel – that the Board of Trustees of Mosdos, in fact *never changed* from its inception (i.e., consisted of only Rabbis Mayer and Aryeh Zaks, their spouses, and Berl Shakovin [who is now deceased]).[5]

It also became clear that Mr. Blisko was a key witness given that his Declaration asserting that he was a Trustee of Mosdos contradicted Rabbi Mayer Zaks' "new" position that Mr. Blisko was "mistaken" in his belief that he was a Trustee and that the original Trustees of Mosdos remained unchanged since Mosdos' formation to the Confirmation Date. It also became clear that the circumstances surrounding the creation of the Blisko Declaration (i.e., the extent to which Rabbi Mayer Zaks was involved in the preparation of the same) was important because, if Rabbi

---

[5]  It is clear that Rabbi Mayer Zaks *had* to, in retrospect, take the latter position because, if he admitted that the Board of trustees of Mosdos changed (which the documentary evidence and deposition testimony now establishes), then he would have to acknowledge that whatever the manner in which such changes were made, that was the operational norm for conduct of Mosdos' business. But, in order to "support" Rabbi Mayer Zaks' March 2020 position that the Board *never* changed since 2003, he had to "recant" the Blisko Declaration. He did that by taking the position (in his discovery responses and through his counsel) that Mr. Blisko was "mistaken" in his "belief" that he was a Mosdos Trustee.

Mayer Zaks participated in creating or modifying the same, then he knowingly participated in the submission of a false Declaration given his own subsequent Declaration asserting that no one other than the original Trustees were ever Trustees of Mosdos.

22.    Consequently, we served on counsel for Rabbi Mayer Zaks a request for production of documents which included, *inter alia*, a request for "[a]ll documents reflecting any communications between you and/or any of your attorneys, on the one hand, and Mark Blisko and/or any representative of Mark Blisko, on the other hand, regarding ... the Blisko Certification ..." [Production Demand, Exhibit "11", ¶ 26].  In response to that, Rabbi Mayer Zaks made it clear that Mr. Lane's prior advice that it was Rabbi Mayer Zaks' position that Mr. Blisko was "mistaken" about the fact that he was a trustee of Mosdos was, in fact, Rabbi Mayer Zaks' "official" position.  In that regard, in a response to a request to produce materials related to any communications with Mr. Blisko [Exhibit "12", Response # 26, emphasis added], Rabbi Mayer Zaks stated that he would make a search for documents regarding:

> any actions that Mark Blisko may have taken at any time from January 1, 2003 through the present on behalf of, at the direction of, or in concert with, Mosdos' Board, or in the ***mistaken*** *belief that he was taking such actions as a "Trustee" of* ***Mosdos***.

23.    On May 7, 2020, I emailed a letter to Mr. Lane, specifically inquiring about that response.  A copy of the same s annexed hereto and labeled Exhibit "13".  With respect to the Blisko issue, I stated as follows:

> **Response 26.**  This response was in connection with a request for documents that reflect communications concerning the "Blisko Certification."  You first objected to this request on the ground that the term "Blisko Certification" was purportedly not defined.  The Definition portion of the requests contained the following: "The Blisko Declaration" – As used herein, the term 'The Blisko Declaration' shall refer to the December 16, 2019 Declaration of Mark Blisko, submitted on the case of *In re Mosdos Chofetz Chaim, Inc.*, pending in the Bankruptcy Court, Southern District of New York, under Case No. 12-23616." Are you seriously telling me that you did not understand the reference to the "Blisko Certification" to be what was so

defined? That disingenuous position will not, I assure you, be looked at favorably by any Court, especially by Judge Drain. In any event, you represented that your client:

> will make diligent search of whatever documents he has in his personal possession, custody, or control responsive that reflect communications with Mark Blisko (or any representative of Mark Blisko) concerning (a) the composition of Mosdos' Board of Trustees during the period in 2019 when the potential sale of the Mosdos Property to defendant CRD first came under consideration and continuing thereafter; and (b) any actions that Mark Blisko may have taken at any time from January 1, 2003 through the present on behalf of, at the direction of, or in concert with, Mosdos' Board, or in the mistaken belief that he was taking such actions as a "Trustee" of Mosdos.

We expect to receive such documents (or an affirmation from your client indicating that he is not in possession of any of the same) by May 18, 2020. However, the time period you set forth for that production is unacceptable. Your client claims to have been a Board Member since the inception of Mosdos, and his refusal to produce documents relevant to that time period is improper.

We are entitled to receive any and all documents reflecting your office's, any co-counsel's, and/or your client's conversations with Mr. Blisko regarding his Declaration, drafts of the same, e-mails you or your client may have had with Mr. Blisko, etc. Please confirm to me *forthwith* that you will, in addition to the documents you represented would be produced, produce all "documents reflecting any communications between [your client] and/or any of your [client's] attorneys, on the one hand, and Mark Blisko and/or any representative of Mark Blisko, on the other hand, regarding the Blisko" Declaration cited above.

Additionally, please clarify if your statement that Mr. Blisko operated under "the mistaken belief that he was taking such actions as a 'Trustee' of Mosdos" means that your client's position is that Mr. Blisko was never a trustee or member of the board of Mosdos.

24. After Mr. Lane confirmed that that was, in fact, Rabbi Mayer Zaks' position, we engaged in discussions regarding Rabbi Mayer Zaks' production of documents related to his communications with Mr. Blisko. I believed that we had reached an agreement that Rabbi Mayer Zaks would produce any communications between him and Mr. Blisko, however Mr. Lane wanted

to think about his position regarding the production of any communications between Mr. Blisko and any of Rabbi Mayer Zaks's attorneys. I sent Mr. Lane an e-mail seeking to confirm that. In response to that, Mr. Lane sent an e-mail to me on May 19, 2020 [Exhibit "14" annexed hereto], which read, in relevant part, as follows (emphasis added):

> I have **confirmed the absence of documents that evidence communications between my client and Mr. Blisko concerning his Declaration**. It is my understanding that **there simply are no such documents**. To the extent there are documents that evidence communications between counsel acting on behalf of any of the plaintiffs and Mr. Blisko that relate to his Declaration, I am at this point reserving for now my decision concerning Rabbi Mayer's obligation to produce such documents, but can report to you that **the Declaration was not prepared by the plaintiffs or by counsel for the plaintiffs**. I am still investigating the extent, if any, to which counsel for the plaintiffs had any input at all into the final form of the Declaration, other than receiving it for inclusion with the moving papers in support of the emergency motion that was filed last December.

25. Thus, Mr. Lane made two representations of extreme consequence (both of which, as discussed below, later proved to be inaccurate). First, he represented that there were **no documents** showing communications between Mr. Blisko and Rabbi Mayer Zaks. Secondly, he represented that the Blisko Declaration was not prepared by Rabbi Mayer Zaks **or any attorney representing him**.

26. My response to Mr. Lane was by way of an e-mail dated May 27, 2020 (exhibit ", in which I stated:

> I acknowledge your representation that the Blisko "Declaration was not prepared by the plaintiffs or by counsel for the plaintiffs." As hard as that is to believe, it begs the questions, (i) where did they get it from, and (ii) how did it come about? Was Mr. Blisko on his couch watching Tiger King one day and suddenly jumped up and said "eureka, I think I better hire an attorney to prepare an affidavit to help Rabbi Mayer Zaks?" While I understand that you are reserving on the issue of whether you will consent to the production of "documents that evidence communications between counsel acting on behalf of any of the plaintiffs and Mr. Blisko that relate to his Declaration," are you refusing (regardless of where you come out on that) to disclose the circumstances surrounding how counsel (and,

14

specifically, Julie Curley) obtained and came to file the Affidavit [DE-333 in the bankruptcy case] in the first place?

27.  Mr. Lane confirmed that no lawyer representing Rabbi Mayer Zaks prepared the Blisko Declaration by repeating, in his email of May 27, 2020 [Exhibit "16" annexed hereto] that (emphasis added):

> I am still working on gathering all of the facts relating to the preparation and submission of the Blisko Declaration and hope to be able to provide further clarification later today. However, I do note that you have already subpoenaed Mark Blisko who neither we, nor Mr. Twersky, nor Ms. Curley represent and who will no doubt be able to testify concerning who he spoke to about his Declaration and how it came to be prepared. To the extent he had a lawyer that fact and the identity of the lawyer who prepared it would not be privileged (although his conversations with his lawyer about the substance of the Declaration would be). ***What I am told (and have no reason not to believe) is that the Declaration was not prepared by counsel for any of the Plaintiffs.***

28.  The following day, May 27, 2020, I received an e-mail from Mr. Lane which, in relevant part, stated:

> In response to your questions concerning the origins of the Blisko Declaration, what I have been able to confirm is that the original text for the Blisko Declaration was drafted with Mr. Blisko by Ariel Dahan (who I understand is the Assistant District Attorney for Rockland County), and provided by Mr. Dahan to Aaron and Julie on December 15 for use in support of Rabbi Mayer's contempt motion.  Julie converted Mr. Dahan's draft text (word for word) into the form necessary for submission later that evening, and then transmitted that draft in WORD back to Mr. Dahan. Aaron (who received a copy of Julie's email to Mr. Dahan with the WORD version) forwarded the WORD version to Mr. Blisko for signature the next morning. Before Mr. Blisko could sign it however, Mr. Dahan (who had made changes to the draft) circulated back a revised version. Aaron and Blisko then apparently had a conversation about Mr. Dahan's revised draft and Aaron inputted a few additional changes that Mr. Blisko requested (including a typo in the spelling of Mr. Blisko's name) and sent the final version back to Mr. Blisko for signature.
>
> ***Rabbi Zaks did not have copies of any of these emails or drafts in his possession*** and, as such, ***I do not believe that we are under any obligation pursuant to your document demand to Rabbi Mayer to produce them to you.***  Nonetheless, I am providing herewith the copies of these documents that I have managed to obtain from my co-counsel.  I have not Bates stamped the attached copies as I do not consider them to be part of Rabbi Mayer Zaks' document production. ***What I have attached are .pdf copies of all of the emails back***

*and forth concerning the preparation of Mr. Blisko's Declaration that we have been able to retrieve.* (The transmittal from either Mr. Dahan or Mr. Blisko to either Julie or Aaron of the signed Declaration is still being looked for. When and if it is located, it too will be provided). Each .pdf transmittal email has the attached draft (in .pdf as well) attached to it.[6]

29.  After I advised Mr. Lane that I did not agree with his position that his client had no obligation to produce materials regarding the Blisko Declaration, on May 28, 2020 he sent me an e-mail [Exhibit "19" annexed hereto] which read, in relevant part (emphasis added):

> As far as anyone remembers or can tell *there were no other emails exchanged between either our client's lawyers and Mr. Blisko (or Mr. Dahan acting on Mr. Blisko's behalf)* concerning the preparation of the Blisko Declaration. *Our client has no emails as he doesn't use email* and he had no written communications with Mr. Blisko concerning Mr. Blisko's Declaration. *Nor was Rabbi Mayer involved in dictating the substance of Mr. Blisko's Declaration.* Neither Aaron nor Julie are sure how the signed Declaration was returned by Mr. Blisko (or by Mr. Dahan on Mr. Blisko's behalf) and what I assume was the email back to one of them with the signed copy hasn't been located.

> The metadata has not been scrubbed. I was able to access the properties and you should be able to as well. I was pretty sure that what I sent did not go through the office scrubber. I will re-send to you and Kevin shortly using my gmail account which has no scrubber attached.

> I am happy to look at whatever authority you have that would require a litigant to produce in response to a document request *correspondence that his counsel had with third parties on which the litigant was not copied* and/or copies of which the litigant does not have.

30.  Finally, on June 9, 2020, Mr. Lane sent an e-mail to this Court [Exhibit "19" annexed hereto], which was copied to all other lawyers in the case, including Mr. Twersky, which stated, in relevant part:

> Second, it is also not correct that no documents have been produced by Plaintiffs to date. Among the documents that Mr. Levine sought from Rabbi Mayer were

---

[6]  A copy of that email and the attachments thereto are annexed hereto and, collectively, labeled Exhibit "17". Separately broken out and labeled exhibit "18" is one of those annexations – the December 15, 2019 email from Airel Dahan to Ms. Curley, Mr. Twersky "aronyz123@gmail.com and "Shimon Zaks."

documents pertaining to the drafting of the Declaration that Mark Blisko submitted in support of the contempt motion. After making inquiry, I informed Mr. Levine that *while Mr. Blisko's Declaration had been typed in form suitable for submission by Rabbi Mayer's counsel Ms. Curley, the text for the Declaration had actually been provided by another attorney who Mr. Blisko had consulted with and not by any counsel who had appeared for Rabbi Mayer*.

Plaintiffs' counsel did not stand on technicalities and I was able to obtain from Mr. Twersky and Ms. Curley the emails they had received from *the attorney who Mr. Blisko had conferred with*. Consequently, even though we consider those documents to be beyond the proper scope of discovery propounded to Rabbi Mayer (as Mr. Blisko is already under subpoena from Mr. Levine), I produced the original drafts of Mr. Blisko's Declaration (and the correspondence that was exchanged with counsel and Mr. Blisko with respect thereto) to both Mr. Levine and Mr. Nash.

31. The document that was included with the package that Mr. Lane sent to me (and all other counsel) that was of particular interest was the first e-mail transmission from Mr. Dahan to Ms. Curley, Mr. Twersky, "aronyz123@gmail.com" and "Shimon Zaks" [Exhibit 18]. It was sent on December 15, 2019, contained in the body of the same the first draft of the Blisko Declaration, and was prefaced with the following (emphasis added):

Please see the below outline for a proposed Declaration of Mark Blisko. *The Rabbi and I spent the day working on it*.

The rabbi is afraid that his truthfulness and integrity will be called into question by Rabbi Aryeh, as there are numerous allegations that can be allowed in their over 30 year partnership. The rabbi feels that having someone who isn't named Zaks Declare that there were other options besides going the route Rabbi Aryeh went would deflect any false allegations that Rabbi Aryeh might decide to bring.

32. That statement by Mr. Dahan leads to at least two important conclusions. First, it was Rabbi Mayer Zaks' idea to create the Blisko Declaration, *not* Mr. Blisko's, because he (Rabbi Mayer Zaks) was afraid that his "credibility" could come into question if he (Rabbi Mayer Zaks) was the declarant, contrary to prior representations made by Rabbi Mayer Zaks through his

counsel,[7] and, as discussed below, contrary to Rabbi Mayer Zaks' subsequent deposition testimony.

33.  Rabbi Mayer Zaks and Mr. Dahan "spent the whole day" creating (or, as Mr. Dahan said, "working on") the Blisko Declaration.[8] That is contrary to prior representations that were made on behalf of Rabbi Mayer Zaks (see footnote 7 below), as well as subsequent deposition testimony from Rabbi Mayer Zaks and his cohorts (as discussed below).

34.  Third, there appears to be no rational reason why Mr. Dahan's emails would be sent to Rabbi Mayer Zaks' son, Shimon Zaks. If, in fact, Rabbi Mayer Zaks was using that email address to communicate, then that would be contrary to Rabbi Mayer Zaks' prior representations that he does not use email for communication purposes.[9]

_____

[7] As discussed above, Mr. Lane had previously represented that "the Declaration was not prepared by the plaintiffs" [Exhibit 14] and "[n]or was Rabbi Mayer involved in dictating the substance of Mr. Blisko's Declaration" [Exhibit 19].

[8] As can be seen from the e-mail, the same was sent by Mr. Dahan at 9:39 PM, so the "whole day" that he was with Rabbi Mayer Zaks creating and revising the Blisko Declaration was obviously a long one.

[9] Rabbi Mayer Zaks had his attorneys repeatedly claim/represent that he purportedly does not use a smart phone and, consequently, does not send, receive, or communicate through email. In Exhibit 19, for example, Mr. Lane specifically represented that *Our client [Rabbi Mayer Zaks] has no emails as he doesn't use email.*" In other emails with me, he repeated that representation in various forms *ad nauseum*, all to be able to stonewall discovery by claiming that Rabbi Mayer Zaks does not have any electronic documents in his "custody or control." For example, in an e-mail of May 18, 2020 [Exhibit "20" annexed hereto], Mr. Lane specifically "advised" me as follows: "you should be aware that Rabbi Mayer Zaks does not use a computer, is not 'computer savvy', and does not have a smart phone." However, when we started to uncover email communications between Rabbi Mayer Zaks and the Robison Brog law firm, I received a "correction" email from Mr. Lane that "advised" me that "[i]t recently came to my attention that although Rabbi Mayer does not use a computer and does not have a smart phone, Mosdos' bankruptcy counsel Robison, Brog on occasion would communicate with Rabbi Mayer by sending emails ultimately intended for Rabbi Mayer to the email address feag123@yahoo.com. That e-mail address is purportedly owned by Rabbi Mayer Zaks' daughter. And, although Mr. Lane claimed that he "caused to be searched" that e-mail address for responsive documents, he did not

35. In any event, after subpoenas for the deposition testimony of Mr. Blisko and Mr. Dahan were served by Mosdos' counsel, and difficulties arose regarding enforcement of those subpoenas, the parties participated in a discovery conference with the Court on July 21, 2020. During that conference, the Court directed that Mr. Blisko appear for a deposition on a date certain. The Court made clear that, if Mr. Blisko admitted that he was "mistaken" in his belief that he was a Trustee of Mosdos, the matter of the lack of credibility of Rabbi Zaks' submission of Mr. Blisko's Declaration would be all but established.

36. Thus, Rabbi Mayer Zaks and Mr. Blisko were between a rock and a hard place. If Mr. Blisko, at his deposition, supported Rabbi Zaks' Declaration (submitted under penalty of perjury) that the original Trustees of Mosdos always remained the *only* Trustees of Mosdos and that he (Mr. Blisko) was "mistaken" in his sworn Declaration when he said that he was a Trustee, it was likely that the Court would entertain a motion to summarily deny the contempt motion and dismiss the underlying Adversary Complaint. If, on the other hand, Mr. Blisko maintained his assertion that he was a Trustee of Mosdos, then Rabbi Mayer Zaks' representation in his Declaration that the original Trustees of Mosdos were the *only* Trustees of Mosdos that ever existed, would be proven false.

37. As described below, Rabbi Mayer Zaks and Mr. Blisko decided to go with the lesser of two evils – having Mr. Blisko take the position at his deposition that he was, in fact, a Trustee of Mosdos on the date of the Confirmation Order. The question that Rabbi Mayer would have to answer, at that point, was *how* Mr. Blisko became a Trustee if, as Rabbi Mayer intended to assert, only a "members meeting" could elect Trustees.

---

have the "Shimon Zaks" email searched. Thus, if that was an email through which Rabbi Mayer Zaks communicated, and did not search, it would be conclusive evidence of his discovery defaults.

38.    In any event, the depositions of Rabbi Mayer Zaks, Mr. Blisko and Mr. Dahan, obliterated the veracity of Rabbi Mayer Zaks' Declaration and the Blisko Declaration (and destroyed their credibility entirely in the process).    As a starting point, the issue of the creation of the Blisko Declaration was a topic at each of their depositions.    And each of them outright lied about that.

39.    First, Rabbi Mayer Zaks testified as follows:

Tr. 21:15-25:

Q.    The question I was asking is whether you participated in the creation of the Mark Blisko December 16, 2019 declaration, did you?

A.    I don't believe I really participated in any way except just to talk to him.  I didn't participate.

Q.    Did you talk to him during the preparation of that declaration?

A.    I don't think so.  No, no. I don't think so.

Tr. 22:9-21:

Q.    Were you with anybody else during the -- that you talked to during the creation of the declaration?

A.    I don't recall if it was a creation of the declaration because certainly it wasn't -- I don't recall such a situation where it had to do with a creation of anything.

Q.    Just so I'm clear, you weren't sitting with any lawyer as this declaration was being prepared, is that correct?

A.    That's correct. That would be true, yes.

TR 193:11-17:

Q.    Were you ever sitting in a room with Mr. Dahan when any phone call was made to Mr. Blisko?

A.    Phone call was made? I don't even remember.

Q.    Don't remember?

A.      No.

Tr. 232:15-22

Q.      Were you and Ariel Dahan someplace together while you reviewed Mr. Blisko's declaration?

A.      I believe -- I'm not sure. I believe not.

Tr. 233:2-10:

Q.      You don't remember that? You don't remember sitting with Mr. Dahan for hours and hours going over Mr. Blisko's declaration?

A.      Maybe he discussed it with me, could be discussing it. But I certainly was not involved in making any declarations, that's for sure.

Tr. 235:17 -236:3:

Q.      Were you sitting there while he was drafting the declaration?

A.      I don't recall. No, not likely.

Q.      Did you and him spend hours revising the deposition?

A.      No.

Q.      I mean the declaration?

A.      Nah.

Q.      That never happened?

A.      Nah, never.  That's silly.  How can I help him?

Tr. 345:2-10:

Q.      I wanted to circle back again to Mark Blisko and his -- you've seen his declaration, right?

A.      I've -- maybe not. Could be I never see it.

Q.      You never saw Mark Blisko's declaration?

A.      Could be not, no.

Tr. 345:24-346:15:

Q.      Was there ever a situation, on or about the time that Mr. Blisko – Mr. Blisko's declaration's date, which is December 16, 2019, was there ever a time when you sat with Mr. Dahan and went over information, at about that time, regarding Mr. Blisko and his declaration?

A.      Yeah, we spoke about this before.

Q.      I just want to make sure I understand.

A.      What? I don't recall ever – if I ever talked to him it was always about the whole case. It was never specifically about this or that.

Tr. 349:14-350:6:

Q.      Did you and him, on December 16, 2019, did you and him sit in a room and go over what was going to be in Mr. Blisko's declaration, you know, what he should say, what he shouldn't say, any of that?

A.      I certainly did not go over for hours, that's for sure.

Q.      Did you go over for any time?

A.      I talked about -- if I talked to Dahan, it was always about the case. I never remember specifically --

Q.      I'm talking about this specific Blisko --

A.      Nah. I don't think I ever saw it even.

Q.      So tell me how --

A.      I don't think I ever saw it.


Tr.353:10-25:

Q.      Let me show you what's been marked as Deposition Exhibit 19 for identification.

        (Declaration of Mark Blisko marked Deposition Exhibit 19 for identification)

Q.      Do you recognize that, sir?

A.    No.

Q.    You don't recognize it?

A.    No.

Q.    You've never seen that declaration before?

A.    You asked me before. Maybe I did but I don't recognize it. You're asking me -- I certainly didn't spend hours reading it, that's for sure.

40.    What is clear from Rabbi Mayer Zaks' testimony is that he absolutely denied having any participation in the preparation or modification of the Blisko Declaration, claimed that he had not even seen it, denied that he spent hours with Mr. Dahan going over it, and denied that he spoke to Mr. Dahan about the Declaration at all, asserting that he only talked with Mr. Dahan about the "case" in general.

41.    Yet, we know from Mr. Dahan's December 15th, 9:39 PM email [Exhibit 18] that *he and Rabbi Mayer Zaks "spent the day working on" the Blisko Declaration*. That being the case, Rabbi Mayer Zaks' sworn testimony regarding the Blisko Declaration was a demonstrable and absolute falsehood – not only did Rabbi Mayer Zaks spend "the day" working on the draft, he was the one who decided to submit it instead of submitting his own Declaration.[10]

---

[10]    Rabbi Mayer Zaks has now taken the position that the Dahan "smoking gun" email was "inadvertently" produced, and that the same is purportedly not admissible based upon some "attorney-client" privilege that has mysteriously popped up allegedly between Mr. Dahan and Rabbi Mayer Zaks. How Rabbi Mayer Zaks can *possibly* advance that absurd position in view of his attorney's repeated representations that the attorney who drafted the Declaration was *not* Rabbi Mayer Zaks' attorney is beyond comprehension but, sadly, not surprising. If and when Rabbi Mayer Zaks brings that ridiculous claim to the Court, we will deal with it (and issues of waiver and crime-fraud exception) in more detail. As of now, however, the Dahan e-mail makes it *very* clear that Rabbi Mayer Zaks was instrumental in (if not the driving force behind) the Blisko Declaration, and his attorney's prior representations, and Rabbi Mayer Zaks' own recent deposition testimony, are nothing more than his fraudulently attempt to make it appear as if this was some independent creation by an independent witness. Instead, it reeks of fraud from its inception.

42. Mr. Dahan's testimony regarding that subject matter was, to say the least, evasive. He repeatedly refused to answer questions, sometimes claiming "attorney-client" privilege to questions like "who was present" at a particular time, sometimes claiming "work privilege" when asked who he sent documents to. But even in the midst of his painstaking attempts to avoid questions (that were clearly not attorney-client or work product privileged), he sometimes simply claimed to not remember, or outright refused to answer because he claimed that the source of the information leading to the question was "privileged:"

Tr. 149:4-150:3

Q.    Okay. Got it. Do you remember leaving your house that day?

A.    Yes.

        MS. PENACHIO: Objection.

8    Q.      Do you remember going to Rabbi Zaks' house that day? That is Mayer Zaks.

        MS. PENACHIO: Objection.

A.    Yes.

Q.    Okay. So when you got to Mayer Zaks' house, did you and he go over any aspect  of  the Blisco declaration?

A.    I don't recall.

Q.    Excuse me.

A.    I do not recall. I do not believe so, but I don't recall.

Q.    You didn't spend the whole day on December 15, 2019 going over the Blisco declaration with Rabbi Mayer Zaks, did you?

A.    Where is the source of your knowledge of that information?

Q.    I'll take an answer, please.

A.    I believe that your source of your knowledge is privileged information and I'm not going to be answering it.

43.  However, after repeated attempts to get information, Mr. Dahan finally just adopted Rabbi Mayer Zaks' position that the tow of them never "spent the day" creating and/or reviewing the Blisko Declaration:

Tr. 159:11-25:

Q.    Did you ever sit with Rabbi Mayer Zaks all day any time reviewing the Blisco declaration?

A.    Are you referring to the one or two-page Blisco declaration?  Are you asking me if I spent all day reviewing a two-page document?

Q.    No. I'm asking you, did you ever -- I'm talking about this particular document.

A.    Okay. So I did not spend an entire day reviewing a two-page document.  That's ridiculous.

Q.    And did you spend any day working on the document with Rabbi Mayer Zaks?

A.    I did not -- no. That's a mischaracterization. And I believe the source of your information is privileged so I'm not answering it.

Q.    To what extent is it a mischaracterization?

A.    To what extent is it a mischaracterization that I -- I don't know where you're getting this information from.  I believe you are unethically using privileged documents to get it.

Q.    All right.

A.    I don't particularly want to participate in such a deposition. And I'm not -- I just can't answer it. My conversations with Rabbi Mayer Zaks are privileged and I'm not answering them.

Q.    Did you ever spend any day working on an outline for the proposed declaration of Mark Blisco with Rabbi Mayer Zaks?

A.    Are you -- I did not spend -- okay. I did not spend a day, whatever that period of time refers to, for drafting a two-page document.

Q.    Okay. Did you ever spend any --

A.    That's ridiculous.

Q.    -- time together with Rabbi Mayer Zaks working on an outline for a proposed declaration of Mark Blisco?

A.    I did not spend time with Rabbi Mayer Zaks to work on an outline -- no, I did not spend time with him to work on an outline. No.

Q.    Okay. You sure? You're sure, right? You're sure about that?

25

A.     I did not spend time with Rabbi Mayer Zaks -- no. No, I did not. I can't talk about it. It's privileged. But that was -- that did not happen. That's not privileged, so it didn't happened. So I can tell you that. That is not what occurred.

44. As can be seen, Mr. Dahan ultimately jumped into Rabbi Mayer Zaks' camp – denying that he spent any time on the Blisko Declaration with Rabbi Mayer Zaks, notwithstanding his specific statement in his December 15th, 9:39 PM email [Exhibit 18] that he and Rabbi Mayer Zaks *"spent the day working on" the Blisko Declaration*.[11]

45. Finally, although Mr. Dahan attempted to participate in Rabbi Mayer Zaks' cover-up of his participation in the Blisko Declaration, he was, obviously, not aware of (i) Rabbi Mayer Zaks' deposition testimony that he (Rabbi Mayer Zaks) had purportedly *not* seen any drafts of the Blisko Declaration, or (ii) Rabbi Mayer Zaks' attorney's repeated prior representations that Rabbi Mayer Zaks purportedly did not communicate by email.  Mr. Dahan blew those two fantasies wide open with the following testimony:

Tr. 103:18-104:19

Q.     Do you remember any of the people you sent it to?
A.     Hold on.

---

[11] There is no doubt that Rabbi Mayer Zaks and Mr. Dahan realized the devastating nature of Mr. Dahan's December 15th e-mail on the credibility of Rabbi Mayer Zaks' claim that he had nothing to do with, and never saw, the Blisko Declaration.  However, they were between a rock and a hard place.  If Mr. Dahan acknowledged the veracity of his e-mail (that he and Rabbi Zaks spent the day working on the Blisko Declaration), then he was conclusively establishing that Rabbi Mayer Zaks' prior representations through counsel, and Rabbi Mayer Zaks' deposition testimony, denying that involvement would be established to be false.  Instead, they obviously decided to have him, first, try to not answer the questions at all, and, if he had to do so, to falsely testify that he did not "spend the day" with Rabbi Mayer Zaks on the Blisko Declaration, hoping that his smoking gun email would be held to be privileged and never see the light of day.

A.       Okay. So I sent that draft to Aaron Twersky, Julie Curley and I believe it was to Shimon Zaks for his father Rabbi Mayer Zaks. There may have been another person. I don't recall at this time. I would have to check my privilege log.

Q.       Who is Ari Zaks?

A.       The Ari Zaks referred to in my privilege log is Rabbi Mayer's son.

Q.       Okay. So did you send it to Shimon Zaks or Ari Zaks for the purpose of transmitting it to Mayer Zaks?

A.       I did. I do not recall – one second. I do not recall if I sent it to Ari Zaks.

Q.       Okay. All right.

A.       But I think -- I would have to check my privilege log. It's a little bit confusing.

Q.       Okay. Right. We're going to --

A.       I believe I sent it for the purpose of it getting to Rabbi Mayer Zaks.

Q.       So you did want Rabbi Mayer Zaks to look at it, right?

A.       This is his case, it's -- yes.

Tr. 106:13-25:

Q.       I'm asking you, is that the way you communicated with Rabbi Mayer Zaks, by sending e-mails to one of his sons?

A.       And I'm trying to comply -- I'm trying to comply with your questions. I really am.

Q.       Okay.

A.       Yes, I sent -- I sent the e-mail to Shimon Zaks for the direct purpose of getting it to Rabbi Mayer.

Q.       Okay. Did you ever send anything else to Rabbi Mayer Zaks in that manner?

A.       I probably did. I can't recall of the top of my head. If I needed to get an e-mail to Rabbi Mayer Zaks, I would have done it through one of his children.

46.    Mark Blisko himself participated in the charade that Rabbi Mayer Zaks had nothing to do with his (Mr. Blisko's) Declaration.[12]  At his deposition, Mr. Blisko was asked "Did Mayer

---

[12]  Mr. Blisko testified during his deposition as follows regarding his relationship with Rabbi Mayer Zaks and the supposed origins of the Blisko Declaration [Tr. 117:5-15:

Zaks assist in providing information for the [Declaration]?  Despite Mr. Dahan having spent the

day going over the content of the Declaration with Rabbi Mayer Zaks, Mr. Blisko tersely

responded "no." [Exhibit 22, Tr. 104:2-4].[13]  Indeed, despite Mr. Dahan admitting in his deposition

that he sent drafts of the Declaration to Rabbi Mayer Zaks (through his son's email), Mr. Blisko

maintained the façade of non-involvement by Rabbi Mayer Zaks, testifying as follows [Tr. 224:24-

226:5]:

> Q.   Did you believe that it was necessary for any reason for Mayer Zaks to review
> your declaration before it was submitted?
>
> A.   I don't know that he did do that.  I don't recall him reviewing my declaration.
>
> Q.   I'm not asking if he did or didn't.  I'm saying, did you think it was necessary
> for him to do that?
>
> A.   No, I don't think so.
>
> Q.   Okay.
>
> A.   It was my declaration, how I saw things.
>
> Q.   All right.  Can you think of any reason why he would have spent the day with
> Mr. Dahan reviewing --
>
> A.   I don't know that he did spend a day with Mr. Dahan.
>
> Q.   No.  I know.  I know.  I'm saying, can you think of any reason why he may
> have done that?
>
> A.   I don't know.  I can't -- I can't give you a reason why he would do something.

---

A. Was Rabbi Zaks my rabbi?  Yeah.  I mean, he was a friend of mine who's a rabbi.  I mean, you know, I'm very close to him.  My family is very close to him.

Q. And isn't it a fact that because he's your friend and very close to him, he asked you -- he asked you to provide an affidavit for the litigation in the bankruptcy court?  Isn't that really what happened here?

A. No.

[13] Although not entirely relevant to the instant motion, it should be pointed out that Mr. Blisko's Declaration claiming to be a Trustee of Mosdos is independently suspect by virtue of his deposition testimony.  In that regard, he testified that he never attended a board meeting, never received any notice of any board meeting [Tr. 105:18-106:18], and never attended any meetings of the trustees of Mosdos [Tr. 237:25-238:3], formal or informal [Tr. 245:22-246:8].

Q.    Right.    Did you authorize Rabbi Mayer Zaks to see any drafts of your declaration?

A.    I don't recall doing anything like that.

47.    Even their stories about how Mr. Dahan became Mr. Blisko's lawyer was inconsistent as between Rabbi Mayer Zaks and Mr. Blisko.  Rabbi Zaks denied that he arranged for an attorney for Mr. Blisko.  Mr. Blisko, on the contrary, testified that he told Rabbi Mayer Zaks that he (Mr. Blisko) was coming to Rockland County and asked Rabbi Mayer Zaks to have a lawyer there [Exhibit 22, Tr. 214:4-17].  Indeed, he specifically testified as follows [Tr. 215:15-216:5]:

> A.    No, no, no.  I asked Rabbi Zaks to get me an attorney -- to have an attorney there so I can know the legalities of what was going on.  And then I wanted to speak to him what I could do.  Okay.

> Q.    Okay.  But he gave you an attorney that was also his attorney, right?

> A.    That could be.  I didn't know it was his attorney at the time.  I don't even know now that it's his attorney.

> Q.    Well, I agree with you on that.  But you didn't know at the time that he was claiming that Mr. Dahan was his attorney?

> A.    No.

48.    The shifting Blisko Story Versions promulgated by Rabbi |Mayer Zaks, coupled with what now appears to be the perjurious testimony regarding the creation and submission of the Blisko Declaration, casts the entire Blisko matter in a shroud of uncertainty and fraud.  For that reason, an *in limine* Order precluding Rabbi Mayer Zaks from offering *any* evidence or testimony regarding the configuration of the Mosdos Board and/or whether Mr. Blisko was a Trustee as of the date of the Confirmation Order should be entered, and both Mr. Blisko and Mr. Dahan should be precluded from testifying at this trial.

Michael Levine

Duly Affirmed: September 1, 2020