Friday, February 5, 2021


Honorable Robert D. Drain

United States Bankruptcy Court

White Plains, New York


**In re: Mosdos Chofetz Chaim Inc v. Mosdos Chofetz Chaim Inc**


Dear Honorable Judge,

As your Honor is aware, since the Court relieved Otterbourg P.C., I am presently not personally represented by counsel. I am therefore compelled to address the Court *pro-se*. I am vigorously pursuing the retainer of new counsel who I expect to petition the Court for reconsideration of its January 27th order on my behalf. I am requesting that the Court extend the time allowed to file a Motion for Reconsideration for another two weeks from today so that my counsel to be able to competently represent me in this matter. In the interim, and if the Court is not inclined to extend my ability to move the Court for reconsideration beyond 14 days from the issue of its order, I petition the Court for reconsideration based on the following:

The Court should allow for reconsideration for me to put forth additional explosive evidence which has very recently come to light. The transcript (annexed hereto as Exhibit A, see forensic certification of Owen Forensic Services annexed hereto as Exhibit B) is of a recorded conversation between Henoch Zaks (speaker 1), an unknown co-conspirator (speaker 2), and Rabbi Aryeh Zaks (speaker 3).[1] They conclusively prove a reality which the Court has resisted accepting[2]. That is, that the configuration of the Board of Mosdos asserted to in Aryeh's legal pleadings, and the documents provided to verify that, were created by him **AFTER** the purported sale.

The October 25th, 2019 "sale" of the Kiryas Radin property went forward solely based upon a self-serving resolution authorizing Aryeh to act on the Board's behalf. That resolution, (annexed hereto as Exhibit C) dated October 7th, 2019 and signed by Aryeh himself (with notary certification)[3], does

---

[1] This recording was among recordings taken of classes delivered in the Synagogue building.

[2] At the January 14th hearing the Court remarked from the bench [transcript page 37] "You're precluded from saying that they're after-the-fact creations, which frankly is somewhat hard to believe anyway." It is noteworthy that at the September 4th hearing Messrs. Lane and Twersky strenuously argued before the Court that Aryeh was creating documents after-the-fact on a play-by-play basis.

[3] This is interesting because if the alleged September 1st, 2018 minutes of meeting are to be believed, Beatrice Waldman-Zaks (Aryeh's wife) had been elected as corporate secretary and she would have assumedly prepared the

not reflect who the other members of the Board are. Indeed, at the November 25th, 2019 hearing before Judge Thorsen at the Supreme Court of the State of New York, Rockland County, Aryeh and his legal counsel did not challenge my standing as a member of the Board of Mosdos. At the November hearing, and in all of the November pleadings before the State Court, Aryeh did not claim that I was not a member of the Board, nor did he produce the minutes of meeting allegedly authorizing the sale, nor any minutes which would prove that I was not authorized to oppose the "sale". His sole argument was that the "sale" was approved by this Court. As is clear from the conversation I am presenting to the Court, which took place in the beginning of December 2019, the conspirators at that time still assumed they would not be able to get away with claiming that I was not on the Board. Their idea was to claim that Henoch was on the Board of Mosdos too, therefore giving them the majority[4]. This claim, although false, may have carried some weight. Henoch knew that he had signed documents with notary certification, on November 30th, 2018, (assumingly as his father's "right hand") that were publicly filed with the New York State Department of Taxation and

---

resolution, especially given the fact that according to the September 1st, 2019 minutes, she was in attendance at the meeting which the October 7th 2019 resolution memorialized.

[4] The relevant part of the transcript between Henoch and the unknown co-conspirator reads as follows:

> Speaker 1 (Henoch Zaks): Correct so that – so that we have [crosstalk] you know, well, how do we have it, because we, **me**, my father and my mother **are on this board**, **and my uncle**, and we, **us three approved it . He didn't have to be there.**

Later on, a conversation between Aryeh and Henoch ensues:

> Speaker 3 (Rabbi Aryeh Zaks): Nobody will undo the payment, you can't with a bank and mortgage.
> Speaker 1 (Henoch Zaks): He says fraud is – [inaudible] it doesn't matter [inaudible].
> Speaker 3 (Rabbi Aryeh Zaks): The question is what makes it fraud.
> Speaker 1 (Henoch Zaks): Forgery not fraud.
> Speaker 3 (Rabbi Aryeh Zaks): Forgery.
> Speaker 1 (Henoch Zaks): Fraud is voidable, forgery is void.
> Speaker 3 (Rabbi Aryeh Zaks): Okay, it's not forgery, maskim (agreed), shoin (alright).
> Speaker 1 (Henoch Zaks): They'll argue you have a corporate resolution?
> Speaker 3 (Rabbi Aryeh Zaks): I didn't give [inaudible] okay, I said I have a Board, **once you say you are the Board** and I had authorization and we a vote which was me, Mommy, and you, are a **roiv (majority)**, shtay oifn kopf (stand on your head).
> Speaker 1 (Henoch Zaks): That's the fact, you know, **go do something, say we're not**.
> Speaker 3 (Rabbi Aryeh Zaks): Yeah.

Finance where he claimed to be a VP at Mosdos with part-time devotion. These documents are annexed hereto as Exhibit D[5].

It seems, that at a later point (assuming to avoid conflict with the fact that Henoch was the owner of Shem Olam LLC and one of the founding trustees of its parent-entity, Chofetz Chaim Inc, which had on September 19th 2019 taken possession of the 24 million-dollar secured claim against the debtor **BEFORE** the confirmation of the October 2nd 2019 Bankruptcy Order), either their desperation or their audacity grew, and the game-plan changed. On December 15th 2019, Aryeh, in opposition to the Motion of Contempt that my counsel had filed in this Court, produced minutes of a September 1st 2019 Board meeting which approved the "sale" (annexed hereto as exhibit E). These minutes do reflect the purported configuration of the Board of Mosdos at that time.

This was the very first time Aryeh ever alleged that I was no longer on the Board of Mosdos, which he at that point he asserted was configured of himself, his wife, and two of his children (Gittel and Mendel), both of whom lived in Israel, and who were incidentally not on the Board of his newly formed Chofetz Chaim Inc[6]. When the Court at its December 17th hearing pressed Aryeh's counsel when this change had taken place, he claimed it happened one year before.

During discovery Aryeh finally produced new minutes (annexed hereto as exhibit F), this time of a September 1st, 2018 meeting, which told a fresh tale. It is important to note that neither Aryeh nor any deposed witness, including Aryeh's wife Beatrice (listed in the minutes as having been appointed Mosdos' secretary) would explain the circumstance of the preparation of these alleged minutes. The revised game-plan now claimed that the Board was compromised of two additional members of Aryeh's immediate family, his daughter Deborah and son-in-law Eliyahu Layosh[7].

---

[5] Although the Court assessed Henoch's testimony as generally credible, it must be noted, that when asked at deposition whether he had ever represented to any government agency that he was an officer of Mosdos he promptly denied it, (see Henoch deposition transcript annexed hereto as Exhibit L). In contrast to my son Yoseph Tzvi, Henoch was not an angry, terrified teenager who had been libelously framed, testifying. He was a conniving adult knowingly committing perjury. The Court should take this to heart.

[6] Aryeh then explained, that Henoch was the individual who orchestrated the donation of the note to Shem Olam LLC - Chofetz Chaim Inc without Aryeh's knowledge, while Aryeh himself was responsible for the "sale" of the property in order to "pay" Mosdos' debts to Shem Olam LLC - Chofetz Chaim Inc, thereby enriching Shem Olam LLC – Chofetz Chaim Inc (Aryeh, Henoch, Beatrice and Abraham Zaks) to the tune of 15 million dollars (the balance of an additional fictional 11 million dollars, although obvious bank fraud, is largely irrelevant because we choose to deal with the facts of this case not the fiction). Somehow, in their criminal minds, they believed the Court would be satisfied that this did not constitute self-dealing.

[7] Oddly, when pressed by the Court at the December 17th hearing regarding the configuration of the Board, neither Aryeh nor any of his counsel disclosed to the Court that the configuration was different than what the Court assumed Aryeh to be asserting. The Court, based on the documents Aryeh provided was only aware of four members of the Board, Aryeh, Beatrice, Gittel and Mendel, and no one bothered to disclose that, one year before, six members had been elected: the previous four, his daughter Deborah and son-in-law Eliyahu Layosh.

Because the game-plan called for not disclosing the tax-exemption application documents it mattered very little that the September 1st, 2018 minutes would pre-date them. I was not meant to lay my hands on them. Indeed, I only received them through a FOIL request on the eve of the September 4th trial[8].

I ask the Court one simple question. If in fact these minutes of meeting that Aryeh produced later were in existence contemporaneously, why would Aryeh, Henoch, and their co-conspirator try to figure out a way to have the Court approve the "sale" based on a majority vote of a Board consisting of myself, Aryeh, Beatrice and Henoch? It is obvious from their conversation that not only had the documents not been in existence yet, but they had also not even contemplated the facts they later came to verify. This is in early December of 2019, long after the purported "sale" took place and prior to the December 15th opposition pleadings he put forth before this Court.

Additionally, I turn the Court's attention to Aryeh's story (see Aryeh deposition transcript attached hereto as Exhibit G) that his three computers suddenly died, leaving him without the all-important documents that would have proven his version of events. I am told by experts (see Harvey Etter affidavit annexed hereto as Exhibit H) that hard-drives do not die – you either have to bleach-bit them or destroy them physically[9]. There is no chance whatsoever of having three computers "die" in a way that the data they contained cannot be resurrected using superior data restoration solutions[10]. It is far more likely they died by the sword and not by the plague. The only plausible reason for Aryeh to destroy his hard drives would be to destroy the meta-data showing when the documents were created.

I believe this newly found evidence to be grounds for reconsideration of the Court's ruling. The Court stated clearly at the January 14th, 2021 hearing that it frankly did not believe that Aryeh and his

---

Even more odd is the fact that the September 1st, 2018 minutes list all the members of the Board in bold as TRUSTEE. No previous or later document from Mosdos' governance ever describes it's Board that way. There always were corporate offices (i.e., president, secretary, treasurer etc.). The reason for this is because Aryeh recently developed a bizarre legal theory that Mosdos had two distinct Boards, and that the TRUE corporate governance was its Board of Trustees. The 2018 minutes were created after this recent legal theory was adopted by Aryeh and therefore reflect, in bold lettering, its assumption.

[8] At his deposition Aryeh extraordinarily went significantly further with his claim that I was not a member of Mosdos' Board since 2003!

[9] Aryeh, who is somewhat proficient in computer technology, is well-aware of this. When the Yeshiva was being investigated regarding the use of the federal E-Rate program, Aryeh told me that he physically destroyed the computer that had the relevant information, using a hammer, so that no evidence would exist. He explained to me that it was not enough to "break" the computer, he had to remove the hard-drive from the laptop and destroy the hard-drive itself.

[10] This incredulous story on its face should be enough to refute Aryeh's claim that we engaged in "spoliation of evidence". How could I or my son Yoseph Tzvi know that Aryeh's computers would all suddenly "die" therefore availing us the opportunity to destroy the alleged remaining back-ups.

ilk were creating documents after-the-fact. If the Court would have been made aware of these conversations that have now come to light it would have been in a significantly better position to accurately assess the credibility of the spoliation of evidence claim that was central to the motion *in-limine*.

Additionally, I believe the newly-found recordings shed light on the *modus-operandi* of Aryeh and his legal team. The plan for the first cover-up (reconfiguration of the Board) and the second cover-up (sanctions for spoliation of evidence) follows the same plot. At first, the movants spoke only of a CCTV hard-drive that had been taken. The evidence they were seeking, and that had been taken from them, was of CCTV footage of Aryeh coming to the Kiryas Radin synagogue on the night of September 1st, 2018. Later, that hard-drive grew to include documents that would have been beneficial to verify their version of events. Even later, (assumingly realizing the lack of facial credibility of claiming that corporate documents were stored on a CCTV hard-drive) more hard-drives and **hard-copy documents** relating to the corporate governance of Mosdos became part of the claim. Henoch boldly asserted that it was not much of an exaggeration to say that 10,000 documents had gone missing. Henoch went on to claim that they were actively assembling these documents at "the office" to present at trial. This can be denied by anyone who has ever ventured into the basement and was flatly refuted by many witnesses both of whom the Court has accepted their testimony and of whose testimony the Court chose to preclude. More to the point, is the fact that the claim of documents memorializing the corporate governance of Kiryas Radin is an after-the-fact (in this case the wire-cutting) fabrication. Aryeh consistently testified at his deposition that all changes in the Board were done orally and not memorialized in writing, (relevant excerpts of Aryeh's deposition are annexed hereto as Exhibit I). The Court itself in its ruling gave radio-silence to these absurd claims of missing hard-copy documents, which Henoch had elaborated upon in detail at his deposition. Instead, the Court erroneously concluded that hard-drives had been taken[11]

---

[11] The claim asserted that the hard-drives were taken during the first incident of wire-cutting. That incident, according to the testimony of Yoseph Tzvi took place around *Sukkot* 2019 (second and third week of October). As your Honor noted, the facts on the ground (green grass, children playing in clothing appropriate for fall weather, etc.) corroborate his testimony. I therefore must bring to your Honor's attention facts regarding the long-time counsel for the reorganized debtor Mitchell Greene and co-counsel Steven Eichel, who have been our attorneys for almost two decades. The evidence I am putting forth before the Court are a recording and transcripts of a conversation that I had with them (annexed hereto as Exhibit M), on October 28th, 2019. I believe if allowed to present this evidence before the Court, the Court will then be able to properly evaluate whether or not I might have reasonably sought to obtain or destroy evidence regarding the corporate governance of Kiryas Radin in October of 2019. The tapes not only offer a view of my mindset at that time but also of the mindset of Mosdos' own long-time attorneys who stewarded the reorganized debtor through its successful climb out of bankruptcy. I believe the fact that the Court did not have a full record of these facts is one of the reasons it reached its erroneous conclusion. This is one of several recordings that would send shock waves in the court room.

and that they seemingly contained data that may have included evidence regarding the corporate governance of Kiryas Radin[12].

The United States Bankruptcy Court for the Southern District of New York has now joined the long list of victims of the frauds of Aryeh and Henoch Zaks[13]. In furtherance of their fraud, they have chosen to make a mockery of this Court, in a cover-up worse than the crime itself. As the Court is aware, my son Yoseph Tzvi, in a moment of hostility, vandalized the CCTV system at the property. This was a copycat crime. My nephew, Henoch, had made it his business to sever the security system that was utilized at the Highview Road campus. Henoch screamed **"Shabbos"[14]**, Tzvika parroted **"Shabbos"** (see Henoch deposition transcript attached hereto as Exhibit J). Everybody (this side of Hudson River) knows it. Aryeh knows it. His kids know it. The residents of Kiryas Radin (whose testimony the Court precluded) know this. The Yeshiva students who study at Kiryas Radin know it. The teachers and office staff at the Highview Road campus know this. The congregants of the Shul know it. The maintenance personnel know it. And, the One-Above knows it, too.

Meanwhile, in a courtroom across the river, instead of having a celebrated Judge litigate the merits of the illegal transfer of the Kiryas Radin property, my brother and his legal team were satirically having the Court prosecute "spoliation of evidence" which they alleged occurred after the wire-cutting. While people on the street joked about the alleged documents and hard-drives Aryeh claimed to have stored at "his office". Men and women in suits, in a courtroom in White Plains, were seriously debating the proper sanction for their spoliation.

In truth, I too bear a measure of responsibility for this mockery of the Court. Being in complete disbelief of the tactics Aryeh employed to cover-up his theft of community funds, I did not treat the proceedings with the proper respect due process of the law required (see attached letter from

---

[12] Additionally, the Court further speculated and subsequently concluded that the hard-drive was taken by my son Yoseph Tzvi who was acting as my agent. The movants did not provide any evidence to demonstrate the legitimacy of this speculation, other than the speculation that my teenage son would surely ask me before engaging in any such activities. I appreciate the Court' absolute confidence in my son's obedience, in reality, things are significantly less absolute to say the least.

[13] While on the subject, it is worthwhile the Court examine the infamous case of Aryeh's father-in-law, U.S. v Leib Waldman, resulting in Mr. Waldman's conviction and subsequent seven-year federal penitentiary sentence. Many consider it to be a case study of complex fraudulent dealings for personal enrichment. It may shed some light on the origin of the case that is now before your Honor.

[14] *Shraiyen Shabbos* (screaming Sabbath) is the (sometimes misguided) ideal of publicly calling for refrain of prohibited activities on Sabbath.

Michael Levine to Judge Marx attached hereto as Exhibit K)[15]. My children, sensing my lack of seriousness, followed suit with ill-mannered, and offensive conduct in their depositions regarding this matter. This was unbecoming of the proceedings and the Honorable Court they represent. Indeed, it was utterly unbecoming of ourselves. There is no excuse for this. Both on my behalf and theirs I beg the Court's forgiveness for our conduct during the depositions.

In closing, I turn to the Court's repeated words of warning that this matter is better left for out-of-court settlement. The Court's advice is most obviously prudent. For my part, as I previously expressed to your Honor, I sincerely appreciate the Court's going beyond its conventions to address the convoluted issues before it, with great feeling, thoughtfulness, and compassion. I must, however, address the Court's comments that Aryeh and I were very close to settlement. Although dreadfully reluctant to divide the ecclesiastical operations of Chofetz Chaim in Rockland County[16], I realized it may be the lesser of two evils.  With the encouragement of this Court, the honored Rabbis I turned to for guidance, and the members of our community, I accepted this reality and entered into serious settlement talks. I left for last the issue of Aryeh bringing back the 15 million-dollars of community funds he had embezzled. Mistakenly, I believed that If **I** (together with the community), would be able to create terms for the future of our community, Aryeh would come clear regarding the community's rightfully owned funds. In the Court's analogy to divorce, if Aryeh chooses to walk off on the family, it his own prerogative. But he cannot transfer the marital home into his own possession and walk off with all the family's assets.  As the Court stated at the December 17 2019 hearing "obviously I am concerned about where the money went. I'm assuming if the money is in the congregation or in the charity, and the two brothers work it out, that won't be an issue". Unfortunately, I did not heed the advice the Court offered at its September 4th hearing, saying, "frankly it's the first question if I was Mayer Zaks, I'd ask Aryeh when I'm trying to figure out what's going to happen with Kiryas Radin, whether Shem Olam has used the money in a way that is not going to help Kiryas Radin". I thought it best to leave for last. Regrettably, I was

---

[15] During my deposition I did, however, ask Mr. Levine to come and tour the premises of the basement of 18 Kiryas Radin Dr., for him to see for himself the absurdity of the claims he was peddling. Mr. Levine, wanting to be able to continue "selling his lie", refused my offer.

[16] Obviously, the Court's suggestion that we bus the congregants for the Friday night services is not realistic for Sabbath-observers of the Orthodox Jewish faith. Similarly, I do not have confidence that the Court fully appreciated the complexities of dividing our spiritual home. Unlike Aryeh's self-serving proposals, the proposal that was submitted to the court on my behalf ("the red-lined proposal") cared to give the community a seat at the table regarding the future of their rightfully owned House of Worship. Aryeh's insistence that the community be side-lined in these talks shows how deeply he misunderstands the responsibility of custodianship of the public-at-large's resources. To be clear, neither Aryeh (thru a shell-entity called CRDI) nor myself "own" Kiryas Radin or the Highview Road campus. They are "owned" by the community. This self-understood principal, I am given to understand is also the law.

mistaken. As I previously advised the Court, after all this settlement talk, and being "this close to an agreement", the first question still remains unanswered.

I am actively seeking counsel to represent me personally on all the aforementioned points, and the entirety of this matter. Several satisfactory options are being considered and I expect to finalize within two weeks from today. I am abundantly confident that the truth will prevail, and this Court will yet recognize that the many pleadings, baseless foul accusations, and legal arguments put before it for more than a year now, are but a sloppy cover-up of the unconscionable theft of a House of Worship, by Aryeh, who was one the individuals entrusted with its guardianship. I ask of the Court to allow me this short period of time in order to have the counsel review the facts and advise me on the appropriate legal path going forward, and ultimately prevail, by the Grace of the L-ord whose signet is *Emes* (truth), and His name is *Shalom* (peace)[17].

I thank the Court for its time, untiring patience, and steadfast pursuit of justice.

Respectfully,

Rabbi Mayer Zaks

CC: counsel

---

[17] According to Jewish tradition the signet of the L-ord is *Emes* and one of His names is *Shalom.*

# Exhibit A

**Excerpt Transcription**

[Starting at 1:20:46]
Speaker 1: I'm doing well, how are you?
Okay. Umm, first of all, what do you say to our situation?

Speaker 2 [inaudible] Situation. I've been thinking about it and I don't think this necessarily should be litigated in the context of bankruptcy. The way I think about it is [inaudible] the argument is the AG approval is the AG approval… [inaudible] the question is if you have to get AG approval [inaudible]
Speaker 1: what do you mean, instead AG approval of a sale in general
Speaker 2: [inaudible]
Speaker 1: 'is hereby Authorized' [inaudible] language
Okay, [crosstalk]
Speaker 2: [inaudible]
It said a price it had a minimum
Speaker 2: [inaudible]
Speaker 1: Alright
Speaker 2 [inaudible], bankruptcy [inaudible] sale [inaudible] context of bankruptcy [inaudible]
Speaker 1: Okay, that was- that was Mitch's perspective as well
Speaker 2 [inaudible]
Speaker 1: Not at all, not at all. [Crosstalk] If you're saying he's a thief, go to the police. What do you want from me?
Speaker 2 [inaudible] as far as I'm concerned
Speaker 1: So, I'll tell you: I don't have a copy of it, but the Attorney General was asked by the title company, they sent them an email [inaudible] that this bankruptcy order would be enough before they gave title, they had this question
Speaker 2: [inaudible]
Speaker 1: And they did not send me that email, but upon information and belief there's a email existing where the Attorney General acknowledged that they would never challenge this order. Now they don't take a position, their position is they don't take a position at the bankruptcy orders, period. That's their position because the minute they take position, they're getting into very messy waters.
So, but they said they wouldn't challenge it. They wouldn't take no position.
Speaker 2: [inaudible]
Speaker 1: So an AG approval issue we don't have, and worst case-scenario, we can go for a [inaudible] approval and any court would grant it because it's the best thing for Mosdos. So, okay, so you'd want to litigate this in state court?
Speaker 2: [inaudible]
Speaker 1: And it doesn't- and you- you're saying this case doesn't violate the stay.
Speaker 2: [inaudible]
Speaker 1: The way we consummated this plan was with the option to sell. Part of the plan is we have two options, basically two options: one is continue making payments, or sell the property if you can't make payments. That's part of consummating the plan, the sale of the property. Mosdos had no way to continue making payments, they had no ability it was defunct, it has no assets, no cash.
Speaker 2 [inaudible]

Speaker 1: Correct, so that- so that we have, [crosstalk] you know, well, well, one could argue- well, how do we have it, because we, me, my father and my mother are on this board, and my uncle and we, us three approved it. he didn't have to be there.

Speaker 2: [inaudible]

Speaker 1: So I'll tell you what his argument will be on the- this statement. First of all, he's gonna maybe pull out papers- he'll create documents. He doesn't have problem, that there was a different board. Now what? It's conflicting facts. So then we go on to say ecclesiastical leadership. Again, this is a- this is a question which is I think in bankruptcy, you know, and- [crosstalk] I see you don't agree with me.

Speaker 2: [inaudible]

Speaker 1: And you don't- and you don't think of this bankruptcy plan that to sell the property,

Speaker 2: [inaudible] dispute [inaudible] jurisdiction [inaudible]

Speaker 1: But he ordered a sale. Part of his order is a sale.

Speaker 2: [inaudible]

Speaker 1: But if- but if the seller- if you're saying the sale is invalid then part of the plan was not consummated.

Speaker 2: [inaudible]

Speaker 1 Either- either- [crosstalk] either you have to pay, [crosstalk] which is something that we can't do. So now what?

Speaker 2: [inaudible]

Speaker 1: Right, so that's under the bankruptcy order.

Speaker 2: [inaudible] selling it for a million dollars or selling it for a hundred million dollars [inaudible]

Speaker 1: I hear

Speaker 2: [inaudible]

Speaker 1: I hear

Speaker 2: [inaudible] police involved [inaudible]

Speaker 1: And- and- and you don't think he would- he would say, you know, this is, you know, part of my order and at the end of the day it's part of the plan and I authorized this sale, and- and- and it goes into Section 6.1 of the plan and you don't agree with that.

Speaker 2: [inaudible] argument [inaudible]

Speaker 1: Um, I hear

Speaker 2: [inaudible]

Speaker 1: I just-

Speaker 2: [inaudible] you guys [inaudible]

Speaker 1: So- so I'll tell you, I'll tell you why, you see, now I'm kicking myself in the pants, because I am an idiot. Why did I structure it like this? Because I saved two hundred and sixty thousand dollars on trustees' fees and I'm an idiot I should have paid it and made a straight sale. I am an idiot. That's all this was I saved two hundred and sixty grand, and it's gonna end up costing me a lot more.

Speaker 2: [inaudible]

Speaker 1: On transfer tax and [inaudible] I don't have to pay trustees' fees As the bankruptcy plan had in it the two options, the trustee- the trustee did not ask for us to give that money. So, I'm an idiot.

I did not see that part. [inaudible] That's my one blunder. Okay. Now the question is, you know, I think fighting this in st- you don't think it's beneficial for us to fight this in front of Drain? If he would- if he would agree to hear this.

Speaker 2: [inaudible]

Speaker 1: You know, if they file a motion. I bel- I'm- I am positive that today or tomorrow they will file a motion in front of the judge. And when they do, then they subject themselves- they submit themselves to jurisdiction, that's clear right? Now- now, I don't know how that works that you can be in two courts at once,

Speaker 2: [inaudible]

Speaker 1: so essentially there be- there are two courts at once

Speaker 2: [inaudible]

Speaker 1: Right. I am afraid of state court much more than I am afraid of Drain, I think Drain, because, whatever happens, he's not gonna say, even if this sale gets undone or whatever happens, he's not gonna say that, you know, the twenty-four million dollars that was paid off, you know, okay, Mosdos got a present, no one- you know, in state court you never know what can happen, in front of-

I- I just have a hypothetical feeling, you just- I am beating myself up because I'm not sure if I'm right. Um, I'd go and I sell Mr. Forenstein's house. I don't own it, I have nothing to do with it, I sell your house to a third party. He pays real money [crosstalk] mortgage on your house, he paid up your mortgage as part of the purchase. What happens when you go to court and the court undoes the sale, what happens to [crosstalk] that mortgage? That mortgage was paid off.

Speaker 2: [inaudible]

Speaker 1: That mortgage was paid off. So did you get a benefit from the buyer paying off the mortgage?

Speaker 2: [inaudible]

Speaker 3: or does he get the mortgage now?

Speaker 2: [inaudible] argument [inaudible] entire transaction [inaudible]

Speaker 1: Okay, so now the bank has to pay you back?

Speaker 2: [inaudible]

Speaker 1: Okay, [inaudible] if I didn't; if it was on an LLC and I signed on behalf of the LLC, [crosstalk] I didn't forge your name

Speaker 2: [inaudible]

Speaker 1: Right, so that's not what we [inaudible]

Speaker 3: So, what happens?

Speaker 1: What happens- [crosstalk] Does the- does the original owner, the real owner, does he get a benefit because the buyer paid off his debt?

Speaker 3: Or does the buyer-

Speaker 1: Or does the buyer become- stand in the shoes of the original bank?

Speaker 2: [inaudible]

Speaker 3: or does he pay the bank for the loan?

Speaker 1: No, no- the buyer didn't commit the fraud, the buyer is the third party here. He's innocently buying a house.

Speaker 3: [inaudible] paying off a mortgage

Speaker 1: I am the seller, there is a buyer, the buyer bought it with clean hands.

Speaker 2: [inaudible]

Speaker 1: And what happens if- okay, what happens if it's a bona fide purchaser for value? That's what this is. Our sale is a bona fide purchaser for value, 25.7 million dollars, unrelated

Speaker 2: [inaudible]

Speaker 1: Right, ours is voidable, it's not void. Right, that's for sure,

Speaker 2: [inaudible]

Speaker 1: Okay, and now,

Speaker 3: So who has the debt?

Speaker 2: [inaudible]

Speaker 3: it puts back the 24 million dollar debt?

Speaker 1: Why not?

Speaker 2: [inaudible]

Speaker 1: Radin Development incorporated, does not have-

Speaker 2: [inaudible]

Speaker 1: It's not- it's not. Radin Development Incorporated, is wholly owned by other people, there's not one Zaks on that incorporation. No one related to me or anyone that is me.

Speaker 2: [inaudible]

Speaker 1: What?

Speaker 2: [inaudible]

Speaker 1: They do not

Speaker 2: [inaudible]

Speaker 1: You know, they know we were in bankruptcy, everyone knows we were in bankruptcy, [crosstalk] they know we are in debt,

Speaker 3: They saw the plan

Speaker 1: They saw the plan, they got a copy of the plan, and they know, you know, they don't know about this- about all these complaints, they have no idea; if they knew, they would have a panic attack. They are serious bona fide purchasers.

Speaker 3: [whispers]

Speaker 1: There is a guy by the name of Mr. Markowitz who signed a personal guarantee on the mortgage here,

Speaker 3: fifteen million dollars

Speaker 1: He's on the board, and he signed a fifteen million dollar personal guarantee. He- he- he doesn't have in his mind, for a second does he think that there's a chance that this purchase is not a good purchase. So that's a bona fide purchaser. So you're saying it will- it will not be able to be undone

Speaker 2: [inaudible]

Speaker 1: Okay, so then uh, then so then- then, again, would this be best to be done in front of Judge Drain?

Speaker 2: [inaudible]

Speaker 3: [inaudible]

Speaker 1: Even though it's in furtherance of the plan, what we did

Speaker 2: [inaudible] furtherance of the plan [inaudible]

Speaker 1: Okay, but- over here everyone was paid, um

Speaker 3: According to the plan

Speaker 2: [inaudible]

Speaker 1: It's another, uh Steve Eichel just told me that he setting up the last few checks today. Should I tell him not to?

Speaker 2: [inaudible]

Speaker 1: That would be a violation of the plan, wow

Speaker 2: [inaudible]

Speaker 1: Okay

Speaker 2: [inaudible]

Speaker 1: Right. That was my thinking, but I hear the other side, I hear the argument [crosstalk] um, now [crosstalk]

Speaker 1: Is she [inaudible] attorney?

Speaker 2: [inaudible]

Speaker 1: Even if we both come and say 'Judge, make a decision'?

Speaker 2: [inaudible]

Speaker 1: Okay, now- now the real question is, you know, you're the attorney for [inaudible] who really [crosstalk] I don't see how anyone has standing to challenge the assignment, do you?

Speaker 2: [inaudible]

Speaker 1: Okay, so that's- yes

Speaker 2: [inaudible]

Speaker 1: And who would have standing to challenge that?

Speaker 2: [inaudible] the argument is [inaudible] based on the fact that [inaudible] he was a beneficiary of [inaudible] bankruptcy [inaudible] initiate [inaudible]

Speaker 1: And- and, and that would give him rights to who TBG decides to give a debt to?

Speaker 2: [inaudible]

[crosstalk]

Speaker 1: Perfect. So that's not something I have to be worried about. Now, we have a buyer who is a bona fide purchaser, who, I guess, we need someone to represent them

Speaker 2: [inaudible]

Speaker 1: They do, [inaudible]

Speaker 2: [inaudible]

Speaker 1: They haven't been sued. They haven't been named a party in any lawsuit.

Speaker 2: [inaudible]

[crosstalk]

Speaker 1: And we keep it that way for now

Speaker 2: [inaudible]

Speaker 1: Okay. What makes something not a bona fide purchase?

Speaker 2: [inaudible]

[crosstalk]

Speaker 3: religious corporations [inaudible] there is no ownership, they are a religious corporation

Speaker 1: And- okay, got it. And, you know, a religious corporation that doesn't have ownership, it could have that was well

Speaker 1 [whispering]: okay, it's still interesting

Speaker 1: Okay, um, now for my father, my father is being accused, and you- you suggested Kevin Ash, we used Kevin on- on a few things

Speaker 3: Closings

Speaker 1: Like closings, and whatever, I never-

Speaker 2: [inaudible]

Speaker 1: I know [inaudible] I asked Mitch for a lawyer, he sent me to Kevin

Speaker 2: [inaudible]

Speaker 1: So you would- so you would prefer that we hire Kevin

Speaker 2: [inaudible] would be good, he talked about [inaudible] the other day [inaudible]

Speaker 1: Okay, and the guy named David Joraslewich is not the right type for this

Speaker 2: [inaudible]

Speaker 1: Joraslowitz

Speaker 2: [inaudible]

Speaker 1: You don't know?  Okay.

Speaker 2: [inaudible]

Speaker 1: And to bring in a federal- a former federal judge, that's too- that looks like we're in a bad position, what?

Speaker 2: [inaudible]

Speaker 1: Too little overkill, okay. [inaudible] But my father is saying- he is being accused of fraud, and theft, and he's allowed to come [inaudible] with guns blazing, that, you know,

Speaker 2: [inaudible]

Speaker 1: Do you think- do you think- you wouldn't suggest that we take a former federal judge?

Speaker 2: [inaudible]

Speaker 1: [laughter]

Speaker 2: [inaudible]

Speaker 1: No, we've seen, you know, we had Judge Wolofsky, I dunno if you know judge Wolofsky

Speaker 2: [inaudible]

Speaker 1: So he- he's amazing, and- and you see the way that the judges respect him, he walks into a court room and it doesn't matter what court room it is.

Speaker 2 [inaudible]

Speaker 1: You know, it makes me, you know, sometimes it adds flavor, but you're right, who says he's a good lawyer? I don't know. Maybe he's not

Speaker 3: [whispers] come on

Speaker 2: [inaudible]

Speaker 1: So you're saying I should go with Kevin

Speaker 2: [inaudible] I think Kevin [inaudible]

Speaker 1: I think the nuts and bolts kind of guy I have is Mr. Forenstein

Speaker 2: [inaudible]

Speaker 1: [inaudible] and so- okay, I'll hire Kevin, I'm gonna call Kevin up. Okay. And we'll wait- we'll get a motion from them, I'm pretty positive.

Speaker 2: [inaudible] motion [inaudible] Mitch [inaudible] jurisdiction

Speaker 1: Yeah, okay, and you know what we say, what's- what's- again, maybe I don't know, maybe I'm wrong, but what's our worst case-scenario?

Speaker 2: [inaudible]

Speaker 1: And then what?

Speaker 2: [inaudible]

Speaker 1: And then what? There's a person who paid 25.7 million dollars. What happens to his money?

Speaker 2: [inaudible]

Speaker 1: right, but their- the title company is gonna say 'Hey, you got a benefit of 24 million dollars on a debt that was paid off, we should stand at least in the shoes of-'

Speaker 3: [Whispers]

Speaker 1: And that would usually work.

Speaker 3: [whispers] claims department [inaudible]

Speaker 2: [inaudible]

Speaker 1: It's really not, and the judge- and the judge knows us well, [inaudible] I speak to judge Drain every time I'm in his courtroom. Every single time he asks me questions, we talk. And he knows that we do- he asked me last time about the TBG RADIN claim, he's like 'is it yours?' This was before it was transferred. I said 'No.' He said, 'It's friendly or it's yours?' I said 'It is very friendly, but it's not mine.' He said 'good.' You know, he's-

Speaker 2: [inaudible]

Speaker 1: Okay

Speaker 2: [inaudible]

Speaker 1: Okay.

Speaker 2: [inaudible]

Speaker 1: No problem, I'll talk to you, bye bye [1:44:07]

Speaker 3: Who was that?

Speaker 1: Rottenberg

[inaudible]

Speaker 3: What did he say?

Speaker 1: I want the transcripts

Speaker 3: [inaudible] cash for it, he wants a copy [inaudible]

Speaker 1: Who told you?

Speaker 3: He sent me an email

Speaker 1: What transcripts do I want?

Speaker 3: [inaudible] transcripts [inaudible] Zaks

[inaudible] [crosstalk]

Speaker 3: [inaudible] what they attached [inaudible] a list of what members [inaudible]

[silence]

[inaudible whispers, crosstalk]

Speaker 3: Nobody will undo the payment, you can't with a bank and a mortgage

Speaker 1: He says fraud is- [inaudible] it doesn't matter [inaudible]

Speaker 3: The question is what make it fraud

Speaker 1: Forgery not fraud,

Speaker 3: Forgery

Speaker 1: Fraud is voidable, forgery is void

Speaker 3: Okay, it's not forgery, *maskim,*[1] *shoin*[2]

Speaker 1: They'll argue you have a corporate resolution

Speaker 3: I didn't give [inaudible] okay, I said I have a board, once you say you are the board and I had authorization and we had a vote which was me, mommy and you, are a *roiv,*[3] *shtay oifn kop*[4]

---

[1] Translation: Agreed
[2] Translation: Alright
[3] Translation: Majority
[4] Translation: Stand on the head

Speaker 1: That's the fact, you know, go do something, say we're not.

Speaker 3: Yeah

Speaker 1: Who's going to decide that?

Speaker 3: Nobody, that's the problem

Speaker 1: He's going to come with his own

Speaker 3: [inaudible]

Speaker 1: -piece of paper a corporate resolution from, I don't now what

Speaker 3: He made a new one

Speaker 1: Fine

Speaker 3: So who are the people, let's see who he's bringing, his wife and his kids, just like I am bringing, thank you.

Speaker 1: Now what?

Speaker 3: Now what?

Speaker 1: You're going to pull out, he's going to say that he is president

Speaker 3: [inaudible]

Speaker 1: You are going to pull out a piece of paper that he signed that you're president [crosstalk] and you'll say 'Excuse me, sir. Look at this'-

Speaker 3: A new president for Mosdos

Speaker 1: -I'm president, you used to be, but now I am,'

Speaker 3: That's where- that's where he is gonna get stuck, I'm telling you [inaudible]

Speaker 1: Because when are, he's gonna bring a fake piece of paper [crosstalk] with a corporate resolution [inaudible] Blisko [inaudible]

Speaker 3: No, Blisko will not want to be part of it

Speaker 1: He will

Speaker 3: He will not. Blisko will not let himself ever be brought down to a deposition to be asked if he was ever the whole time- if he was since 2005, if he ever went to a meeting or had a *shaychus* [inaudible] never, it's not happening. There was nothing that was ever done for Mosdos in the past 10 years, that's the point, what Mosdos, what did he have with Mosdos? Nothing. [inaudible] he wasn't an insider. Where is his money? I need it, [inaudible] big difference

Speaker 1: He's getting now a twenty-one and a half thousand dollars

Speaker 3: That's nothing, he has-

Speaker 1: Why is it nothing?

Speaker 3: Because I need the rest [inaudible]

Speaker 1: I don't have it! [inaudible] what do you want from me?

Speaker 3: What did they answer?

Speaker 1: They're- they're doing research, what do you want? Do you want to deal with them? [inaudible]

Speaker 3: No, I want you to pressure them, that's all

Speaker 1: [inaudible]

Speaker 3: [inaudible]

Speaker 1: [inaudible]

Speaker 3: So we'll talk [inaudible]

[inaudible]

Speaker 3: Do we tell [inaudible] we have somebody [inaudible]

Speaker 1: [inaudible]

Speaker 3: [inaudible] says he's [inaudible] okay

Speaker 1: He's not a nut-and-bolts guy, but [inaudible] my problem with [inaudible]

Speaker 3: Yeah

Speaker 1: Better than everyone, [inaudible]

Speaker 3: [inaudible]

Speaker 1: [inaudible] it's not really what you need [inaudible]

Speaker 3: Yeah

Speaker 1: You need a [inaudible], you need these criminals

Speaker 3: Yeah, yeah

Speaker 1: Criminals, thieves, you know, whatever, you need that [inaudible] bona fide purchasers

Speaker 3: Yeah, he is

Speaker 1: [inaudible] he says they're not bona fides if they knew anything was going on

Speaker 3: Between us?

Speaker 1: Meaning, with the problem

Speaker 3: No, how are they [inaudible] to know? [inaudible] position, then what?

Speaker 1: Did you know?

Speaker 3: About what?

[crosstalk]

Speaker 3: Afterwards

Speaker 1: [inaudible] to explain

Speaker 3: I have to send them my letter. You have my letter on your phone?

Speaker 1: [inaudible]

Speaker 3: Just attach it to the [inaudible] he's gonna [inaudible] mad

Speaker 1: [inaudible]

Speaker 3: he has to see the judge [inaudible]

Speaker 1: [inaudible] he says the [inaudible] take the case

Speaker 3: He said he will?

Speaker 1: He didn't, he said [inaudible]

Speaker 3: What did he say? [inaudible]

Speaker 1: [inaudible] and go to the police, is that it has nothing to do with my client, he says the argument to be made, and Drain is going to make this argument, they won't, we will. Drain will.

Speaker 3: [inaudible]

Speaker 1: The argument [inaudible] the plan was consummated, the plans call for [inaudible] sales in the future. Or options of sales. That is not the heart-

Speaker 3: the core

Speaker 1: -consummation of the plan. The plan was consummated. I'm out.

Speaker 3: Yeah

Speaker 1: Any other problems, there's [inaudible]. You know, you sold the property on authority. Could be it's a problem, because the terms of sale weren't- weren't in this [crosstalk]

[Ends at 1:50:46]



**LANGUAGE & RESEARCH, INC.**

Telephone: 718-362-0726 •    Email: PGLRTranslations@gmail.com

## CERTIFICATE OF ACCURACY

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF NEW YORK )

Penina R. Gold, being duly sworn, deposes and says:

1. I am not a party to this action.

2. I am of full age and reside in the County, City and State of New York.

3. I am an experienced translator and transcriber. I have transcribed various recordings in various settings for several years. I have translated various court and legal documents for a number of years.

4. I am fluent in the English, Hebrew and Yiddish languages, and I am fully competent to translate from Yiddish and Hebrew to English. I am a qualified Hebrew Language Interpreter for the New York State Unified Court System.

5. I listened to the audio recording, entitled *Aryeh zev and Chanoch Henich*, I have made the attached excerpt transcription of said audio recording, and I hereby certify that the excerpt transcription is a true and accurate reproduction of what has been said in the audio recording to the best of my knowledge, ability, and belief.

6. I have made the attached translation of words in the attached excerpt transcription in the Yiddish and Hebrew languages into English, and I hereby certify that the same is a true and complete translation to the best of my knowledge, ability, and belief.

Penina R. Gold
P.G. Language & Research, Inc.

Sworn before me this
20th day of January, 2021

Notary Public

DAVID M. KATZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02KA6175556
Qualified in Rockland County
My Commission Expires October 15, 2023

# Exhibit B

# MOSDOS CHOFETZ CHAIM

February 5, 2021

Prepared by : Jennifer E. Owen

# Owen Forensic Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

February 5, 2021

Mosdos Chofetz Chaim Inc.
14 Cloverdale Lane
Monsey, New York
mosdoscc@gmail.com

RE: Voice Analysis Comparison

My name is Jennifer Owen and I am the President of Owen Forensic Services, LLC. I have a Master's Degree in Criminology and have attended training and continuing education for over 25 years in the areas of audio and video analysis. My Curriculum vitae is attached and can also be found online at www.owenforensicservices.com . My area of expertise is audio clarification and authenticity, video clarification and authenticity, imaging forensics, clarification and authenticity, voice comparison analysis, and speaker recognition. In this capacity, my work involves the scientific examination, comparison and evaluation and clarification of recorded evidence, which includes audio. I have been admitted as an expert in New Jersey, New York, Georgia, Utah, and Florida several times in audio clarification and authentication, video clarification and authentication, image analysis and authentication.

**Scope of Work:** Owen Forensic Services was retained by Mosdos Chofetz Chaim, Inc. on February 3, 2021 to determine if the speakers on the recordings provided match the speakers on another recording also provided by Mosdos Chofetz Chaim, Inc.

**Statement of Duty**: "I understand that my duty as an expert witness is to assist the court by providing impartial, objective, unbiased and independent opinions uninfluenced by the party who has retained me or called me as a witness."

# Owen Forensic Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

**Evidence Received:**



Aryeh Zaks
deposition
8-14-20.MP4



Aryeh zev and
Chanoch
Henich.wav



GMT20200930-16
3347_Mosdos-et-
_gallery_1920x10
80.mp4

Dropbox Links provided by Mosdos Chofetz Chaim, Inc.

The known files of both speakers identify themselves and are visually visible in the Aryeh Zaks deposition. These are the "known" samples.

Henoch Zaks deposition

https://www.dropbox.com/sh/h1o7l3tnijgou3h/AAAWRTQYFZz9hYD9Vt0ejrGka?dl=0

Aryeh Zaks deposition 8/14/20 MP4

https://www.dropbox.com/s/81js6jo44o4e749/Aryeh%20Zaks%20deposition%208-14-20.MP4?dl=0

Telephone conversation with both speakers 1 and 2 on the phone with a third speaker who is not a subject of interest. The voices of Speaker 1 and 2 were compared to the knowns of Henoch and Aryeh Zaks.

https://www.dropbox.com/s/nz5qp1hvli17qrc/Aryeh%20zev%20and%20Chanoch%20Henich.wav?dl=0

**Software Used:**

Hash Calc

Easy Voice Biometrics/Multi Speech

Media info



**Owen Forensic**
Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

File Verification and Documentation:

A Hash Value, Hash Calc, (also called as Hashes or Checksum) is a string value (of specific length), which is the result of calculation of a Hashing Algorithm. Hash Values have different uses. One of the main uses of Hash Values is to determine the Integrity of any Data (which can be a file, folder, email, attachments, downloads). The most wonderful character of Hash Values is that they are highly unique. No two data can theoretically have same Hash Value.



**732.574.9672**
www.owenforensicservices.com



P. O. BOX 189 • COLONIA, NEW JERSEY 07067





**Owen Forensic**
Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

732.574.9672
www.owenforensicservices.com

**Owen Forensic**
Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

## VOICE IDENTIFICATION OVERVIEW

Voice/speaker identification/comparison is defined as: "A combination of both aural (listening) and instrumental comparison of one or more known voices with an unknown voice for the purpose of identification or elimination." It is founded on the principles that each voice is individually characteristic enough to distinguish it from others through scientific analysis.

The factors in determining voice uniqueness lie in the size and configuration of the vocal cavities such as the throat, nasal and oral cavities, and the shape, length and tension of the individual's vocal cords. A second factor in determining voice uniqueness lies in the manner in which the articulator muscles (lips and tongue) are manipulated during speech.

For 40-50 years, the accepted method of voice identification analysis was the aural (listening)/spectrographic (instrument) method. This aural/spectrographic method used the audio for listening and aural comparison, and the sound spectrograms to visually compare the known voice with the unknown voice. Spectrographs of speech had come to be known as "voiceprints" in lay terms. Human speech is seen on the spectrograph as formants, which are bands of acoustical energy at certain frequencies in a person's voice.

Voice Identification was first admitted in court in 1967 and was affirmed on appeal. For well over forty years, aural/spectrographic analysis was the accepted method of voice/speaker comparison.

Voice ID Criteria
Aural Cues

1. Perceived pitch (eg: voice sounds high or low)
2. Quality (eg: street talk vs. educated speech)
3. Rate (how fast or slow a person speaks)
4. Mannerisms (eg: Someone who speaks fast and then slows down at the end of a sentence, "Sopranos" guys who end every sentence with "forget-about-it".)
5. Amplitude (how loud someone speaks)
6. Pathologies (eg: a harelip, a lisp or a stutter)
7. Breath patterns
8. Dialect/accent
9. Syllable coupling (the way we put the words together when we speak)

# Owen Forensic Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

Voice ID Criteria
Visual Cues

1. Bandwidth
2. Mean frequency (vibrations of the vocal cords per second-- average male has a mean frequency 130 cycles per second, average female is 150-160)
3. Trajectory of formants (on a spectrogram the formants are shapes that represent the vocal energy of the words that we are speaking, and our voices)
4. Inter formant information/ intra formant.
5. Fricatives ("ch" sounds)
6. Plosives ("p" sounds)
7. Gaps (refers to syllable couplings, how we put words together when we speak)
8. Consonants (have a distinctive look and shape on a spectrogram)
9. Transitions between consonants and vowels
10. Transition between words
11. Rate (average # of words spoken per minute)
12. Pitch
13. Distribution
14. Nasal patterns distribution
15. Evidence of pathology, i.e. nasality, lisp, etc.
16. Relative intensity
17. Other spectral data

## BIOMETRICS

Biometrics is used for identification of humans based on their unique characteristics. This includes DNA testing, fingerprints, facial recognition, palm prints, iris recognition, and the human voice/speech which is used in voice/speaker identification/comparison analysis.

To conduct voice biometrics, a sample of as little as 16 seconds of pure speech from a known voice and an unknown voice is necessary. Multiple voices can be compared in a single analysis. Biometric voice/speaker identification/comparison is currently being used by federal, state and local law enforcement agencies, as well as by forensic laboratories. Unlike aural/spectrographic, a verbatim exemplar is no longer necessary. A reliable comparison result can be gained using random speech samples.



**Owen Forensic**
Services, LLC

P. O. BOX 189 • COLONIA, NEW JERSEY 07067

For the purpose of calibration, I ran a comparison of the known voice of Chanoch Zaks to the known voice recording against itself. This test produced an absolute match. The software is working correctly.

| Method | FR [min.maxl. %] | FA [min.maxl. %] | EER. % | P [min.maxl. %] | P≠ [min.maxl. %] | LR [min.maxl] | DET |
|--------|---------|---------|------|---------|---------|------|-----|
| ☑ SF | 99.9 **[99.7**, 99.99] | 0.0 [0.0_ **0.0** ] | 13.8% | 99.96 **[99.9**, 100.0] | 0.04 [0.0_ **0.1** ] | 9 999.99 **[9 999.99**, 9 9 | DET |
| ☑ Pitch | 99.9 **[99.7**, 99.99] | 0.0 [0.0_ **0.0** ] | 11.9% | 99.96 **[99.9**, 100.0] | 0.04 [0.0_ **0.1** ] | 9 999.99 **[9 999.99**, 9 9 | DET |
| ☑ GMM | 99.9 **[99.7**, 99.99] | 0.0 [0.0_ **0.0** ] | 10.3% | 99.96 **[99.9**, 100.0] | 0.04 [0.0_ **0.1** ] | 9 999.99 **[9 999.99**, 9 9 | DET |
| Fusion | 99.9 **[99.7**, 99.99] | 0.0 [0.0_ **0.0** ] | 7.5% | 99.96 **[99.9**, 100.0] | 0.04 [0.0_ **0.1** ] | 9 999.99 **[9 999.99**, 9 9 | DET |

**Automatic Comparison**

Files
☐ Different emotional states
File 1 C: Chanoch Known exemplar from deposition wav16k.wav    Mark Group
☐ Use as pitch model
Source
● Microphone    ○ Telephone
16 bit; mono; 16000 Hz; 48.83 s;
Clear voice signal: 26.76 s;

File 2 C: Chanoch Known exemplar from deposition wav16k.wav    Mark Group
☐ Use as pitch model
Source
● Microphone    ○ Telephone
16 bit; mono; 16000 Hz; 48.83 s;
Clear voice signal: 26.76 s;

Confidence level:    99%

Summary:
False rejection percentage FR: **99.9%**
False acceptance percentage FA: **0.0_ %**
Likelihood ratio LR: **9 999.9999**

Same speaker (High probability)

EER table    Compare    Copy results    Save to project    Close    DET

732.574.9672
www.owenforensicservices.com



P. O. BOX 189 • COLONIA, NEW JERSEY 07067

Summary: The voice comparison of Mr. Chanoch Zaks to the knowns and unknowns is a very high probability of the same speaker (aurally and spectrographically), critically listening, Mr. Chanoch Zaks has very distinct mannerisms and voice patterns when he speaks which was documented by the software. Owen Forensic Services had over two hours of audio for comparison purposes for this voice analysis.

Mr. Aryeh Zaks has a lesser probability of a likelihood ratio due to the "whispering" in the background of the unknown speaker's phone call and there were less "known samples" to work with. Critically listening to both known and unknown samples of Mr. Aryeh Zaks, I would agree they are more similar than not. Also, In the unknown Chanoch Zaks clearly states he is on the board with his father (which is an indication of identity) and the secondary speaker guiding from the background most likely is his father after reviewing the transcript and listening to the region of interest in the conversation.

Conclusion:

My findings are to a reasonable degree of professional certainty, as the investigation continues, I reserve the right to supplement or amend my report.

Respectfully submitted,

Jennifer E. Owen

9 | Page

# Exhibit C

## CORPORATE RESOLUTION

At a meeting dully held on September 1ˢᵗ , at Mosdos Chofetz Chaim, 50 Kiryas Radin Drive Spring Valley NY, IT WAS HEREBY RESOLVED AS FOLLOWS:

To submit the disclosure statement and plan of reorganization of the corporation as reviewed and prepared by the Firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C. to the Bankruptcy Court in the Southern District of New York. As part of this submitted plan Mosdos shall have the right and ability to sell off the property to Congregation Radin Development Inc or another Religious Corporation if needed to repay its secured debt to TBG Radin LLC or its assigns.

THAT upon approval of the plan by the Bankruptcy Court, the Corporation is hereby authorized to close on the sale of the property to Congregation Radin Development Inc. on the terms and conditions as set forth in the contract of sale in order to repay the secured mortgage debts incurred by the corporation.

IT WAS FURTHER RESOLVED AS FOLLOWS: THAT Rabbi Aryeh Zaks, is hereby authorized to execute all documents in the name of and on behalf of the Corporation , and to deliver any and all commitments, notes, mortgages, deeds of trust, deeds to secure debt, security agreements, assignments of leases and rents, loan agreements, pledges or assignments of any other collateral, indemnities, certificates, affidavits, financing statements, applications, notices and other instruments, agreements or certificates of any kind or nature whatsoever, and to take from time to time any other actions which such he in his discretion may determine to be necessary or appropriate to effect the transactions contemplated by any such document or instrument, whether upon the terms and conditions set forth in such documents and instruments or upon such other terms and conditions as he shall in his discretion determine to be appropriate, and the execution and delivery of any document or instrument by Rabbi Aryeh Zaks shall constitute conclusive evidence that the terms and conditions contained in said documents or instruments have been determined to be appropriate on behalf of the Corporation pursuant to this Resolution.

Signed this __7_ day of ~~September~~ October 1, 2019

.Rabbi Aryeh Zaks- President.

Affirmed to before me this _7_ Day of _October_,2019

Notary

ROCHELLE INGER
Notary Public, State of New York
No. 02IN6063222
Qualified in Rockland County
Commission Expires Aug. 27, 20__

# Exhibit D



**RP-420-a/b-Rnw-II (9/08)**

## NYS DEPARTMENT OF TAXATION & FINANCE
## OFFICE OF REAL PROPERTY TAX SERVICES

### RENEWAL APPLICATION FOR REAL PROPERTY TAX EXEMPTION
### FOR NONPROFIT ORGANIZATIONS
### II – PROPERTY USE

1-11 Kiryas Radin (See general information and instructions on back form)

25110   89/41.20-2-40
MOSDOS CHOFETZ CHAIM INC
18 MOUNTAIN AV.
MONSEY, NY 10952

d. Name of contact person
HENOCH ZAKS

e. Telephone no. of contact person
Day (845) 578-7709 Evening (    )

c. Employer ID no. 43-1993684

f. E-mail address (optional)

g. Property identification (see tax bill or assessment roll) Tax map number or section/block/lot

2. Have any of the following changes occurred since application for this property tax exemption was last filed? If any of the listed changes have occurred, please give a detailed explanation of each change on the back of this form, check the appropriate line below, and complete and sign the statement. If none of the changes has occurred, please check the appropriate line below and complete and sign the statement.

☐ a. A change has occurred in the ownership of all or part of the property.
☐ b. A change has occurred in the use or uses of the property by the owner.
☐ c. A change has occurred in that all or part of the property is now being offered for sale or lease.
☐ d. All or part of the property is occupied by an organization other than the owner: the user organization(s) make payments for use of the property, and a change has occurred in (1) the proportion of the property so occupied, (2) the terms of the occupancy, or (3) the payments made by the occupant(s).
☐ e. Physical changes in the property (such as construction, alterations, or demolition) have occurred.
☐ f. A change has occurred in the nature or schedule of planned construction of buildings or other improvements on an unimproved portion of the property.
☐ g. One of the organization's purposes is hospital, and a change has occurred in the amount of space or time that the property is used for the private practice of staff members or others rather than for the direct hospital related activities.

☐ **STATEMENT OF CHANGE**
I hereby certify that all of the changes, as listed above, that have occurred since application for exemption was last filed have been noted and the explanations of such charges are true and correct to the best of my knowledge and belief.

☑ **STATEMENT OF NO CHANGE**
I hereby certify that none of the changes listed above has occurred since application for exemption was last filed to the best of my knowledge and belief.

Signature                          Date 11-30-18                          Title see V.P

## FOR ASSESSOR'S USE

Assessing unit _____     County _____
City/Town _____          Village _____
School District _____

RP-420-a/b-Rnw-II (9/08)                                                                                    2

## EXPLANATIONS OF CHANGES THAT HAVE OCCURRED

(If more space is needed, attach additional sheets. Please give the organization's name, its employer identification number and the parcel number on each attachment)

Change No. _____          Explanation _____

## GENERAL INFORMATION AND FILING REQUIREMENTS

**1. Application**

For purposes of exemptions granted pursuant to section 420-b of the Real Property Tax Law, each year following the year in which exemption is granted on the basis of application forms RP-420-b-Org and RP-420-a/b-Use, a renewal application must be filed. One copy of RP-420-a/b-Rnw-I must be filed in each assessing unit; one copy of RP-420-a/b-Rnw-II must be filed in each assessing unit for each separately assessed parcel for which exemption renewal is sought. The assessor may request information in addition to the information contained in the application.

For purposes of exemptions granted pursuant to section 420-a of the Real Property Tax Law, the same forms may be used (except RP-420-a-Org replaces RP-420-b-Org). In the alternative, the owner may submit proof of continued exempt status to the assessor in whatever form is mutually acceptable.

**2. Place of filing application**

Application for exemption from city, town, or village taxes must be filed with the city, town, or village assessor. Application for exemption from county or school district taxes must be filed with the city or town assessor who prepares the assessment roll used in levying county or school taxes. In Nassau County, applications must be filed with the Nassau County Board of Assessors. In Tompkins County, applications must be filed with the Tompkins County Division of Assessment. **Do not file with the Office of Real Property Tax Services.**

**3. Time of filing application**

The application must be filed in the assessor's office on or before the appropriate taxable status date. In towns preparing their assessment roll in accordance with the schedule provided by the Real Property Tax Law, the taxable status is March 1. In towns in Nassau County, the taxable status date is January 2. Westchester County towns have either a May 1 or June 1 taxable status date; contact the assessor. In villages and cities, the taxable status dates vary, and the appropriate assessor should be consulted for the correct date.

## SPACE BELOW FOR ASSESSOR'S USE

_____

Parcel identification no. (s)

_____    _____    _____

Applicant organization          Employer ID no.              Date application filed

Application     ☐ Approved     ☐ Disapproved

Assessed Valuation  $_____ Taxable      $_____ Exempt

Documentary evidence presented: _____

_____

_____    _____    _____

Assessing unit                   Assessor's signature          Date

# APPLICATION FOR REAL PROPERTY TAX EXEMPTION
## PROPERTY USE – <u>OCCUPANCY STATEMENT</u>

<u>PROPERTY ADDRESS LOCATION</u> _____ 1-11 KIRYAS RADIN

<u>APPLICANT ORGANIZATION NAME</u> _____ MOSDOS CHOFETZ CHAIM

ORGANIZATIONS MAILING ADDRESS_____ 18 MOUNTAIN AV
MONSEY, NY 10952

PARCEL DESCRIPTION AS IT APPEARS ON ASSESSMENT ROLL _____ 89/41.20-2-40

A.  NAME OF OCCUPANT(S):
1. _____ YESHIVA CHOFETZ CHAIM
2. _____
3. _____
4. _____

B.  SPECIFY THE EXACT USE OF THE PROPERTY BY THE OCCUPANT(S):
1. _____ YESHIVA RELIGOUS/EDUCATIONAL CAMPUS
2. _____
3. _____
4. _____

*** *PLEASE PROVIDE WRITTEN NARRATIVE OF WORK OR STUDENT STATUS FOR EACH RESIDENT.*

C.  TERM(S) OF OCCUPANCY, (FOR EXAMPLE – LEASE, MONTH TO MONTH, ETC.):
1. _____ N/A
2. _____
3. _____
4. _____

D.  AMOUNT OF RENT PAID BY OCCUPANT(S):
1. _____ N/A
2. _____
3. _____
4. _____

E.  S THIS PROPERTY OR ANY PORTION THEREOF AT ANY TIME USED BY OTHERS THAN THE
APPLICANT OR THE OCCUPANTS NAMED ABOVE        YES_____   NO _X_
IF YES, SPECIFICALLY FOR WHAT PURPOSE_____

PRINT NAME _HENOCH ZAKS_____ SIGNATURE _____

TITLE _V.P._____ TELEPHONE _845-538-7909___ DATE _NOV 4-19_



RP-420-a/b-Rnw-I (9/08)

**NEW YORK STATE DEPARTMENT OF TAXATION & FINANCE**
**OFFICE OF REAL PROPERTY TAX SERVICES**

**RENEWAL APPLICATION FOR REAL PROPERTY TAX EXEMPTION**
**FOR NONPROFIT ORGANIZATIONS**
**I – ORGANIZATION PURPOSE**
(See general information and instructions on back form)

1a. MOSDOS CHOFETZ CHAIM INC
    18 MOUNTAIN AV

b. MONSEY, NY 10952

d. Name of contact person
   MENUCIR ZAVES

e. Telephone no. of contact person
   Day (845) 535 -789 Evening (   )

f. E-mail address (optional)

c. Employer ID no.

2. Have any of the following changes occurred since application for this property tax exemption was last filed? If any of the listed changes have occurred, please give a detailed explanation of each change on the back of this form, check the appropriate line below, and complete and sign the statement. If none of the changes has occurred, please check the appropriate line below and complete and sign the statement.

☐ a. A change has occurred in the purpose(s) of the organization.
☐ b. A change has occurred in the organization as a result of action taken by one or more regulatory agencies (such as issuance, restriction, or withdrawal of an operating certificate, permit, charter, or similar authorization).
☐ c. A change has occurred in the organization's status with regard to exemption from federal income taxes (such as exempt status has been recognized, denied, or revoked by the Internal Revenue Service, or the Internal Revenue Code classification of exemption has been changed).

☐ STATEMENT OF CHANGE -- I hereby certify that all of the changes, as listed above, that have occurred since application for exemption was last filed have been noted and the explanations of such changes are true and correct to the best of my knowledge and belief.

☑ STATEMENT OF NO CHANGE -- I hereby certify that none of the changes listed above has occurred since application for exemption was last filed to the best of my knowledge and belief.

Signature _____   Title V.P   Date 1-23-17

3. Forms filed with the Internal Revenue Service by the organization since application for property tax exemption was last filed (check all applicable lines):
☐ Form 1023 (Application for Recognition of Exemption under Section 501 (c)(3) of the Internal Revenue Code)
☐ Form 1024 (Application for Recognition of Exemption under Section 501 (a)).
☐ Form 990 (Return of Organization Exempt from Income Tax under Section 501 (c) of the Internal Revenue Code)
☐ Schedule A. Form 990 (Organizations Exempt under Section 501(c) (3))
☐ Form 990-PF (Return of Private Foundation Exempt from Income Tax)
☐ Form 990-AR (Annual Report of Private Foundation)
☐ Form 990-T (Exempt Organization Business Income Tax Return)
☐ None of these

(Note: Assessor may request a copy of forms filed)

**FOR ASSESSOR'S USE**

Assessing unit _____   County _____

City/Town _____   Village _____

School District _____

RP-420-a/b-Rnw-I (9/08)

2

## EXPLANATION OF CHANGES THAT HAVE OCCURRED

(If more space is needed, attach additional sheets. Please give the organization's name, its employer identification number and the parcel number on each attachment)

Change No. _____ Explanation _____

## GENERAL INFORMATION AND FILING REQUIREMENTS

### 1. Application

For purposes of exemptions granted pursuant to section 420-b of the Real Property Tax Law, each year following the year in which exemption is granted on the basis of application forms RP-420-b-Org and RP-420-a/b-Use, a renewal application must be filed. One copy of RP-420-a/b-Rnw-I must be filed in each assessing unit; one copy of RP-420-a/b-Rnw-II must be filed in each assessing unit for each separately assessed parcel for which exemption renewal is sought. The assessor may request information in addition to the information contained in the application.

For purposes of exemptions granted pursuant to section 420-a of the Real Property Tax Law, the same forms may be used (except RP-420-a-Org replaces RP-420-b-Org). In the alternative, the owner may submit proof of continued exempt status to the assessor in whatever form is mutually acceptable.

### 2. Place of filing application

Application for exemption from city, town, or village taxes must be filed with the city, town, or village assessor. Application for exemption from county or school district taxes must be filed with the city or town assessor who prepares the assessment roll used in levying county or school taxes. In Nassau County, applications for county, town and school tax purposes should be filed with the Nassau County Board of Assessors. In Tompkins County, application should be filed with the Tompkins County Division of Assessment. Do not file with the Office of Real Property Tax Services.

### 3. Time of filing application

The application must be filed in the assessor's office on or before the appropriate taxable status date. In towns preparing their assessment roll in accordance with the schedule provided by the Real Property Tax Law, the taxable status is March 1. In towns in Nassau County, the taxable status date is January 2. Westchester County towns have either a May 1 or June 1 taxable status date; contact the assessor. In villages and cities, the taxable status dates vary, and the appropriate assessor should be consulted for the correct date.

## SPACE BELOW FOR ASSESSOR'S USE ONLY

Parcel identification no. (s)

_____

| Applicant organization | Employer ID no. | Date application filed |

Application   ☐ Approved   ☐ Disapproved

Assessed Valuation  $ _____ Taxable   $ _____ Exempt

Documentary evidence presented: _____

_____

| Assessing unit | Assessor's signature | Date |



**SCHEDULE A**
**RP-420-a/b-Rnw-I (1/95)**

## NEW YORK STATE DEPARTMENT OF TAXATION & FINANCE
### OFFICE OF REAL PROPERTY TAX SERVICES

### RENEWAL APPLICATION FOR REAL PROPERTY TAX
### EXEMPTION FOR NONPROFIT ORGANIZATIONS
### I-ORGANIZATION PURPOSE

43-1993684

c. Employer ID no.
HENOCH    BAKS

d. Name of contact person
845-538-7909

e. Day telephone no. of contact person

MOSDOS CHOFETZ CHAIM INC
18 MOUNTAIN AV
MONSEY, NY 10952

f. Evening telephone no.

**b. Mailing address**

2a.  Statement of receipts and expenditures for the fiscal year   (year ending _____ , 20____ )

PLEASE SEE LETTER ATTACHED -

**RECEIPTS**

(1) Gross dues and assessments of members .............................................

(2) Gross contributions, gifts, etc. * ......................................................

(3) Gross amounts derived from activities related to organization's
exempt purpose (attach schedule) .......................................................

    Less cost of sales (attach schedule) ...............................................

(4) Gross amount from unrelated business activities (attach schedule)...

    Less cost of sales (attach schedule) ...............................................

(5) Gross amounts received from sale of assets, excluding inventory
items (attach schedule) .........................................................................
    Less cost or other basis and sales expenses of assets sold (attach
schedule) ..............................................................................................

(6) Interest, dividends, rents and royalties .............................................

(7) Other receipts (attach schedule) .......................................................

(8) Total receipts.....................................................................................

**EXPENDITURES**

(9) Fund raising expenses ......................................................................

(10) Contributions, gifts, grants and similar amounts paid (attach schedule) ............

(11) Disbursements to or for the benefit of members (attach schedule) ...............

(12) Compensation of officers, directors and trustees ................................

(13) Other salaries and wages ................................................................

(14) Interest ...........................................................................................

(15) Rent ................................................................................................

(16) Depreciation and depletion .............................................................

(17) Other expenditures (attach schedule) ..............................................

(18) TOTAL EXPENDITURES ..............................................................

(19) Excess of receipts over expenditures (line 8 less line 18) ..................

*If the organization received any unusual grants during the year, attach a list showing the name of the contributor, the date and amount of the grant and a brief description of the nature of the grant.

SCHEDULE A
RP-420-a/b-Rnw-I (1/95)

2

**2b. Statement of assets and liabilities for the last fiscal year**

Enter Dates

| I. ASSETS | Beginning date | Ending date |
|---|---|---|
| (1) Cash (a) interest bearing accounts ............................................. | | |
| (b) other ..................................................................................... | | |
| (2) Accounts receivable, net .......................................................... | | |
| (3) Inventories .............................................................................. | | |
| (4) Bonds and notes (attach schedule) ............................................ | | |
| (5) Corporate stocks (attach schedule) ........................................... | | |
| (6) Mortgage loans (attach schedule) ............................................. | | |
| (7) Other investments (attach schedule) ......................................... | | |
| (8) Depreciable and depleted assets (attach schedule) .................... | | |
| (9) Land ...................................................................................... | | |
| (10) Other assets (attach schedule) ............................................... | | |
| (11) TOTAL ASSETS ................................................................... | | |

| II. LIABILITIES | | |
|---|---|---|
| (12) Accounts payable .................................................................. | | |
| (13) Contributions, gifts, grants, etc. payable ............................... | | |
| (14) Mortgages and notes payable (attach schedule) ...................... | | |
| (15) Other liabilities (attach schedule) ......................................... | | |
| (16) TOTAL LIABILITIES .......................................................... | | |

| III. FUND BALANCE OR NET WORTH | | |
|---|---|---|
| (17) Total fund balance or net worth ............................................. | | |
| (18) Total liabilities and fund balance or net worth (line 16 plus line 17) ............................... | | |

(19) Has there been any substantial change in any aspect of the organization's financial activities since the period ended as shown above?

☐ Yes   ☐ No

If yes, attach a detailed explanation.

SCHEDULE A
RP-420-a/b-Rnw-I (1/95)

3

## 3a. Officers, directors and trustees:

| Name and title | Time devoted to position | Compensation (annual) | Contributions to Employee Benefit Plans (annual) | Expense account and other Allowances (annual) |
|---|---|---|---|---|
| RABBI AARYH  ZAKS PRES | FULL | 0 | | |
| RABBI MAYER  ZAKS VP | FULL | 0 | | |
| BEATRICE WALDMAN SEC | FULL | 0 | | |
| SIMA WEINGRAUB  VP | FULL | 0 | | |
| MENOCH ZAKS  VPRES | ASDA= | 0 | | |
| | | 0 | | |

## b. Five highest paid full-time employees (other than officers, directors and trustees):

| Name, title and address | Time devoted to position | Compensation (annual) | Contributions to Employee Benefit Plans (annual) | Expense account and other Allowances (annual) |
|---|---|---|---|---|
| N/A | | | | |
| | | | | |
| | | | | |
| | | | | |

## c. Five highest paid part-time employees (other than officers, directors and trustees):

| Name, title and address | Time devoted to position | Compensation (annual) | Contributions to Employee Benefit Plans (annual) | Expense Account and other Allowances (annual) |
|---|---|---|---|---|
| N/A | | | | |
| | | | | |
| | | | | |
| | | | | |

## d. Five highest paid persons for professional services (non-employees):

| Name and address | Type of service | Time devoted to service | Compensation (annual) | Expense Account and other Allowances (annual) |
|---|---|---|---|---|
| N/A | | | | |
| | | | | |
| | | | | |
| | | | | |

SCHEDULE A                                                                                                    4
RP-420-a/b-Rnw-I (1/95)

4. During the last fiscal year, did the organization, either directly or indirectly, engage in any of the following acts with a trustee, director, principle officer or creator of the organization, or any organization with which such a person is affiliated:

a. Sale, exchange or leasing of property? ...........................................................  ☐ Yes   ☑ No

b. Lending of money or other extension of credit? .............................................  ☐ Yes   ☑ No

c. Furnishing of goods, services or facilities? ...................................................  ☐ Yes   ☑ No

d. Transfer of any part of the organization's income or assets? ..........................  ☐ Yes   ☑ No

**IF YES ANSWERED TO a, b, c or d ABOVE, ATTACH A DETAILED
EXPLANATION OF THE TRANSACTION(S)**

**VERIFICATION**

State of New York                                    )
County of Rockland                                   )ss:
                                                     )

Henoch   Zaks                              , being duly sworn ~~says~~ *affirms*: that ___ he is the

V.P.                  of the applicant organization, that the statements contained in this application (including

the attached sheets consisting of _____ pages) are true, correct and complete, and that ___ he makes this

application for real property tax exemption as provided by law.


Subscribed and ~~sworn~~ *affirmed* to me before

this 30th day of Nov, 20 08

_____
Commissioner of deeds of notary public

_____
Signature of owner or authorized representative


DORI KAPLAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KA6320062
Qualified In Rockland County
My Commission Expires March 02, 2019

# Exhibit E

Minutes of a meeting of the board of Mosdos Chofetz Chaim Inc At a meeting dully held on September 1st, at Mosdos Chofetz Chaim, 50 Kiryas Radin Drive Spring Valley NY.
Attending in person and via phone conference were the following:
Rabbi Aryeh Zaks President
Beatrice Waldman/Zaks Secretary
Rabbi Mendel Zaks Trustee
Gittel Zaks / Layosh Trustee

A discussion was held about the need to finalize a plan of reorganization that would finally put all the many years of litigation to rest and pay off the debts of Mosdos.

Congregation Radin Development Inc has been in discussions with Rabbi Zaks to ensure that the many years of effort to rebuild the Radin institutions has not been in vain. Congregation Radin Development Inc has confirmed that the Chofetz Chaim way of teaching and following of the Torah has been incorporated in to their religious mission.
As a sale that would cover the debts would be in the best interests of the corporation a vote was held and it was unanimously passed by all in attendance.

IT WAS HEREBY RESOLVED BY THE BOARD AS FOLLOWS:

To submit the disclosure statement and plan of reorganization of the corporation as reviewed and prepared by the Firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C. to the Bankruptcy Court in the Southern District of New York. As part of this submitted plan Mosdos shall have the right and ability to sell off the property to Congregation Radin Development Inc or another Religious Corporation to repay its secured debt to TBG Radin LLC or its assigns for an amount to be determined by a reputable appraisal and in no case less than the full amount of the secured debt.

THAT upon approval of the plan by the Bankruptcy Court, the Corporation is hereby authorized to close on the sale of the property to Congregation Radin Development Inc. on the terms and conditions as set forth in the contract of sale in order to repay the secured mortgage debts incurred by the corporation.

IT WAS FURTHER RESOLVED AS FOLLOWS: THAT Rabbi Aryeh Zaks, is hereby authorized to execute all documents in the name of and on behalf of the Corporation , and to deliver any and all commitments, notes, mortgages, deeds of trust, deeds to secure debt, security agreements, assignments of leases and rents, loan agreements, pledges or assignments of any other collateral, indemnities, certificates, affidavits, financing statements, applications, notices and other instruments, agreements or certificates of any kind or nature whatsoever, and to take from time to time any other actions which such he in his discretion may determine to be necessary or appropriate to effect the transactions contemplated by any such document or instrument, whether upon the terms and conditions set forth in such documents and instruments or upon such other terms and conditions as he shall in his discretion determine to be appropriate, and the execution and delivery of any document or instrument by Rabbi Aryeh Zaks shall constitute conclusive evidence that the terms and conditions contained in said documents or instruments have been determined to be appropriate on behalf of the Corporation pursuant to this Resolution.

Having no further business the meeting was adjourned.

# Exhibit F

## Minutes of a meeting of the board of Mosdos Chofetz Chaim Inc.

**At a meeting dully held Saturday night on September 1st of Mosdos Chofetz Chaim,
50 Kiryas Radin Drive Spring Valley NY.**

Attending in person and/or via phone were the following:

Rabbi Aryeh Zaks Chairman TRUSTEE

Beatrice Waldman/Zaks  TRUSTEE

Gittel Layosh  Vice Pres TRUSTEE

Rabbi Mendel Zaks    (newly elected) TRUSTEE

Rabbi Eliyahu Layosh (newly elected) TRUSTEE

Deborah Zaks (newly elected) TRUSTEE


**AS THE FIRST ORDER OF BUSINESS** A discussion was made about the need of replacing
the missing trustees for the corporation.

**IT WAS HEREBY UNANIMOUSLY RESOLVED BY THE TRUSTEES RABBI ARYEH
ZAKS GITTEL LYOSH AND BEATRICE WALDMAN AS FOLLOWS:**

THAT the following Rabbi Mendel Zaks, Deborah Zaks and Rabbi Eliyahu Layosh shall
join the corporate board of trustees effective immediately.


**Subsequently** Rabbi Aryeh Zaks was unanimously appointed as President and Beatrice
Waldman/Zaks was appointed as Secretary.


**AS THE SECOND ORDER OF BUSINESS:** A discussion was held about the need to find
additional sources of loans, donations or avenues of credit to directly fund the ongoing expenses
until such time that Mosdos can finally become operational.

A discussion was held about the emergency need to find alternative financing to pay off or carry
the massive TBG debt.

A discussion was held about the urgency of finalizing a plan of reorganization and the strong
possibility of selling off the assets of the corporation to facilitate a plan if so needed.

A brief discussion was held about the new Jewish Religious College accreditation organization
that is run by the son of Rabbi Ginsberg and the complexities of Mosdos utilizing this
accreditation agency in the future due to its terrible credit history.


**IT WAS UNANIMOUSLY RESOLVED BY THE BOARD AS FOLLOWS:**

THAT Rabbi Aryeh Zaks shall be authorized to seek out and obtain any avenues of temporary or
permanent financing and do anything he feels is necessary on behalf of the corporation and to
finalize and implement any plan of reorganization acceptable to and so ordered by the court.
Rabbi Aryeh Zaks, is hereby authorized to execute all documents in the name of and on behalf of
the Corporation, Rabbi Aryeh Zaks is fully authorized act on behalf of the corporation, to
execute deeds, sign notes, contracts, mortgages, stipulations, any documents needed for or in
furtherance of a plan of reorganization, anything needed for a sale of the property or to secure
debt, including security agreements, pledges or assignments of any kind.


As this was the first night of "slichos" and there was a sudden medical family emergency, the
meeting was adjourned.

# Exhibit G

201

```
1              Aryeh Zaks
2    persons attended in person and certain
3    persons attended by phone.  But before I
4    ask you -- withdraw that question.
5         Do you know who prepared this
6    document?
7         A.    I believe I did.  Maybe with my
8    wife.
9         Q.    When did you prepare it?
10        A.    Then.  At some point back in
11   2018.
12        Q.    Do you have a -- was it prepared
13   on September 1, was it prepared --
14        A.    Probably a little bit later.  I
15   don't recall.  But sometime probably in
16   September of that year.  Definitely not
17   September 1.
18        Q.    Did you prepare this on your
19   computer?
20        A.    I don't recall.  But I can look
21   for it if you would like me to, if it's
22   something that my lawyers say I should do.
23              MR. LANE:  This has come up
24   before.  We would like to obtain, if
25   this document was prepared by Rabbi
```

203

```
1              Aryeh Zaks
2    that I have.
3         A.    I don't know why, it just burnt
4    out, it was unbelievable, everything, just
5    dead.  I didn't have the backup so it
6    created a problem.
7         Q.    So the lawyers for Mosdos
8    produced this document as an exhibit in
9    response to discovery.
10        A.    Correct.
11        Q.    Do you know who provided a copy
12   of this document to Mosdos's lawyers to be
13   produced?
14        A.    I believe I had a copy of it
15   somewhere.  I may have had it in an e-mail,
16   I'm going to go back and look.
17        Q.    So you may have reviewed e-mails,
18   that may have been attached to an e-mail,
19   is that --
20        A.    It may have been attached to an
21   e-mail back then.  I don't know from then.
22        Q.    If you had it in e-mails, do you
23   know what address, the e-mail address that
24   was?
25        A.    This I don't remember.  I'll go
```

202

```
1              Aryeh Zaks
2         Zaks on his computer, we'd like to have
3    the document produced in native format
4    so we can see the metadata.
5         A.    I don't know what I have.  I may
6    have it in a PDF or it may have been typed
7    up in a Word.
8              MR. LANE:  That's fine.  If it's
9    in a Word document, I'd like to know
10   what form it was produced in.
11             MR. LEVINE:  You'll give us a
12   letter setting forth all your requests
13   for documents, right, Stan?
14        Q.    How many computers do you have,
15   by the way?
16             MR. LEVINE:  You'll give us a
17   letter?
18             MR. LANE:  We'll give you a
19   letter, we'll give you a letter.
20        A.    There are several computers that
21   multiple people use.  There's one that I
22   just got two months ago.  Mine, I had three
23   that the hard drives died and they threw
24   them out.  I had --
25        Q.    You must have the same computers
```

204

```
1              Aryeh Zaks
2    back and look.  All know is I may just have
3    it somewhere as a copy of a PDF.
4         Q.    This has been produced in the
5    last several weeks --
6              MR. LEVINE:  Excuse me?
7         Q.    -- do you recall how it was
8    transmitted, did you give your lawyer a
9    hard copy?
10             MR. LEVINE:  Wait, wait, wait,
11   what do you mean it's been produced in
12   the last several weeks?
13             MR. LANE:  No, no.  I mean
14   produced in the litigation in the last
15   -- I mean it was provided to us.  I'm
16   not talking when it was prepared.
17             MR. LEVINE:  Okay.  Thank you.
18        Q.    Do you recall the form in which
19   it was delivered to your counsel?
20        A.    Could be it was in a book, I
21   don't know.
22             MR. NASH:  Objection.  Objection.
23             MR. TWERSKY:  You can answer
24   anyway.
25             MR. NASH:  No, I think it's
```

# Exhibit H

## AFFIDAVIT

**HARVEY ETTER**, being duly sworn deposes and says:

1.      I am a Senior Manager of IT Operations & Infrastructure as well as an IT consultant.

2.      I have worked in the field of IT for over 22 years.

3.      I have been asked if data can be retrieved from a hard drive when the hard drive allegedly "dies".

4.      I have maintained computer systems, data and networks for all of those 22 years.

5.      I have repaired and recovered data hundreds of times over those 22 years.

6.      The amount of times full data was lost completely without recovery, I can count on one hand.

7.      It is always worth trying to extract the data.  No one should simply assume that because the computer is not working that the hard drive can not be extracted from.

8.      There is a simple way to get the data from the hard drive of a dead laptop or computer onto a working system using a data transfer cable.

9.      A data transfer cable is a universal cable that works with any hard drive.

10.     You can also use a hard drive adapter cable to connect to a working computer or an external hard drive enclosure.

11.     I have, at times, put the non-working hard drive into another computer.

12.     However, using the data transfer cable, you would connect the data transfer cable to the hard drive or insert the hard drive into an appropriate hard drive enclosure.

-1-

10.    There are three main types of hard drive connection options for both laptop and desk top computers.

11.    The older of the three will be an IDE type connection with a group of small pins used. The newer of the three will be a SATA type connection (used in most desktops) and MSATA and M.2.  The SATA connection is the same for both desktop computer hard drives and laptop computer hard drives.

12.    Once the correct cable is connected, you can plug the cable into a working computer system and transfer your data.

13.    In the correct order, the power cable for the drive should be connected first, and then connect the cable to the working computer.

14.    In the rare event that this process does not work, I have worked with 3rd party service companies to repair the old hard drive, which is usually successful.

15.    One should never give up retrieving data from a hard drive.  There are many ways to successfully retrieve the data.

Harvey Etter

Sworn to before me this 4th
day of February, 2021

Notary Public

LORI GALGANO
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01GA6346324
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES 08/08/20

-2-

# Exhibit I

35

Aryeh Zaks

1    Q.   Okay.  So is it your testimony
2    that the trustees had the direction -- had
3    the discretion to add officers at different
4    times as they perceived the need to be?
5    A.   Yes.
6    Q.   So how would that process work?
7    You mentioned Mr. Beyman.  How was Mr.
8    Beyman made an officer?
9    A.   He was talking to the bank
10    negotiating on our behalf at some point.
11    And he asked, he wanted to talk on a more
12    of an official capacity.  I told him -- I
13    told my wife and my daughter at the time, I
14    don't know, I believe it was both of them
15    -- that I'm putting Mr. Beyman on as -- to
16    act on behalf of the corporation.  They
17    said gladly.  That's all that's required.
18    Q.   Was there a meeting of the board
19    of trustees where that occurred?
20    A.   Can you define the word meeting?
21    Q.   Did the trustees get together and
22    formally consider whether Mr. Beyman should
23    be added --
24    MR. NASH:  Objection to the form

34

Aryeh Zaks

1    of the question.
2    THE COURT REPORTER:  I'm sorry, I
3    couldn't hear the end of the question.
4    Q.   Did the trustees get together and
5    decide amongst themselves that Mr. Beyman
6    should be added as a trustee?
7    MR. LEVINE:  That's a different
8    question.
9    Q.   As a director, as a director --
10    as an officer.
11    A.   As an officer, as a board of
12    director we'll call it.  Yes.  I don't know
13    what you call getting together but yes,
14    there was a decision made to add somebody
15    or not at any time.
16    Q.   And those decisions, when they
17    were made, were they memorialized in any
18    writings?
19    A.   Probably not.  It was not that
20    important.  We could remove them at any
21    time.
22    The trustees are the ultimate
23    authority of the corporation.  These were
24    people who were helping out and we were

35

Aryeh Zaks

1    happy to have them on board.  If they
2    weren't working out with the bank, it
3    didn't work out, he was out.
4    MR. LANE:  One moment, please.
5    Q.   How old is your daughter Gittel
6    today?
7    A.   29, 30, something like that.
8    Q.   Do you recall the time frame in
9    which Mr. Beyman was appointed by the
10    trustees as an officer?
11    A.   It was at some point when he was
12    negotiating with Citizens Bank on our
13    behalf.  I don't recall it offhand.
14    Q.   Would that be after 2007?
15    A.   Definitely after 2007.  It was
16    much later.  Probably after, sometime 2000
17    and -- I don't know.  It was definitely
18    afterwards.  We were negotiating -- it was
19    before, I think, I don't remember the exact
20    date.  But definitely after 2007.
21    Q.   You testified that Mr. Blisko was
22    an officer for a period of time?
23    A.   Yes.  He was also negotiating
24    with the bank at a later period.

36

Aryeh Zaks

1    Q.   Was that in the same time frame?
2    A.   It was after 2007 for sure.  It
3    was probably much later.
4    Q.   Was there any other time period
5    in which he was acting as an officer?
6    A.   There was a time period where he
7    was a trustee.
8    Q.   I didn't ask you that.  I said
9    was there a time period in which he was
10    acting as an officer?
11    A.   Possibly.  I don't recall offhand
12    but there were times when he was working on
13    behalf -- negotiating on behalf of the
14    yeshiva, Mosdos.  So then he did.
15    Q.   What was the time period in which
16    he was a trustee?
17    A.   2003, the end of 2003 until 2007
18    sometime.
19    Q.   And what were the circumstances
20    of his departure from the board of
21    trustees?
22    A.   He told me he wants to leave, he
23    doesn't want to be part of it, it was
24    having negative publicity.  And I accepted

37

Aryeh Zaks

1 his resignation. I was on the board at
2 that time.
3
4     Q.    And who else was on the board
5 with you at that time?
6     A.    At that point -- that's what I
7 said -- I wasn't sure if it was Mr. Green
8 was still on or not. I'm trying to recall
9 that. It was the end of 2007, there wasn't
10 many other -- it was either me, Mr. Green,
11 and him or something to that effect, or me
12 and him and Mr. Green left. It was one of
13 those.
14     Q.    Was Mr. Blisko's request to you
15 that he resign from the board, or his
16 intention to resign, was that memorialized
17 in any writing?
18     A.    I don't recall. Probably not.
19 He told me I want to leave and I accepted
20 his -- he said I don't want to be part of
21 this mess.
22     Q.    Do you know what time of the year
23 that request came?
24     A.    I think I met him even personally
25 face to face then at one time here in

38

Aryeh Zaks

1
2 Monsey. And he came over to me and told me
3 I want to leave, don't make me part of this
4 situation. He was upset that there was
5 money owed to him as well. There was a few
6 things that came together he said. And I
7 said fine, I accept it.
8     Q.    Where would that meeting have
9 taken place?
10     A.    I don't recall. I think it was
11 even in the Kiryas Radin site, maybe I met
12 him there. I don't recall it offhand.
13     Q.    Would that be in one of the
14 residential units of --
15     A.    I think it was outside on the
16 driveway when he told it to me. There was
17 -- I don't know if there was -- yeah, there
18 was a driveway already at that point.
19     Q.    Did there ever come a time when
20 you resigned as a trustee?
21     A.    Yes.
22     Q.    When was that?
23     A.    The end of 2003, together with
24 the rest of the board.
25     Q.    And how was your -- you said with

39

Aryeh Zaks

1
2 the rest of the board; the entire board
3 resigned?
4     A.    The entire board of trustees
5 resigned.
6     Q.    Did that occur at some meeting of
7 all of the trustees? Tell me how that
8 occurred.
9     A.    It occurred, I had a conversation
10 with a bank. I was talking about
11 potentially buying a property, doing
12 something for -- and I don't recall the
13 exact, who it was, it was a woman, Sally
14 Love Associates or maybe it was Dain
15 Rauscher was the company.
16         And they looked in a little bit
17 into what we were talking about. And they
18 told me there's no way that anybody who has
19 to do with the Zaks family can be on the
20 board of trustees when you file an
21 application for the bank because we were
22 involved in a previous bankruptcy on that
23 property, which was Yeshiva Chofetz Chaim
24 Kiryas Radin. And being that we were
25 trustees all on that property as well, they

40

Aryeh Zaks

1
2 said there's no way that your history can
3 work.
4         And I asked then this person, I
5 said so if I put in new people, and the
6 goal is business people who have better --
7 will look much better for a bank, will that
8 work? And they said as long as you people
9 are not on the board and they can file and
10 do it afterwards, there's no problem.
11     Q.    And that was a conversation that
12 you had with this person from the bank?
13     A.    I think I had this conversation
14 with two or three people. One was, I
15 believe, there was a man from Target
16 Capital -- I don't remember his name, maybe
17 Mr. Silverberg. I think there was a --
18 definitely I had a conversation with
19 somebody from Dain Rauscher, it was a
20 woman, Maria Nolan, who was working on
21 getting us -- getting financing. She was
22 practically hit by a car later on but she
23 worked for a year or two on this. She was
24 helping to find -- we were working on many
25 different fronts.

41

Aryeh Zaks

1

2      But every single person that I
3  spoke to at the time in 2003 told me, he's
4  right, you need to change the board.  And
5  that's when the board was changed.
6      Q.    Was anybody else with you from
7  the board when you had those conversations?
8      A.    I'm sure my brother had
9  conversations with me about that as well.
10  We spoke about it at length that it has to
11  change.
12      Q.    And --
13      A.    And Zakses can't be part of the
14  board in order to get a loan.
15      Q.    And how was that advice from the
16  bank communicated to the other directors,
17  the other trustees?
18      A.    Which -- they spoke basically
19  more -- Mr. Silverberg, I believe, met with
20  me and my brother many times.  And it was
21  communicated by us to the rest of the
22  trustees which, at the time, was my wife
23  and his wife and Berel Shakovin, who lived
24  in my house for a good number of years.
25      Q.    Okay.  So you informed Mr.

42

Aryeh Zaks

1

2  Shakovin of those conversations as well?
3      A.    He was, at that point, he was
4  fairly old.  But yes, I told him.  And
5  Berel -- he was the shoemaker of Radin's
6  son.  And he had no family.  And he ended
7  up living here for a good period of years
8  as, literally as part of the family.
9      Q.    When you say lived in your house,
10  is it this house?
11      A.    This house, yes.
12      Q.    And was there -- when you said
13  everybody resigned, were the resignations
14  done orally or was there some -- did
15  somebody submit letters of resignation, how
16  was that done?
17      A.    I believe we did it orally.  And,
18  you know, for the bank, I guess, it was
19  memorialized in our application through the
20  trustees ones, so.
21      Q.    And do you recall when the
22  resignations occurred?
23      A.    Sometime in late 2003.  I don't
24  recall the date offhand.
25      Q.    Is there some document that

43

Aryeh Zaks

1

2  memorializes when those resignations
3  occurred?
4      A.    I don't know.  I'm sure I could
5  find documents that would reflect it.  I
6  don't know if there is an actual document
7  that -- you asked me about the resignation,
8  I said I think it was orally, so there
9  wouldn't be a documentation to the actual
10  resignation.
11      Q.    Was there a meeting at which all
12  of the directors were present where they
13  all confirmed that they were -- I use the
14  term directors, I meant trustees -- where
15  they all confirmed that they were
16  resigning?
17      A.    I'm going have to ask or reask my
18  old question, what is the meeting?
19      Q.    Was there a physical discussion
20  where everybody was physically present
21  where they communicated or affirmed their
22  intentions to resign?
23      A.    They may not have been physically
24  present in one area but they definitely
25  communicated and everybody agreed that

44

Aryeh Zaks

1

2  they're going off the board as we have no
3  choice.
4      Q.    When we talk about communicated
5  in one area, were they all on the phone?
6      A.    I don't recall the process from
7  2003.  My memory is not that great.
8      Q.    Really what I'm getting at is
9  were the resignations sequential or
10  simultaneous?
11      A.    I think that some were maybe
12  before.  My wife and his wife I believe,
13  said, okay, we accepted their resignations.
14  We were still on the board.  And then the
15  rest of us just went off as well.  But I
16  don't recall it thoroughly, I can't tell
17  you.
18      Q.    So you resigned in 2003, and the
19  other trustees resigned because that was
20  what the bank want --
21      THE WITNESS:  I apologize for a
22  moment.
23      I'm going to give this phone --
24  it's somebody who needs food for
25  Shabbos.  So I'm going to give the

69

Aryeh Zaks

1  
2      MR. LEVINE:  Keep your voice up.
3      Q.    Did, after your daughter and your
4  wife rejoined the board as trustees --
5      A.    Yes.
6      Q.    -- did Mosdos have annual trustee
7  meetings?
8      A.    Yes.
9      Q.    And when did those meetings
10  occur?
11      A.    September 1st each year.  There
12  were some years it was nothing to discuss
13  but there was always a meeting.
14      Q.    And were there minutes prepared
15  of those meetings?
16      A.    If there was something that
17  needed to be memorialized, then we would
18  make minutes.  Otherwise, there was no
19  reason for it.
20      MR. LEVINE:  Keep your voice up.
21      Q.    Who would have the responsibility
22  for preparing minutes?
23      A.    Most of the time I probably would
24  have prepared it.  Maybe my wife, depending
25  on what role she was playing at what time.

70

Aryeh Zaks

1  
2      Q.    Prior to your brother being
3  readded as an officer in 2012, so after
4  your -- after in 2010 when your wife and
5  daughter joined the board of trustees, do
6  you recall what positions you each held as
7  officers?
8      A.    I don't recall offhand.  It could
9  -- I don't recall the official positions
10  that I -- it wasn't really -- I don't
11  recall anything really relevant that it
12  made a difference to, so I can't -- at that
13  point.  Except in 2011 I was secretary if I
14  remember correctly.  So I must have kept
15  myself as secretary until later on.
16      Q.    When you were secretary in 2011,
17  who was president?
18      A.    I don't know if we gave anybody
19  the title of president at that point.
20  Could be my wife was officially president.
21  I don't recall.
22      Q.    Would there be a document that
23  would reflect who held which office at that
24  time?
25      A.    If there would have been

71

Aryeh Zaks

1  
2  something that would have had to be
3  memorialized.  I don't think at that time
4  we had something.
5      Q.    When did Mr. Blisko resign as an
6  officer?
7      A.    Sometime in 2008 -- as an
8  officer?
9      Q.    As an officer?
10      A.    When he came on -- he didn't
11  resign as an officer.  I put him on as an
12  officer when we were negotiating with the
13  bank.  I just took him off.
14      Officers were something which the
15  board of trustees had the ability to put on
16  and take off.  They didn't have to resign.
17      Q.    How did you communicate to Mr.
18  Blisko that he was no longer an officer?
19      MR. LEVINE:  Objection.  Asked
20  and answered.
21      A.    I don't know what the
22  communication method was.  I think is when
23  he was talking to the bank, I said you can
24  talk on behalf of the yeshiva.  When he
25  finished and it wasn't relevant, I said

72

Aryeh Zaks

1  
2  it's okay, that's it, you're out.  There
3  was nothing to discuss.  There wasn't a
4  formality.  Using the officer, the title of
5  an officer to do things on behalf of the
6  yeshiva was not something that was done
7  with so much formality.  I was able to tell
8  somebody you'll be an officer, Mr. Beyman
9  was negotiating, fine, you should negotiate
10  on behalf of the yeshiva, you can call
11  yourself vice president of Mosdos and go
12  ahead.  And he did it.
13      When he came back and it wasn't
14  relevant, okay, so you're not vice
15  president anymore.  We, three trustees,
16  he's not vice president anymore.  The
17  officers are under the control of the board
18  of trustees.
19      Q.    You, in your answer, referred to
20  the yeshiva --
21      A.    I meant Mosdos.  Thank you for
22  correcting me.  I realize it.
23      Q.    Okay.  Is there another entity
24  that you would refer to as the yeshiva?
25      A.    Yes.

85

Aryeh Zaks

1
2 husband. They lived here in my house for a
3 period of about three years, on and off,
4 they were from Israel. And she found it
5 very hard if we went. Later on I even
6 moved her temporarily to Kiryas Radin.
7 That lasted only a short period of time and
8 I had to come back.
9         Even currently, I wish there's a
10 way for me to take this off the record, but
11 I'm going to say it anyway. I have
12 currently in my house a woman who is a
13 widow with two small children, one is three
14 years old, one is two years old. They're
15 part now somewhat of my family. And they
16 find it hard if I go to Kiryas Radin for
17 Shabbos, it's hard for her to leave and to
18 take her children. She asked me many times
19 not to go. So I stay home. That's my
20 primary religious obligation under the
21 Torah requirements, so I do that.
22         But generally speaking, there was
23 a time -- when I was able to, it was two
24 weeks and two weeks. That's what we spoke
25 between ourselves that it should be.

86

Aryeh Zaks

2         MR. TWERSKY: Objection as
3 nonresponsive.
4         MR. LEVINE: Completely
5 responsive.
6         MR. LANE: I'm going to place the
7 objection. I'm going to accommodate --
8         MR. NASH: Stop asking about
9 congregation, please.
10         MR. LANE: I'm going to
11 accommodate you in your desire to have
12 it off the record. I'm going to object
13 to the portion of that that's
14 unresponsive. We'll go on.
15         MR. NASH: This is a narrow scope
16 evidentiary hearing. And you guys are
17 so far afield it's frightening.
18 Q.    When you were appointed as --
19 when you became the sole trustee of Mosdos,
20 I'd like to review the circumstances under
21 how you, procedurally, how you became the
22 sole trustee?
23 A.    I mentioned to you that when Mr.
24 Blisko left and Mr. Green left and, at that
25 point, Munish Weintraub was ill, he was out

87

Aryeh Zaks

1
2 -- my brother told me he's out -- I was
3 left alone. It just happened by default.
4 Q.    So, I'm sorry, and I apologize
5 and we've had noise and other things, I'm a
6 little bit confused. You resigned?
7 A.    I came back on.
8 Q.    You came back almost immediately?
9 A.    Right after the loan in 2006.
10 Q.    Okay. And let's go through that
11 process. Did the existing board appoint
12 you as a trustee?
13 A.    Yes.
14 Q.    And is there a meeting of the
15 existing board where that occurred?
16 A.    I have no idea. I wasn't the
17 board at the time.
18 Q.    How were you informed that you
19 were going to be --
20 A.    I spoke to Mr. Green, I think Mr.
21 Blisko, they all -- they told me yes. It
22 was understood, even when I put them on the
23 board, that I'm going to be the one dealing
24 with the bank. I am the one who's dealt
25 with them on an ongoing basis during

88

Aryeh Zaks

2 construction. I dealt with -- nobody
3 wanted to actually be coming down and
4 dealing with the issues. And I think
5 people were much happier that my signature
6 should be on documents rather than theirs.
7 Q.    And is it your testimony that
8 your brother was not involved with
9 discussions with them concerning the bank
10 and the construction of the project?
11 A.    If yes it was to a minute amount
12 in comparison.
13 Q.    And when you were reappointed to
14 the board by them, was it with an
15 understanding that you could remove them at
16 any point in time or did they --
17 A.    Trustees don't have the ability
18 to remove trustees.
19 Q.    Okay. So they --
20 A.    They resigned.
21 Q.    So they each resigned at some
22 point after you came back on?
23 A.    Yes. After the new lawsuit got
24 reinstituted by the appellate that gave the
25 villages a right and stopped the project.

89

Aryeh Zaks

1  And it became very messy.
2  
3      Q.    Did they resign at the same time?
4           MR. LEVINE:  Why are we doing
5      this again?
6      A.    I believe I said no.
7           MR. NASH:  It's their time.  They
8      want to waste it, they'll waste it.
9      Q.    And how far apart in time were
10  their resignations?
11     A.    It was at some point probably
12  between the end of 2007 and early 2008
13  somewhere.
14     Q.    And just to clarify, and if I
15  asked this before I apologize.  Their
16  resignations, did either of them resign in
17  writing?
18     A.    Not that I recall, no.
19     Q.    For what length of time -- how
20  long were you the sole trustee of Mosdos?
21     A.    Sometime in 2008 I guess till
22  around 2009, 2010 when I took on my wife
23  and my daughter.  I think the students that
24  we were getting to come in, there were 16
25  students that were coming in from Israel,

90

Aryeh Zaks

1  from other places.  And we got permission
2  to bring them in.
3           And my daughter Gittel was
4  dealing with the Town of Ramapo at that
5  point.  And she was dealing with the houses
6  and getting them ready for these 16
7  students.  And the inspections, she was
8  dealing with the town.  So at that point is
9  when I decided things are starting to move,
10  I need some other people to be on the
11  board.  I put my wife and Gittel on.
12     Q.    When you were the sole trustee --
13     A.    Yes.
14     Q.    -- did you make -- did you
15  unilaterally make decisions for the
16  management of Mosdos?  I mean how did that
17  work?
18     A.    There was no management of
19  Mosdos.  Mosdos then was only litigation.
20  And I think the lawyers were just fighting
21  the case.  There wasn't much to do.
22           I mean I may have spoken to my
23  brother about different aspects of a case
24  that are going on, he knew about it, we

91

Aryeh Zaks

1  
2  were involved in it.  But -- and then there
3  was a lawsuit that was filed by my wife and
4  his wife against the villages at some
5  point.  But I don't think that -- there
6  were no real decisions to make other than
7  to fight the battle.
8      Q.    Who was involved in making the
9  decision to file for bankruptcy in 2011?
10     A.    I filed it.  And I filed it, if
11  you look carefully at that paper, it
12  doesn't say anything about Mayer Zaks
13  having authorization to do anything, it
14  only says me.
15           In 2012, when I put my brother
16  on, it says both of us.
17     Q.    So your brother had rejoined
18  the --
19     A.    Officership.
20     Q.    -- officer group --
21     A.    Yes.
22     Q.    -- prior to September of 2012
23  when the bankruptcy --
24     A.    Just then I put him on.
25     Q.    Did you inform him that he was

92

Aryeh Zaks

1  going to be an officer?
2      A.    I told him he's going to be
3  signing and he said I have to be president.
4  I said, sure, anything that had to do with
5  -- sounded honorable, he was ready.  As
6  long as it's...
7      Q.    How was the decision made to
8  retain Robinson Brog?
9      A.    We dealt with Robinson Brog the
10  first bankruptcy with Yeshiva Chofetz Chaim
11  Kiryas Radin, which was part of the yeshiva
12  that bought the property from the U.S. Army
13  in 1997.
14     Q.    And that decision to retain them
15  was made by whom?
16     A.    At that point both of us.
17     Q.    And what was the capacity in
18  which Rabbi Mayer was involved  in that
19  decision?
20     A.    I think we spoke about it evenly.
21  I mean we both were the rabbis of that
22  corporation, we both knew there was a
23  problem and we had to fight -- there was a
24  foreclosure action.

137

Aryeh Zaks

1  foolish.
2
3          So I said we'll put it on for 50.
4  We were going to give up the trusteeship,
5  so put this document in and we made it part
6  of it.
7      Q.    Now, this document sets out a
8  whole article about the requirements and
9  the process for becoming a member in
10  Article Three.
11     A.    Correct.
12     Q.    And I think your testimony was
13  that those procedures were never followed,
14  is that correct?
15         MR. LEVINE:  Objection.
16     A.    There was nobody who applied yet.
17  Mosdos doesn't operate, there is nothing to
18  apply to.
19     Q.    If you turn to Article Nine, it
20  talks about the board of trustees.
21     A.    Yes.  Yes.
22     Q.    And the document specifies
23  certain obligations of the secretary.  Do
24  you see that?
25         MR. LEVINE:  Where are you?

138

Aryeh Zaks

1
2      Q.    "The Secretary shall keep the
3  minutes and records of the organization in
4  appropriate books."  Do you see that?
5         MR. LEVINE:  Where are you?
6      Q.    That's under Secretary in Article
7  Nine.
8      A.    Yes.
9      Q.    And you were the person elected
10  as secretary at that initial -- at the
11  initial meeting, correct?
12     A.    Yeah, at the initial meeting,
13  correct.
14     Q.    Until the time that you resigned,
15  did you keep minutes and records of the
16  organization in appropriate books?
17     A.    I don't know what minutes we had.
18  That I would have to go back and look at.
19  But I believe there wasn't much.  It was
20  from the beginning of 2003, by the end I
21  was out.
22     Q.    If you go to -- if you --
23     A.    I mean there may have been,
24  possible.
25     Q.    If you go to Article -- bear with

139

Aryeh Zaks

1  me one second.
2
3          You said before that Mosdos
4  conducted annual meetings on the 1st of
5  September each year, do I have that right?
6      A.    I believe it's somewhere in the
7  corporate papers.
8      Q.    But I'm looking for that in the
9  bylaws.
10     A.    I don't know if it says it in the
11  bylaws.  But I think it says -- no, this
12  was the annual elections on December.
13  Somewhere it said September 1st if I
14  remember correctly.  I don't know where to
15  find it.
16     Q.    Yeah, it says it in Article Four
17  Meetings.
18     A.    Okay.  Maybe that's where it is.
19     Q.    The annual meeting shall be on
20  the first day of September except if that's
21  a legal holiday.
22     A.    Okay.
23     Q.    But you did just refer to the
24  certificate of incorporation which provides
25  that --

140

Aryeh Zaks

1
2      A.    It had December.
3      Q.    -- the election of directors will
4  be in December.
5      A.    Correct.  We changed it to
6  September.
7      Q.    When was it changed?
8      A.    When we made the bylaws.  The
9  bylaws are created --
10     Q.    Are there minutes that reflect
11  that change?
12     A.    The bylaws itself.
13     Q.    Why was that -- there's no
14  indication here.  I don't see any
15  document -- anything in the bylaws that
16  reflects there having been voted on or
17  approved by the directors.  Was there
18  something separate that --
19     A.    The bylaws were voted and
20  approved by everybody when we made them.
21     Q.    And there's no resolution that
22  says that, is that correct?
23     A.    I don't recall.
24         MR. NASH:  Objection.  You're
25  assuming you need a resolution.

165

Aryeh Zaks

1  wife and my daughter and I said we're going
2  to put him on as president, do you agree,
3  as an officer?  They said sure.
4      Q.    Do you know --
5      A.    I want him to sign.  They said
6  sure, we want him to sign.  Finally, should
7  live up to the mess that he created.
8      Q.    And that meeting may have taken
9  place in person, it may have taken place by
10 phone?
11     A.    I don't recall.
12     Q.    By the way, where was your
13 daughter Gittel living in April 2012?
14     A.    Probably here at home.
15     Q.    She wasn't in Israel at that
16 time?
17     A.    Not yet.  I don't think so.
18     Q.    Do you recall when she left to go
19 to Israel?
20     A.    She was here.  For sure she was
21 here.
22     Q.    It says that the resolutions were
23 adopted and recorded in the minute book.
24 Was there in fact a minute book?
25

166

Aryeh Zaks

1      A.    I don't think so.  I don't know
2  what it says here.  Who wrote those words?
3  I guess that's the language that Mitch
4  Greene's office used.  I didn't prepare
5  this document.
6      Q.    Did you review the language of
7  the document before your brother was asked
8  to sign it?
9      A.    I definitely spoke to him about
10 it and told him that it has to say that
11 either one of us has the ability to bring
12 this case to a conclusion.
13     Q.    Did you discuss this document
14 with Mitch Greene or anybody else in the
15 Robinson Brog office before your brother
16 signed it?
17     A.    I'm sure I did.
18     Q.    Did you, in the course of that
19 conversation, advise -- withdrawn.
20        Do you know whether the lawyers
21 in Mitch Greene's office, whoever prepared
22 this document, was aware that there was no
23 formal minute book?
24     MR. NASH:  Objection.

167

Aryeh Zaks

1      MR. LEVINE:  Give me one second.
2  Hold on one second.
3      MR. NASH:  Objection.
4      A.    It's lawyer-client issues.
5      MR. NASH:  It's not
6  lawyer-client.
7      MR. LEVINE:  Are you waiving any
8  potential privilege on behalf of Rabbi
9  Mayer?
10     MR. LANE:  No, I'm not.
11     MR. TWERSKY:  No.
12     MR. LANE:  I don't think it's a
13 lawyer-client conversation.  I'm asking
14 if he knows whether they were aware.
15     A.    I have no idea.
16     Q.    Thank you.  Let's go to the next
17 document.
18        You referred to the mess that
19 your brother had created just now, a few
20 minutes ago.  Can you describe the mess,
21 please?
22     MR. NASH:  Okay.  He's going to
23 give you a narrative.
24     MR. TWERSKY:  Stop, stop, stop,

168

Aryeh Zaks

1  stop, stop, stop.
2      MR. NASH:  And don't move to say
3  it's unresponsive.
4      MR. LEVINE:  I don't think you
5  should be that close to him, without
6  wearing a mask, and screaming.
7      MR. LANE:  I'm okay with that.
8      MR. TWERSKY:  Kevin knows me a
9  long time.
10     MR. LEVINE:  The spit goes on
11 him.
12     MR. TWERSKY:  Stop, stop.  No
13 directing the witness.
14     MR. NASH:  I'm not.  I'm just
15 telling him.  He doesn't need
16 direction.
17     MR. TWERSKY:  Stop, Kevin.
18     Q.    Please describe the mess that you
19 say your brother caused.
20     MR. NASH:  Go.
21     A.    The fact that a person by the
22 name of Mr. Grunwald bought the note and
23 started a foreclosure -- the bank never
24 started a foreclosure.  Mr. Grunwald who

201

1 Aryeh Zaks
2 persons attended in person and certain
3 persons attended by phone.  But before I
4 ask you -- withdraw that question.
5        Do you know who prepared this
6 document?
7     A.    I believe I did.  Maybe with my
8 wife.
9     Q.    When did you prepare it?
10     A.    Then.  At some point back in
11 2018.
12     Q.    Do you have a -- was it prepared
13 on September 1, was it prepared --
14     A.    Probably a little bit later.  I
15 don't recall.  But sometime probably in
16 September of that year.  Definitely not
17 September 1.
18     Q.    Did you prepare this on your
19 computer?
20     A.    I don't recall.  But I can look
21 for it if you would like me to, if it's
22 something that my lawyers say I should do.
23        MR. LANE:  This has come up
24        before.  We would like to obtain, if
25        this document was prepared by Rabbi

202

1 Aryeh Zaks
2        Zaks on his computer, we'd like to have
3        the document produced in native format
4        so we can see the metadata.
5     A.    I don't know what I have.  I may
6 have it in a PDF or it may have been typed
7 up in a Word.
8        MR. LANE:  That's fine.  If it's
9        in a Word document, I'd like to know
10        what form it was produced in.
11        MR. LEVINE:  You'll give us a
12        letter setting forth all your requests
13        for documents, right, Stan?
14     Q.    How many computers do you have,
15 by the way?
16        MR. LEVINE:  You'll give us a
17        letter?
18        MR. LANE:  We'll give you a
19        letter, we'll give you a letter.
20     A.    There are several computers that
21 multiple people use.  There's one that I
22 just got two months ago.  Mine, I had three
23 that the hard drives died and they thew
24 them out.  I had --
25     Q.    You must have the same computers

203

1 Aryeh Zaks
2 that I have.
3     A.    I don't know why, it just burnt
4 out, it was unbelievable, everything, just
5 dead.  I didn't have the backup so it
6 created a problem.
7     Q.    So the lawyers for Mosdos
8 produced this document as an exhibit in
9 response to discovery.
10     A.    Correct.
11     Q.    Do you know who provided a copy
12 of this document to Mosdos's lawyers to be
13 produced?
14     A.    I believe I had a copy of it
15 somewhere.  I may have had it in an e-mail,
16 I'm going to go back and look.
17     Q.    So you may have reviewed e-mails,
18 that may have been attached to an e-mail,
19 is that --
20     A.    It may have been attached to an
21 e-mail back then.  I don't know from then.
22     Q.    If you had it in e-mails, do you
23 know what address, the e-mail address that
24 was?
25     A.    This I don't remember.  I'll go

204

1 Aryeh Zaks
2 back and look.  All know is I may just have
3 it somewhere as a copy of a PDF.
4     Q.    This has been produced in the
5 last several weeks --
6        MR. LEVINE:  Excuse me?
7     Q.    -- do you recall how it was
8 transmitted, did you give your lawyer a
9 hard copy?
10        MR. LEVINE:  Wait, wait, wait,
11        what do you mean it's been produced in
12        the last several weeks?
13        MR. LANE:  No, no.  I mean
14        produced in the litigation in the last
15        -- I mean it was provided to us.  I'm
16        not talking when it was prepared.
17        MR. LEVINE:  Okay.  Thank you.
18     Q.    Do you recall the form in which
19 it was delivered to your counsel?
20     A.    Could be it was in a book, I
21 don't know.
22        MR. NASH:  Objection.  Objection.
23        MR. TWERSKY:  You can answer
24        anyway.
25        MR. NASH:  No, I think it's

205

Aryeh Zaks

1  privileged.
2
3       MR. TWERSKY:  No, it's not
4  privileged, no it's not.
5       A.    I think I gave him a book of
6  documents that we found or whatever.  I
7  know it's part of it.
8       Q.    The question is whether you would
9  have transmitted electronically or hard
10  copy?
11       A.    I don't know at this point.  I
12  really don't know remember.
13       Q.    If it was in a book, what kind of
14  book would it have been in?
15       A.    It would be a book of documents
16  that my lawyer got from me and it's between
17  me and him what else was in there.
18       Q.    Is that a book that was assembled
19  after this litigation started?
20       A.    Probably.
21       Q.    So you went and pulled documents
22  and put it in a file like we're doing?
23       A.    Yeah, something like that.  I
24  looked around in old papers and whatever I
25  was able to find.

206

Aryeh Zaks

1
2       Q.    Where did you look for documents?
3  I'm just curious.
4       A.    I looked for documents -- I had
5  some documents here in the house.  I had
6  some documents in Kiryas Radin.  I had some
7  documents in the basement of 18 which I'm
8  missing.  I had a hard drive as a backup
9  which was in Kiryas Radin as well.  And
10  that's why I, when my computer died, I went
11  a little bit ballistic.  There are a lot of
12  things that I had to resurrect by simply
13  going through my e-mails and finding any
14  document that I sent to somebody.  That's
15  why I said, it may have been part of an old
16  e-mail somewhere and I'm going to go look
17  back and see where I found it.
18       Q.    Do you know whether anybody from
19  Robinson Brog ever saw this document?
20       A.    Possibly.  I don't -- maybe
21  that's where I got it, I have to look.
22  Maybe it was wired -- you know, e-mailed to
23  them.  I don't know.  I'm not going to
24  speculate.
25            I don't know why they would have

207

Aryeh Zaks

1
2  needed it but...
3       MR. LEVINE:  Okay.
4       A.    Go ahead.
5       MR. LEVINE:  Wait for a question.
6       Q.    Do you know whether anybody at
7  Robinson Brog was aware, when your brother
8  signed the resolution as president
9  authorizing you or your brother to sign
10  documents for Mosdos, that your brother was
11  not a trustee?
12       MR. LEVINE:  How would he know
13  what they're aware of?
14       MR. TWERSKY:  We're asking.
15       MR. LANE:  If he knows.  If he
16  doesn't know, he'll say no.
17       A.    I don't know what they know.  I
18  don't think it ever came up.  Nobody asked
19  me.
20       Q.    You never told Robinson Brog your
21  brother resigned as trustee, did you?
22       MR. LEVINE:  Objection to form.
23       A.    No, I said he was president so he
24  can sign.
25       MR. LEVINE:  Objection to form.

208

Aryeh Zaks

1
2       Q.    It says that some people attended
3  in person and some people attended via
4  phone.  Do you know who attended in person
5  and who attended by phone?
6       A.    I was in Kiryas Radin that night.
7  So I was in person for sure.  I believe --
8       Q.    Louder.
9       A.    My wife was not there.  I don't
10  recall who else was around.  My other son
11  was there as well, I think, Gershon.  But
12  he was not on the board but he was around.
13  I'm trying to remember who else was with
14  me.  Mendel possibly was there as well, I
15  think.
16       Q.    Do you recall --
17       A.    No, Mendel was not there maybe.
18  I can't recall exactly.  But I know I was
19  on a phone call, I spoke to my wife.  Could
20  be Mendel, Mendel maybe was there, he spoke
21  -- I was speaking to Gittel.  But we had
22  the meeting, definitely.
23       Q.    Gittel was in Israel at that
24  time, right?
25       A.    In Israel, correct.  By her it

209

Aryeh Zaks

1  was like early, early morning.  But her
2  husband was up that night.  By then he
3  already finished selichos.
4      Q.    Do you recall what time the call
5  took place?
6      A.    I had to be in -- I was the
7  cantor, I led the services for selichos in
8  the yeshiva, the yeshiva's congregation on
9  Highview Road.  My brother was coming to
10 lead the selichos in the yeshiva's
11 congregation at 50 Kiryas Radin Drive.  So
12 I had to be in the yeshiva before 12
13 o'clock for sure.  1 o'clock was selichos,
14 I was probably at Yeshiva long before that.
15      So it had to be from the end of
16 Shabbos sometime, probably 45 minutes, an
17 hour after Shabbos -- I don't know when
18 Shabbos ended that year, that time.  9, 10
19 o'clock, whatever that was.  I don't recall
20 right now.
21      Q.    So you were at Highview --
22      A.    At 1 o'clock I was the cantor at
23 the Highview Road and led the services at
24 the Highview Road congregation.

210

Aryeh Zaks

1      Q.    At 1 o'clock Sunday morning?
2      A.    That night.
3      Q.    Yeah, that night.
4      A.    Same night.  This is before 12
5  and that's after 12.  By midnight I was
6  probably already there.
7      Q.    Okay.  Did you spend Shabbos that
8  day at -- were you here or were you at
9  Kiryas Radin for Shabbos that day?
10      A.    I believe I was home.  I would be
11 able to check on that probably.
12      Q.    Okay.
13      A.    If, on the camera system that was
14 stolen, I would have had -- been able to
15 see if I was there Shabbos was not.
16      Q.    So after Shabbos, if you went to
17 Kiryas Radin for this meeting, you would
18 have had to drive from here to Kiryas
19 Radin, correct?
20      A.    Most likely.  Or somebody could
21 have taken me.
22      Q.    I don't know how long it takes.
23 How long does it take?
24      A.    It's a long trip.  At least --

211

Aryeh Zaks

1      Q.    Five minutes?
2      A.    -- three to five minutes.
3  Depending on traffic.  And if my son's
4  driving, it could take even less, but let's
5  not talk about it.
6      Q.    Do you know how long this meeting
7  lasted?
8      A.    No.  Probably half hour.  I'm
9  looking at this, I'm remembering there was
10 a crisis in the middle.  So things came to
11 a quick halt but, yeah, not that long.
12      Q.    The crisis you're referring to is
13 the family medical emergency that's
14 referred to?
15      A.    Yes.
16      Q.    And that occurred before selichos
17 started?
18      A.    Yes.
19      Q.    And it cut short the meeting?
20      A.    It cut short the meeting, yes.
21      Q.    And you learned of that crisis
22 while you were at Kiryas Radin?
23      A.    I learned of that crisis -- I
24 think I was on the phone with my wife.  I

212

Aryeh Zaks

1  don't know.  I believe at that point -- I
2  was probably at Kiryas Radin when that
3  happened.  And everything -- yeah, okay,
4  whatever it was, I'm not going to discuss
5  that.
6      Q.    I'm not going to ask.
7      Did the crisis require someone's
8  hospitalization?
9      A.    Yes.  We went to the hospital.
10      Q.    Did everything work out?
11      A.    Thank God.
12      Q.    Was it a member of your immediate
13 family?
14      A.    I guess you would call it a
15 member of my immediate family.  What do you
16 consider immediate?
17      Q.    Children and spouses.
18      A.    Yes.  Do grandchildren count?
19 Just out of curiosity.
20      MR. NASH:  Yes, they count.
21      Q.    Yeah.  Was it a grandchild?
22      A.    Let's not go there.
23      Q.    So some of the people, and
24 certainly Gittel would have participated by

213

Aryeh Zaks

1  phone?
2
3      A.    Yes.
4      Q.    Her husband would have
5  participated by phone.  You didn't mention
6  Deborah, was Deborah participating by
7  phone?
8      A.    Deborah, Deborah was probably --
9  she may have even been with me.  I'm trying
10  to remember where she was.  I was in the
11  yeshiva building -- I call it Yeshiva
12  building because Yeshiva uses it.  In
13  Mosdos's building at 50 Kiryas Radin Drive
14  that they were the owner of, I was in the
15  office.  I was in the back.  I even went
16  downstairs, I remember going downstairs, we
17  have a hall.  And I know Mendel was -- I
18  think Mendel was there.  Deborah, I can't
19  recall.  She was around because of the
20  medical emergency so that's why I'm a
21  little bit confused what happened and when
22  people came where.  And definitely Gittel
23  and her husband were via phone.
24      Q.    And it's your recollection that
25  your wife was also participating by phone,

214

Aryeh Zaks

1
2  correct?
3      A.    Yes, sure.
4      Q.    Was that a conference call?  How
5  was that set up?
6      A.    No.  I think I called one --
7  could be my son Mendel called Gittel at the
8  time.  So it was not a conference call but
9  everybody was speaking with me.  It could
10  be I put up a speakerphone and they heard
11  each other.  I don't even remember.
12      Q.    I'm trying to -- and I assume
13  there was somebody else physically present,
14  otherwise it would have been entirely by
15  phone?
16      A.    Right.
17      Q.    When you were participating in
18  this meeting by phone with other members of
19  the board, the existing board and the new
20  board members, did that meeting all occur
21  while you were in one place or were you
22  walking around the building at the time?
23      A.    I mean generally I was in the
24  building probably for 15, 20 minutes before
25  this meeting started.  It takes time to put

215

Aryeh Zaks

1  everybody together even on a phone,
2  especially on a phone.  Even when you sit
3  here it takes time.
4      So I was around the building.  I
5  walked downstairs, I came back up, I was in
6  the office, which is a glass little office
7  that we have when you come in on the right
8  side.
9
10      Q.    I've actually seen it.
11      A.    You've seen it?
12      Q.    Yes, I have.
13      A.    I didn't know that.
14      Q.    So I'm trying to understand the
15  sequence.  You may have called Mendel or --
16      A.    Mendel maybe was with -- I'm
17  trying to remember who was with me.  Could
18  be Deborah was with me and she put Gittel
19  on the phone.  Somebody was there, we put
20  Gittel on the phone.  I was on the phone
21  with my wife, that I recall.
22      Q.    When you were on the phone with
23  your wife during this meeting, what cell
24  phone were you using?
25      A.    I don't recall.

216

Aryeh Zaks

1
2      Q.    How many cell phones do you have?
3      A.    It depends.  I could use my
4  children's cell phones.  I use mine.  I've
5  changed cell phones sometimes.  My last
6  cell phone I just gave -- my phone I gave
7  to him.
8      Q.    We've gone through that exercise
9  before with other witnesses.  How often do
10  you use -- how many different cell phones
11  do you use?
12      A.    It depends.  Many times I use
13  cell phones whoever's standing next to me.
14      Q.    Okay.
15      A.    I many times don't carry my cell
16  phone.  I don't want to be bothered.  When
17  there is somebody who needs me or I know
18  there's an issue, I'll carry a cell phone.
19  Sometimes -- I have a cell phone which
20  doesn't -- I never use to make phone calls,
21  I sometimes take it out just if I need to
22  have for e-mail purposes because my cell
23  phone doesn't have any type of e-mail
24  capability that I can use.
25      Q.    Do you believe that the cell

217

Aryeh Zaks

1  phone that you were using at this meeting
2  was not a smart phone, it was a cell phone
3  that didn't have e-mail capability?
4      A.    Probably.
5      Q.    Do you know what phone numbers
6  you may have used to participate in this
7  call?
8      A.    It could be I called at that time
9  352-8448, which was my home number.  I
10  don't know if my wife was on her cell phone
11  or -- -
12      Q.    354?
13      A.    -- on my home phone.  352-8448.
14      Q.    I'm sorry, I'm very slow at this.
15  352?
16      A.    8448.
17      Q.    And that's a --
18      A.    That was my home phone.
19      Q.    What's the prefix for that?
20      A.    845.
21      Q.    845?
22      A.    Then --
23      Q.    I'm more interested in the call
24  that connected to folks in Israel.
25

218

Aryeh Zaks

1      A.    I don't remember whose phone that
2  was.  And it could be -- it's possible my
3  wife connected them through the house
4  phone.  I have no idea.
5      Q.    What number would she have used
6  to connect?
7      A.    She could have used this number
8  or she could have used any other phone that
9  was there.  Not every phone that we had
10  always had ability to call out of the
11  country.  We had trouble with that for a
12  while.  So I don't know, sometimes one
13  phone works to call overseas and one only
14  works domestically.  I have no idea.
15      Q.    Is there any way that you're
16  aware of that we would be able to determine
17  which phone was used to call Israel?
18      A.    Not at this moment.  I would have
19  no idea.
20      Q.    How would you do that?
21      A.    I would probably ask my son
22  Henoch.
23      Q.    Was Henoch party to the meeting?
24      A.    Not that I know of.
25

219

Aryeh Zaks

1      Q.    Do you know whether he was
2  listening in?
3      A.    I wouldn't know.  Ask him.  He
4  wasn't with me.
5      Q.    Do you know, when you were at
6  Kiryas Radin that night -- and part of that
7  time you were in this meeting and then you
8  had to leave.  Did you go anywhere when you
9  left Kiryas Radin -- because you said you
10  led services at 82 Highview?
11      A.    Yes.
12      Q.    Did you go travel straight from
13  Kiryas Radin to 82 Highview?
14      A.    No.  I'm sure I stopped for,
15  somewhere else, where there was -- because
16  of that medical emergency issue that I had
17  to deal with in the middle.
18      Q.    Do you know how long -- can you
19  have any recollection how long the interval
20  was from the time you left Kiryas Radin
21  till the time you were at Highview?
22      A.    I don't remember.
23      Q.    Do you know what time you got to
24  Highview?
25

220

Aryeh Zaks

1      A.    I figured around midnight
2  sometime.  I think the services started at
3  1, I was there 45 minutes before or
4  whatever.
5      Q.    Do you know how long the interval
6  was from the time the meeting ended till
7  the time you ended up at Highview?
8      A.    Not that long but I did stop off,
9  I believe I stopped off even at home, here,
10  on the way.
11      Q.    Would it have been more than a
12  half an hour?
13      A.    No.  Less probably.
14      Q.    And you got to Highview around
15  midnight?
16      A.    I -- probably around midnight.  I
17  stopped here, I had to take care of this
18  emergency.  Maybe the emergency took me
19  longer.  When you're dealing with crisis
20  time flies.
21      Q.    It says in the minutes that you
22  were appointed as president at that
23  meeting?
24      A.    Yes, president, yes.
25

233

Aryeh Zaks

1    MR. LEVINE:  No, you didn't ask
2    him to switch to Exhibit 10.
3    A.    Okay.  I understood it.  It's
4    fine.
5    Q.    That's how you understood it,
6    correct?
7    A.    And I answered that, to the best
8    of my knowledge, I don't recall such a
9    vote.
10   Q.    There are two trustees who are
11   not present and did not participate in the
12   meeting memorializing the September 1
13   minutes.
14   MR. NASH:  Which exhibit?
15   MR. LEVINE:  Exhibit 10?
16   Q.    Exhibit 10, we're on Exhibit 10.
17   MR. NASH:  Say Exhibit 10, that's
18   all you have to do.
19   Q.    Do you know why Deborah did not
20   participate in the September 1, 2019
21   meeting?
22   A.    It wasn't really necessary.  She
23   knew it wasn't as important.  The
24   resolution to submit -- I was authorized

234

Aryeh Zaks

1    multiple times to do this.  I was
2    authorized by 2018, I was authorized by
3    Mayer's document that he filed when we
4    filed a bankruptcy, and I was authorized by
5    a document that we prepared way back when
6    in 2003 before we went off the board.  So
7    there was no real reason for everybody to
8    come.  They knew there was nothing
9    important.
10   And I don't remember where
11   Deborah was that day, but I guess she had
12   something more important to do.  You can't
13   force people to always attend meetings.  We
14   try.  And I guess that Eliyahu Layosh, it
15   was the first day of the zman, which means
16   it was the first day of the semester that
17   started.  So probably Eliyahu Layosh was
18   out studying, which is something he does
19   all day.
20   Q.    Was he in Israel at the time?
21   A.    In Israel, correct.
22   Q.    Do you recall where this meeting
23   was held?
24   A.    Yes, I was in Kiryas Radin that

235

Aryeh Zaks

1    day.  It was the first day of the zman.
2    Q.    So it was in the synagogue
3    building at 50 --
4    A.    It was in that building, correct.
5    And Mendel was there as well.
6    Q.    Where in the building?
7    A.    I probably had it in the office,
8    if I remember correctly.  That's where I
9    was on the phone.
10   Q.    Okay.  And Mendel was there with
11   you.  Was your wife there with you as well?
12   A.    No, I believe not.
13   Q.    And Gittel obviously --
14   A.    Gittel was obviously --
15   Q.    -- was in Israel?
16   A.    -- not there.
17   MR. LEVINE:  Let him ask the
18   question before you answer.
19   Q.    Do you recall -- it says "via
20   phone conference" -- was there a single
21   line that set it up?
22   A.    I am not that sophisticated.  I
23   don't think I've ever set up a phone
24   conference in my life as what you call a

236

Aryeh Zaks

1    conference call, not that I remember.  I
2    wouldn't know how to do it.
3    Q.    Do you know who set it up?
4    A.    I didn't say we set one up.
5    Probably --
6    Q.    It says "via phone conference."
7    A.    Oh, phone conference can mean if
8    I clicked on my phone and I put you on hold
9    and call him, and then you put somebody
10   else on hold, so it becomes a phone
11   conference.
12   Q.    Do you know who initiated the
13   first phone call?
14   A.    No, I don't.
15   Q.    Do you know what phone was used?
16   A.    Maybe Mendel, I have no idea.
17   Q.    I think I may have asked you
18   this, but do you know what the phone number
19   was for Mendel's phone at the time?
20   A.    No, no idea.
21   Q.    Do you know how long that meeting
22   lasted?
23   A.    I'm looking at it, probably not
24   that long, like 45 minutes, an hour, less.

# Exhibit J

347

H. Zaks

1    Q.    I mean are there cameras at
2  Highview?
3    A.    There are cameras at Highview,
4  yes.
5    Q.    You've never disconnected those
6  cameras, have you, you personally?
7    A.    Disconnect the cameras. I
8  actually shut them off for Shabbos.
9         There was a time where little Joe
10  would fight the fight of making sure the
11  cameras were on on Shabbos, even though the
12  system -- you're laughing but it's God
13  honest truth. He would fight the fight of
14  making sure the cameras were on on Shabbos
15  like they have in their house. The cameras
16  in their house are on on Shabbos. And he
17  wanted the cameras on in the shul building
18  and the like magnetic locks on the door.
19  And I would shut off those cameras for
20  Shabbos.
21    Q.    So you think -- so were the
22  cameras --
23    A.    Hold on one second.
24    Q.    -- did they run on Shabbos?

348

H. Zaks

1    A.    I need a second. Hold on. I'm
2  sorry.
3         What was your question?
4    Q.    I said did the cameras at
5  Grandview, did they run on Shabbos?
6    A.    I believe they did not.
7    Q.    And who is responsible --
8    A.    Not on a regular basis. That's
9  for sure.
10    Q.    Let's talk about the second
11  system which you discussed beginning at
12  paragraph 13 of your declaration.
13         MR. LANE: You know what, I need
14         to take a three minute break. Can we
15         stop for three minutes and I'll be
16         right back.
17         (Recess)
18  EXAMINATION CONTINUED
19  BY MR. LANE:
20    Q.    Just I thought I asked you this,
21  but in retrospect I may have only said this
22  with respect to Ron Henig.
23         Mr. Zaks, did you have the
24  password for the laptop computer that was

349

H. Zaks

1  in the office?
2    A.    I don't recall.
3    Q.    And was that laptop replaced
4  after the January -- alleged January 2020
5  burglary?
6         MR. LEVINE: Whoa. Nobody said
7         January 2020. Objection to form.
8    Q.    The burglary that took place a
9  couple of days after the first -- beginning
10  of the year wire-cutting incident --
11         MR. LEVINE: Objection to form.
12    Q.    -- was that laptop replaced?
13         MR. LEVINE: Objection to form.
14    A.    Asked and answered.
15    Q.    I don't recall the answer. We
16  don't have the transcript in front of us.
17         Was that laptop replaced?
18    A.    I don't know what you mean by
19  that question.
20    Q.    You said that the laptop that was
21  there in the basement was stolen, along
22  with the Wi-Fi thing that was removed from
23  the closet.
24    A.    What is your question?

350

H. Zaks

1    Q.    Okay.
2    A.    Was there another laptop --
3    Q.    Was a laptop --
4    A.    -- put in that office?
5    Q.    Was a new laptop placed in the
6  office after the laptop that was there at
7  the beginning of the year was stolen?
8         MR. LEVINE: Objection. Asked
9         and answered. You can answer again.
10    A.    No.
11    Q.    Okay. So now -- after the theft
12  at the beginning of the year that's
13  referred to in Roman numeral I of your
14  declaration, there was no new laptop put
15  in.
16         Was there some other computer
17  that was put in other than the hardware
18  that's directly connected to the CCTV
19  system?
20    A.    Hardware? I don't recall.
21    Q.    Okay. You also said at one point
22  that from time to time it was possible that
23  documents were scanned into the hard drive.
24  Was there a scanner at any time in the

# Exhibit K

# LEVINE & ASSOCIATES, P.C.

## ATTORNEYS-AT-LAW

**15 Barclay Road**
**Scarsdale, New York 10583-2707**
**e-mail: ml@LevLaw.org**
**Fax (914) 725-4778**
**Telephone (914) 600-4288**

September 14, 2020

**Via ECF and Fax (212-401-9258)**

Hon. Paul I. Marx, J.S.C.
Rockland County Supreme Court
1 South Main Street
New City, NY 10956

### *Re: Yeshiva Chofetz Chaim, Inc., et. al. v. Yeshiva Chofetz Chaim Inc., et.al. (036178/2019)*

Dear Judge Marx:

The undersigned is counsel to the Defendants in the above-referenced matter. This matter was originally assigned to Judge Thorsen and reassigned to this Court recently. The matter involves a dispute between two brothers, Rabbi Mayer Zaks and Rabbi Aryeh Zaks, both of whom were, at one point, trustees of the entity Yeshiva Chofetz Chaim, Inc. ("YCC"). I am representing the Rabbi Aryeh Zaks side, and Joseph Churgin, Esq. is representing the Rabbi Mayer Zaks side. The action now before this Court was commenced by Rabbi Mayer Zaks in 2019.

We received the Court's notice today regarding conferring on a mutually acceptable briefing schedule and we will do so with Mr. Churgin forthwith. However, I wanted to alert you to a situation that we believe may become an issue shortly. There is another matter that was recently commenced by me on behalf of YCC (the Rabbi Aryeh Zaks side) as against YCC (the Rabbi Mayer Zaks side) involving the propriety of a Payroll Protection Program ("PPP) loan in excess of $300,000 that was taken by Rabbi Mayer Zaks, purportedly on behalf of YCC. It is a completely different set of facts from those before this Court in connection with the action assigned to this Court. The recently commenced PPP action was assigned to Judge Eisenpress under Index number 033156/2020.

It is our belief that Rabbi Mayer Zaks (Plaintiff in the matter referred to this Court) will shortly seek to have your Honor re-refer the action assigned to this Court to Judge Eisenpress. The reason that we believe that to be the case is that Rabbi Mayer Zaks, who brought the original action in 2019 (that has now been assigned to this Court) has recently taken the position in a deposition in another case (one before Judge Drain in the Bankruptcy Court) that your Honor is somehow either not smart enough to understand the issues between the brothers, or can be fooled by a "spiel." Specifically, at his deposition of August 7, 2020, Rabbi Mayer Zaks testified as follows:

LEVINE & ASSOCIATES, P.C.
ATTORNEYS-AT-LAW

Hon. Paul I. Marx, J.S.C.
Page 2

September 14, 2020

Q: You know that you would have told Mr. Blisko to change paragraph ---

A: No. Reb Mordeche,[1] stop this. You're talking – Judge Drain is a brilliant man. It's not going to help. This spiel is good for Marx, and then you get something – stop it. For Judge Marx it's good. Stop it. It's not for Judge Drain, he's a smart man. If you think a fictitious illusional (sic) that he's going to believe that in the middle of the night somebody put board members on. Come on, stop it. Before the – stop it. Do your job and let's get it done.

A copy of the cover and transcript page cited above is enclosed with this letter. While I wholeheartedly agree that Judge Drain is a smart man, I have (as you know) been before this Court on several occasions and (without attempting to be patronizing) do not, for one minute, believe that this Court is not equally smart or that this Court can be bamboozled by *anything* ("spiel" or otherwise). However, the fact that Rabbi Mayer Zaks believes otherwise, will, I suspect, result in his attempt to remove this case from your Honor for some created reason. I just wanted the Court to understand what we believe to be the motive for that.[2]

Thank you for your attention.

Respectfully,

MICHAEL LEVINE

cc    All counsel (via e-mail)

---

[1] "Reb Mordeche" (the second word being my Hebrew name) is what Rabbi Mayer Zaks insisted on calling me throughout his deposition, notwithstanding my repeated requests that he refer to me as "Mr. Levine" or "counsel." It was, I believe, his unsuccessful attempt to either "rattle" or demean me during the deposition.

[2] There are other issues with the action now before this Court, such as whether a prior Oder from Judge Drain prohibited the continued prosecution of this action, but we will deal with that at the appropriate time.

1                                                                    1

2          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF NEW YORK
3          ------------------------x

4          MOSDOS CHOFETZ CHAIM INC., RABBI MAYER ZAKS,
           derivatively on behalf of MOSDOS CHOFETZ
5          CHAIM INC., SIMA WEINTRAUB, derivatively on
           behalf of MOSDOS CHOFETZ CHAIM INC., DANIEL
6          ROSENBLUM, derivatively on behalf of MOSDOS
           CHOFETZ CHAIM INC., JOSEPH GRUNWALD,
7          derivatively on behalf of MOSDOS CHOFETZ
           CHAIM INC. and YISROEL HOCHMAN, derivatively
8          on behalf of MOSDOS CHOFETZ CHAIM INC.,

9                    Plaintiffs,
                                          Adv. Pro. No.
10                 -against-             20-08949-rdd

11         MOSDOS CHOFETZ CHAIM INC., CHOFETZ CHAIM
           INC., TBG RADIN LLC, SHEM OLAM LLC,
12         CONGREGATION RADIN DEVELOPMENT INC., ARYEH
           ZAKS, BEATRICE WALDMAN ZAKS, HENOCH ZAKS,
13         MENDEL ZAKS, GITTEL ZAKS LAYOSH, SAMUEL
           MARKOWITZ and STERLING NATIONAL BANK,

14
                     Defendants.
15
           ------------------------x
16                                       August 7, 2020
                                         9:38 a.m.
17

18            Deposition of RABBI MAYER ZAKS, taken

19         by defendant Mosdos Chofetz Chaim Inc., at

20         22 Pleasant Ridge Road, Spring Valley, NY

21         10977, before Julia Liu, a Shorthand

22         Reporter and Notary Public of the State of

23         New York.

24

25

```
 1                        Zaks                    359
 2           Q.    You know you haven't seen it, let
 3      alone spend hours reviewing it, because --
 4           A.    No.  This I wouldn't allow.
 5           Q.    You know that you would have told
 6      Mr. Blisko to change paragraph --
 7                 MR. TWERSKY:  Objection.
 8           A.    No.  Reb Mordche, stop this.
 9      You're talking -- Judge Drain is a
10      brilliant man.  It's not going to help.
11      This spiel is good for Marx, and then you
12      get something -- stop it.  For Judge Marx
13      it's good.  Stop it.  It's not for Judge
14      Drain, he's a smart man.  If you think a
15      fictitious illusional that he's going to
16      believe in the middle of the night somebody
17      put board members on.  Come on, stop it.
18      Before the -- stop it.  Do your job and
19      let's get it done.
20                 MR. LANE:  All right.
21           A.    If I had known Rabbi Zaks would
22      steal mortgage and hold the property --
23      that's all true, but I would have added
24      that we're partners in that note.  The
25      yeshiva gave that, the fraudulent --
```

# Exhibit L

1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------x

4  MOSDOS CHOFETZ CHAIM INC., RABBI MAYER ZAKS,
   derivatively on behalf of MOSDOS CHOFETZ
5  CHAIM INC., SIMA WEINTRAUB, derivatively on
   behalf of MOSDOS CHOFETZ CHAIM INC., DANIEL
6  ROSENBLUM, derivatively on behalf of MOSDOS
   CHOFETZ CHAIM INC., JOSEPH GRUNWALD,
7  derivatively on behalf of MOSDOS CHOFETZ
   CHAIM INC., and YISROEL HOCHMAN,
8  derivatively on behalf of MOSDOS CHOFETZ
   CHAIM, INC.
9
            Plaintiffs,
10                      Adv. Pro No.
    -against-     20-08949-rdd
11
   MOSDOS CHOFETZ CHAIM INC., CHOFETZ CHAIM
12 INC., TBG RADIN LLC, SHEM OLAM LLC,
   CONGREGATION RADIN DEVELOPMENT INC., ARYEH
13 ZAKS, BEATRICE WALDMAN ZAKS, HENOCH ZAKS,
   MENDEL ZAKS, GITTEL ZAKS LAYOSH, SAMUEL
14 MARKOWITZ, and STERLING NATIONAL BANK,

15         Defendants.

16 ------------------------x
                August 24, 2020
17              11:35 a.m.

18

19      Videoconference deposition of HENOCH
20 ZAKS, taken by plaintiff, pursuant to
21 notice, reported remotely by Pamela
22 Grimaldi, Registered Professional Reporter,
23 Certified LiveNote Reporter, and Notary
24 Public.
25

---

3

1

2  APPEARANCES (CONTINUED):

3

4  MORRISON COHEN LLP

5      Attorneys for Defendant Henoch Zaks

6      909 Third Avenue

7      New York, New York  10022

8      212.735.8745

9  BY:  AARON B. LAUCHHEIMER, ESQ.

10     alauchheimer@morrisoncohen.com

11

12 KLESTADT WINTERS JURELLER

13 SOUTHARD & STEVENS LLP

14     Attorneys for Defendant Congregation

15     Radin Development Inc.

16     200 West 41st Street, 17th Floor

17     New York, New York  10036

18     212.679.8700

19 BY:  TRACY KLESTADT, ESQ.

20     tklestadt@klestadt.com

21

22

23

24

25

---

2

1

2  APPEARANCES (ALL REMOTE PARTICIPANTS):

3

4  OTTERBOURG P.C.

5      Attorneys for Plaintiff Rabbi Mayer Zaks

6      230 Park Avenue

7      New York, New York  10169

8      212.905.3631

9  BY:  STANLEY L. LANE, JR., ESQ.

10     slane@otterbourg.com

11

12 LEVINE & ASSOCIATES P.C.

13     Attorneys for the Defendant Mosdos

14     Chofetz Chaim

15     15 Barclay Road

16     Scarsdale, New York  10583

17     914.600.4288

18 BY:  MICHAEL LEVINE, ESQ.

19     ml@levlaw.org

20

21

22

23

24

25

---

4

1

2  APPEARANCES (CONTINUED):

3

4  SCHWARTZ SLADKUS REICH GREENBERG ATLAS LLP

5      Attorneys for Defendant Sterling

6      National Bank

7      444 Madison Avenue, 6th Floor

8      New York, New York  10022

9      212.743.7039

10 BY:  MILAD BODDOOHI, ESQ.

11     mboddoohi@ssrga.com

12

13 PRESENT:

14 SIMA WEINTRAUB

15 RABBI ARYEH ZAKS

16

17

18

19

20

21

22

23

24

25

17

H. Zaks

1  Mosdos?
2
3      A.    No.
4      Q.    Do you know who the present
5  trustees of Mosdos are?
6      A.    Yes.
7      Q.    Who -- how do you know that?
8      A.    From my involvement I have
9  knowledge, I know.
10     Q.    Well, from where did you gain
11  that knowledge?
12     A.    From being involved.
13     Q.    And in what manner were you
14  involved?
15     A.    In all matters.  I'm not going --
16  I'm not going to say "all matters."  I've
17  been very involved in Mosdos.
18     Q.    For how long have you been
19  involved in Mosdos?
20     A.    As long as I can remember.
21     Q.    Were you involved in Mosdos
22  during the year 2018?
23     A.    Yes.
24     Q.    What was the nature of your
25  involvement?

18

H. Zaks

1
2      A.    The nature of my involvement is I
3  would call myself somewhat my father's
4  right hand.
5      Q.    Were you ever -- do you consider
6  yourself to be a member of Mosdos?
7      A.    No.
8      Q.    Have you ever been a member of
9  Mosdos?
10     A.    No.  And to the best of my
11  knowledge...
12     Q.    Have you finished your answer?
13     A.    Yes.
14     Q.    I don't want to cut you off.
15            Are you a director of Mosdos?
16     A.    No.
17     Q.    Have you ever been a director of
18  Mosdos?
19     A.    Not that I can recall, I don't
20  believe so.
21     Q.    Are you an officer of Mosdos?
22     A.    Not that I can recall.
23     Q.    I asked you today --
24     A.    Am I -- no.
25     Q.    So I think you answered my second

19

H. Zaks

1  question, but just so the record is clear,
2
3  have you ever been an officer of Mosdos?
4      A.    Not that I can recall, I don't
5  believe so.
6      Q.    Have you ever represented
7  yourself to any government agency as being
8  an officer of Mosdos?
9      A.    Not that I can recall.
10     Q.    You said that you function sort
11  of as your father's right-hand man.  Did
12  you prepare a letter for your father to
13  send on behalf of Mosdos?
14            MR. LAUCHHEIMER:  Object to the
15     form.
16     A.    I don't believe I said I was my
17  father's right-hand man.  I think you added
18  a word there.  So I'm going to say you're
19  mischaracterizing my testimony.
20            MR. LANE:  Let's -- can we go
21     back and read the -- if we can just go
22     back, I think it's three or four
23     answers, where he used -- the phrase
24     "right-hand man" was used by Mr. Zaks
25     in response to a question.

20

H. Zaks

1
2            I just want to clarify exactly
3     what you said.
4            MR. LEVINE:  I don't believe the
5     word right-hand "man" was used.
6            MR. BODDOOHI:  "Man."  He didn't
7     say "man."  But he said right hand.
8  BY MR. LANE:
9      Q.    Okay.  So that's a clarification.
10            What did you mean by your
11  father's right hand?
12     A.    Anything my father needed help
13  with, I was there to assist.
14     Q.    Can you give us an example of
15  something that your father needed help
16  with respect to Mosdos in 2018?
17     A.    The term is everything my father
18  needed.  Offhand, like that, I can't give
19  you an example.
20     Q.    Did you ever assist your father
21  in preparing minutes of meetings?
22            MR. LAUCHHEIMER:  Object to the
23     form.
24     Q.    Of Mosdos.
25     A.    Not that I can recall.

# Exhibit M

MITCH REENE

OCTOBER 28, 2019

Digitally Recorded
Transcribed By Nancy Doherty

SANDY SAUNDERS REPORTING
254 South Main Street
2nd Floor
New City, New York 10956
(845) 634-7561

```
 1          START

 2              MITCH GREENE:  — have you in contempt of

 3          court.  You could be — you'd [inaudible] lis

 4          pendens immediately.  It's worthless.  It's not

 5          worth the paper it's written on, number one.  And

 6          number two is it puts you in contempt of court,

 7          so you now look like a bad guy, okay?

 8                  Number two is nothing has happened and

 9          will happen without you and me being involved

10          with Steve, okay?  You're — I'm giving, look, if

11          it does, I will be in court with you to — to make

12          sure it gets done right.

13              RABBI MAYER ZAKS:  But — but —

14              MITCH GREENE:  Right now, your brother has

15          done absolutely  nothing concerning this debtor.

16          Once I told you I will know the moment he gets a

17          commitment letter, he's sending it to me.  I will

18          make sure it goes to you.

19              RABBI MAYER ZAKS:  But — but I want to ask

20          you —

21              MITCH GREENE:  [Inaudible] —

22              RABBI MAYER ZAKS:  — but — but — it's —

23              MITCH GREENE:  [Inaudible] but no, you don't

24          understand [inaudible] —
```

1

2   RABBI MAYER ZAKS:  But, Mitch, let me ask

3  you a question.  I'm asking you a question.

4   MITCH GREENE:  No, you're going to listen.

5  You're going to listen because you didn't listen

6  to me before.  Once you get a commitment it take

7  — it will take two weeks minimum.  I got to get a

8  certified order from the bankruptcy court.  He's

9  not closing without my input.  Any lender's going

10  to want to know something from me.  So I will

11  know, and you will be at the table.

12   RABBI MAYER ZAKS:  All right.  Okay, so

13  listen to me one second.  Mitch, Mitch, let me

14  ask you a question.

15   MITCH GREENE:  [Inaudible].

16   RABBI MAYER ZAKS:  I want to ask you a

17  question.  Are you feeling better, first of all?

18  Are you up and around already?

19   MITCH GREENE:  I'm — I'm — I'm up.  You —

20  you — you know something, I feel better until you

21  give me pain.

22   RABBI MAYER ZAKS:  Okay, listen to me.  I

23  want to meet you face to face.  I need to meet

24  you.  I'm telling you.  I need to meet you.

25   MITCH GREENE:  I — no, no.  You got to —

| | |
|---|---|
| 1 | Mitch Greene — Oct 28, 2019                    4 |
| 2 | we're going to — listen to me.  We're going to — |
| 3 | Steve is trying to engineer a meeting.  We're |
| 4 | going to sit down.  The answer is you got to get |
| 5 | rid of the lis pendens. |
| 6 | RABBI MAYER ZAKS:  Okay.  Listen, but one — |
| 7 | stop, Mitch, for a second.  I need to meet you |
| 8 | before I do it.  For a second.  I — I'm telling |
| 9 | you, they're — one thing.  You're a smart guy, |
| 10 | no, but if I'll show you black and white things, |
| 11 | you will not be able — you'll have to talk to me. |
| 12 | I, certain things I kept back from you.  I don't |
| 13 | want to get you involved.  I'm telling you — |
| 14 | MITCH GREENE:  I don't want — listen to me. |
| 15 | I don't want [inaudible] — |
| 16 | RABBI MAYER ZAKS:  But you're dealing with |
| 17 | criminal — I'm telling you, crazy people. |
| 18 | MITCH GREENE:  Rabbi.  Rabbi.  Right now |
| 19 | there's been no change. |
| 20 | RABBI MAYER ZAKS:  One second.  One second. |
| 21 | Wait. |
| 22 | MITCH GREENE:  [Inaudible] — |
| 23 | RABBI MAYER ZAKS:  Let me stop you.  Shem |
| 24 | Olam [ph] — |
| 25 | MITCH GREENE:  — [inaudible] — |

2              RABBI MAYER ZAKS:  One second.

3              MITCH GREENE:  — not for profit.

4              RABBI MAYER ZAKS:  One second.  Stop.

5              MITCH GREENE:  A not for profit is not owned

6         by anybody.

7              RABBI MAYER ZAKS:  Stop.  Stop.  Stop.

8         Stop.  He put the note on Shem Olam, right?  He

9         put the note on Shem Olam?

10             MITCH GREENE:  Okay —

11             RABBI MAYER ZAKS:  Okay?

12             MITCH GREENE:  [Inaudible] correct —

13             MALE SPEAKER:  I did.  I — I — I think it

14        was transferred.  I think, yeah, I think the

15        Rabbi showed me something that it was transferred

16        to Shem Olav.

17             RABBI MAYER ZAKS:  I'll give you the whole

18        copy, what do you mean?

19             MALE SPEAKER:  [Inaudible].

20             RABBI MAYER ZAKS:  I don't have to show you

21        something.

22             MALE SPEAKER:  No, no, at that meeting, I

23        think you showed me something that [inaudible].

24             RABBI MAYER ZAKS:  Yeah, it's listed.  You

25        can look it up yourself.  You don't need me.  He

1

2     put it — he put it onto Shem Olam.  Shem Olam is

3     the owner, Chamoid Zaks.  You know how sick that

4     is?  And my brother threatened me, Mitch.  I'm

5     embarrassed to tell you.  I'm crying.  There are

6     people in the industry who have the highest

7     respect for you, Mitch.  They think you're

8     atsavig [ph].  They tell me there is the person —

9     you could have a friend more in the world than

10    Mitch Greene, you understand that?  These are

11    people who are adversaries of yours, people who

12    work with you, they love you.  And they told me,

13    Rabbi, you're blessed that you have a man like

14    that.  The problem is the hillul ha-Shem Hashem,

15    the disgrace of God's name.  By me telling you

16    what they're up to is — is — I — I — I myself

17    can't even face it.

18         MITCH GREENE:  Rabbi, let me explain

19    something.  Okay?

20         RABBI MAYER ZAKS:  Go ahead.

21         MITCH GREENE:  There's a very important card

22    you all have.  We have a card, but you know,

23    that's why you got to get rid of the lis pendens.

24    We have the card here that if some — if

25    [inaudible] has jurisdiction to go back to Drayn,

Mitch Greene — Oct 28, 2019                     7

1

2          to unwind anything that happens that shouldn't

3          have happened without our input or [inaudible] —

4               RABBI MAYER ZAKS:  So, can I ask you, Mitch

5          —

6               MITCH GREENE:  — right now — right now,

7          there is some range of points that have to

8          happen, okay.  Your brother has promised to clear

9          up the other property that he was going to — that

10         was getting him paid, and I don't even know

11         what's going on.  And that at the end of the day,

12         when he said to [inaudible] he's a witness, when

13         the loan comes into place here, that the payback

14         whatever has to be paid back —

15              MALE SPEAKER:  The [inaudible], right.

16              MITCH GREENE:  Whatever the amounts was,

17         five three I believe came out, and [inaudible]

18         assuming it comes through, and it hasn't, at that

19         stage and time, the owners — and it's really not

20         the owners, because the owners are not for

21         profit, but you and — and your brother will be

22         50/50 is a, you know, and at that stage in time

23         all the creditors have been taken care of, the

24         Rockland's been taken care of.  There's this just

25         one obligation out there, and you're good.  You

Mitch Greene — Oct 28, 2019                    8

1

2      are 50/50, and if you can't go along together,

3      you will see based on your prior agreement, they

4      — he will sit down and he will — he will work out

5      an amicable arrangement whereby you and him

6      [inaudible] as brothers and equal and whatever,

7      how you — I don't know how you divide the pie.  I

8      — I don't know if it's possible or what happens,

9      but he said you and him know how to do it.  If

10     not, he'll — you remain 50/50.

11           RABBI MAYER ZAKS:  But once second.

12           MITCH GREENE:  Right now, what you're doing

13     is you're — you're basically —

14           RABBI MAYER ZAKS:  [Inaudible] —

15           MITCH GREENE:  — [inaudible] something that

16     at the end of the day, I don't know if we can —

17     this way —

18           RABBI MAYER ZAKS:  Mitch, Mitch, Mitch.

19           MITCH GREENE:  — we can keep 50/50.

20           RABBI MAYER ZAKS:  Mitch, Mitch, Mitch.

21           MITCH GREENE:  The other way we're going to

22     —

23           RABBI MAYER ZAKS:  Mitch, Mitch.  I heard

24     you.  I know what you're saying.  I understand

25     you.  I'm just telling you, hello, that one thing

Mitch Greene — Oct 28, 2019                    9

1

2          —

3              MITCH GREENE:  [Inaudible] —

4              RABBI MAYER ZAKS:  — one thing you have to

5          understand.  Nothing is going to ever happen

6          without me.  So if he's taking —

7              MITCH GREENE:  I just [inaudible] —

8              RABBI MAYER ZAKS:  Wait, wait.  Listen —

9              MITCH GREENE:  — [inaudible] Rabbi, you

10         never —

11             RABBI MAYER ZAKS:  — let me finish.

12             MITCH GREENE:  — let me —

13             RABBI MAYER ZAKS:  But — but, Mitch, you're

14         missing what I want to say.  Let me finish.

15             MITCH GREENE:  No, no [inaudible] —

16             RABBI MAYER ZAKS:  He is not clearing up —

17             MITCH GREENE:  — Steve and I are in

18         agreement, you're missing the point.  What you're

19         doing is you're — you're basically having what

20         they call a divine intervention.  You're

21         intervening, and you're going to blow up

22         everything —

23             RABBI MAYER ZAKS:  No, no, no, no, no, no,

24         no.

25             MITCH GREENE:  — [inaudible] everybody.

1

2           RABBI MAYER ZAKS:  Listen, please.

3           MITCH GREENE:  [Inaudible] —

4           RABBI MAYER ZAKS:  Mitch, please listen to

5       me.  I need one thing.  You missed what I wanted

6       to say.  I'm not — I can't let — when I meet you,

7       you'll agree with me, him taking any financing

8       now without me.  There should be no problem for

9       him —

10          MITCH GREENE:  Now I'm [inaudible] —

11          RABBI MAYER ZAKS:  — to include me.

12          MITCH GREENE:  — [inaudible] have it, listen

13      to me.  Steve, maybe you could — he did — he — he

14      is just like a horse with blinders.  He doesn't

15      see.  I got to tell you something.   You're

16      missing the point.

17          RABBI MAYER ZAKS:  But I — you're not —

18          MITCH GREENE:  [Inaudible] —

19          RABBI MAYER ZAKS:  — but I'm telling you —

20          MITCH GREENE:  — [inaudible] quiet, just

21      still.  Quiet.  Listen.

22          RABBI MAYER ZAKS:  Yeah.

23          MITCH GREENE:  Number one is I — I just said

24      to you, this will be the 15th time we've had this

25      conversation.  There will be no closing on any

1

2        finance without you at the table.

3            RABBI MAYER ZAKS:  What does he care to

4        include me now?

5            MITCH GREENE:  What does he — what?

6            RABBI MAYER ZAKS:  I want him to include me

7        this minute before the commitment.

8            MITCH GREENE:  [Inaudible] you're missing

9        the point.  There's — as I understand it right

10       now, there's nothing to include you in.  He

11       doesn't have anything [inaudible] —

12           RABBI MAYER ZAKS:  But he has all the pape —

13           MITCH GREENE:  — [inaudible] —

14           RABBI MAYER ZAKS:  — I want to see — he

15       should share with me the papers that he gave him,

16       and he should sit down with me, and I want to see

17       —

18           MITCH GREENE:  I will [inaudible] —

19           RABBI MAYER ZAKS:  — everything that he's

20       asking.

21           MITCH GREENE:  Listen to me.

22           RABBI MAYER ZAKS:  Got you.

23           MITCH GREENE:  I want — I've been pushing

24       it, but [inaudible] not [inaudible].

25           RABBI MAYER ZAKS:  Oh.

1

2      MITCH GREENE:  I've been pushing.  I want to

3      see a commitment.  He does — he promised me the

4      moment the commitment comes in, he's giving it to

5      me.  I promised you once we have a — right now,

6      we don't even have a lender.  He doesn't have a

7      lender right now, so what I'm saying to you is —

8      RABBI MAYER ZAKS:  Okay.

9      MITCH GREENE:  — as soon as we get a —

10     RABBI MAYER ZAKS:  Mitch.

11     MITCH GREENE:  — commitment — a commitment.

12     Once you have a commitment, that's when we jump

13     in for —

14     RABBI MAYER ZAKS:  Okay.  Mitch —

15     MITCH GREENE:  — a meeting, that's when

16     [inaudible] —

17     RABBI MAYER ZAKS:  — stop.  Stop.  Mitch.

18     Two things.  I'm working on getting you a

19     statement from the bank.  It's not so easy.  He

20     has the money.  That's the first lie.

21     The second lie — he has the money.  Second

22     of all, besides that he has the money, I'm going

23     to — don't say a word.  I'm going to get you the

24     papers now from the commitment, and I'm going to

25     show you how he structured the mortgage.  I don't

```
 1  │                Mitch Greene — Oct 28, 2019              13

 2  │        mind.  I'm going to let him.  But it's going to

 3  │        be with my signature too.  He —

 4  │             MITCH GREENE:  How [inaudible] wait — and

 5  │        you know something, we're all agreed he does not

 6  │        have the commitment.

 7  │             RABBI MAYER ZAKS:  I want — I know, but I'm

 8  │        —

 9  │             MITCH GREENE:  [Inaudible] —

10  │             RABBI MAYER ZAKS:  — going to show you that

11  │        the applications to the bank, he cut me —

12  │             MITCH GREENE:  No, that's [inaudible] —

13  │        that's a — I don't want to see that.

14  │             END

15  │

16  │

17  │

18  │

19  │

20  │

21  │

22  │

23  │

24  │
```

1                    Mitch Greene – Oct 28, 2019                    14

2                              CERTIFICATION

3

4       I,   Nancy   Doherty,   certify   that   the   foregoing

5       transcript   was   prepared   using   the   required

6       transcription equipment and is a true and accurate

7       transcript of the recording.

8

9

10

11      Nancy Doherty

12      SANDY SAUNDERS REPORTING

13      254 South Main St., 2nd Floor

14      New City, New York  10956

15      Dated:  June 15, 2020

16

17

18

19

20

21

22

23

24

25