UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

MOSDOS CHOFETZ CHAIM INC.,

*Debtor.*

Main Case No. 12-23616-rdd
White Plains, New York
January 14, 2021
10:11 a.m. - 12:31 p.m.

AP: 20-08949-RDD MOSDOS CHOFETZ CHAIM, INC. ET AL
VS. MOSDOS CHOFETZ CHAIM INC. ET AL

**(Hearing recorded by Court Solutions)**

- TRIAL
- ORDER SIGNED ON 9/1/2020 ESTABLISHING PROCEDURES FOR REMOTE EVIDENTIARY HEARING IN CONNECTION WITH CONTESTED ISSUES WITH HEARING TO BE HELD ON 9/4/2020
- MOTION FOR TEMPORARY RESTRAINING ORDER/EMERGENCY MOTION TO REMAND, OR IN THE ALTERNATIVE, FOR THE APPOINTMENT OF A RECEIVER AND TEMPORARY RESTRAINING ORDER, FILED BY AARON TWERSKY ON BEHALF OF JOSEPH GRUNWALD, YISROEL HOCHMAN, MOSDOS CHOFETZ CHAIM, INC., DANIEL ROSENBLUM, SIMA WEINTRAUB, MAYERS ZAKS (ECF #6)
- ORDER SIGNED ON 3/26/2020 (A) DENYING PLAINTIFF'S MOTION FOR REMAND, OR ALTERNATIVELY, FOR THE APPOINTMENT OF A RECEIVER; AND (B) ISSUING INJUNCTIVE RELIEF PENDING DETERMINATION OF CONTESTED ISSUES (RELATED DOC #6) (ECF #17)
- AFFIDAVIT OF RABBI ARYEH ZAKS FILED BY J. TED DONOVAN ON BEHALF OF ARYEH ZAKS (ECF #18)
- STATEMENT CERTIFICATION OF DANIEL GREEN ON BEHALF OF CONGREGATION RADIN DEVELOPMENT, INC. FILED BY BRENDAN M. SCOTT ON BEHALF OF CONGREGATION RADIN DEVELOPMENT INC. (ECF #19)
- CERTIFICATION OF HENOCH ZAKS EXPLAINING THE DISPOSITION OF FUNDS RECEIVED BY SHEM OLAM LLC IN DISCHARGE OF THE MORTGAGE HELD BY SHEM OLAM LLC ON THE PROPERTY LOCATED AT 1-50 KIRYAS RADIN DRIVE, SPRING VALLEY, NEW YORK FILED BY DANIEL N ZINMAN ON BEHALF OF SHEM OLAM INC. (ECF #20)
- LETTER SEEKING CLARIFICATION OF ORDER FILED BY MICHAEL LEVINE ON BEHALF OF MOSDOS CHOFETZ CHAIM INC. (ECF #24)
- ANSWER TO COMPLAINT, COUNTERCLAIM AGAINST MOSDOS CHOFETZ CHAIM, INC., CROSSCLAIM AGAINST CHOFETZ CHAIM INC., CONGREGATION RADIN DEVELOPMENT INC., SAMUEL MARKOWITZ, MOSDOS CHOFETZ CHAIM, INC., SHEM OLAM INC., TBG RADIN LLC, BEATRICE WALDMAN ZAKS, ARYEH ZAKS, HENOCH ZAKS, MENDEL ZAKS, GITEL ZAKS LAYOSH FILED BY MILAD BODDOOHI ON BEHALF OF STERLING NATIONAL BANK (ECF #25)

AP: 20-08949-RDD MOSDOS CHOFETZ CHAIM, INC. ET AL
VS. MOSDOS CHOFETZ CHAIM INC. ET AL

- WITNESS DECLARATIONS FILED BY MELANIE L. CYGANOWSKI:

  - DECLARATION OF DANIEL ROSENBLUM FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #29)

  - DECLARATION OF JOSEPH GRUNWALD FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #30)

  - DECLARATION OF MARK BLISKO FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #31)

  - DECLARATION OF NOCHUM ZEV BRODY FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #32)

  - DECLARATION OF THOMAS E. WALSH FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #33)

  - DECLARATION OF BENT PHILLIPSON FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #34)

  - DECLARATION OF CHASIA LHEV FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #35)

  - DECLARATION OF DAVID GEWIRTZMAN FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #36)

  - DECLARATION OF EZRA BEYMAN FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #37)

  - DECLARATION OF ELIEZER ZELMAN FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #38)

  - DECLARATION OF JOHNY MELOHN FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #39)

  - DECLARATION OF RON HENIG FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #40)

  - DECLARATION OF SIMA ZAKS FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #41)

  - DECLARATION/CORRECTED DECLARATION OF SIMA ZAKS (RELATED DOC #41) FILED BY MELANIE L. CYGANOWSKI (ECF #44)

  - DECLARATION OF ABRAHAM J. BACKENROTH FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #45)

  - DECLARATION OF RABBI DR. JOHATHAN GINSBERG FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #46)

  - DECLARATION/CORRECTED DECLARATION OF RABBI DR. JONATHAN GINSBERG (RELATED  DOC #46) FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #48)

  - DECLARATION OF GERSHON ALEXANDER FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #47)

  - DECLARATION/CORRECTED DECLARATION OF GERSHON ALEXANDER (RELATED  DOC #47) FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #49)

  - DECLARATION OF RABBI MAYER ZAKS FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #50)

<u>AP: 20-08949-RDD MOSDOS CHOFETZ CHAIM, INC. ET AL</u>
<u>VS. MOSDOS CHOFETZ CHAIM INC. ET AL</u>

- WITNESS AFFIDAVITS FILED BY MICHAEL LEVINE:

  − AFFIDAVIT DIRECT DECLARATION OF ARYEH ZAKS FILED BY MICHAEL LEVINE (ECF #42)

  − AFFIDAVIT DIRECT DECLARATION OF STEVEN GREEN FILED BY MICHAEL LEVINE (ECF #43)

- MEMORANDUM OF LAW/PRE-TRIAL BRIEF OF MOVANT RABBI MAYER ZAKS FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #51)

- FIRST MOTION FOR SANCTIONS, *IN LIMINE* RELIEF FILED BY MICHAEL LEVINE ON BEHALF OF MOSDOS CHOFETZ CHAIM INC. (ECF #52)

- OPPOSITION OF RABBI MAYER ZAKS TO DEFENDANTS MOTION FOR IN LIMINE RELIEF (RELATED DOC #52) FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #53)

- LETTER REGARDING MOTION IN LIMINE (RELATED DOCUMENT(S)52) FILED BY ANNE J. PENACHIO ON BEHALF OF ARIEL DAHAN (ECF #54)

- OPPOSITION ON MOTION FOR IN LIMINE RELIEF (RELATED DOCUMENT(S)52) FILED BY MICHAEL LEVINE ON BEHALF OF MOSDOS CHOFETZ CHAIM INC. (ECF #55)

- DECLARATION OF A. YEHUDA ZAKS DATED SEPTEMBER 3, 2020 (RELATED DOCUMENT(S)52) FILED BY MELANIE L. CYGANOWSKI ON BEHALF OF MAYER ZAKS (ECF #56)

- AFFIDAVIT DEFENDANTS' RESPONSIVE TRIAL MEMO FILED BY MICHAEL LEVINE ON BEHALF OF MOSDOS CHOFETZ CHAIM INC. (ECF #57)

- LETTER DATED SEPTEMBER 4, 2020 FILED BY MILAD BODDOOHI ON BEHALF OF STERLING NATIONAL BANK (ECF #58)

- LETTER REQUESTING APPOINTMENT OF A RECEIVER FILED BY MILAD BODDOOHI ON BEHALF OF STERLING NATIONAL BANK (ECF #59)

- SUPPLEMENTAL DECLARATION OF HENOCH ZAKS (RELATED DOC #52)

- JOINT RESPONSE TO MOTION - RESPONSE TO PLAINTIFFS SUPPLEMENTAL SUBMISSION ON DEFENDANTS *IN LIMINE* MOTION

BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

```
                       - A P P E A R A N C E S -
 1

 2   For Rabbi Mayer Zaks:        MICHAEL R. MAIZEL, ESQ.
                                  Otterbourg, P.C.
                                  230 Park Avenue
 3                                New York, New York 10169-0075
                                  (212) 905-3660; (212) 682-6104 fax
 4                                mmaizel@otterbourg.com

 5
     For Rabbi Mayer Zaks:        STANLEY L. LANE, JR., ESQ.
 6                                Otterbourg, P.C.
                                  230 Park Avenue
 7                                New York, New York 10169-0075
                                  (212) 905-3631; (212) 682-6104 fax
 8                                slane@otterbourg.com

 9   Plaintiff:                   RABBI MAYER ZAKS
                                  14 Cloverdale Lane,
10                                Monsey, New York 10952
                                  yeshivachch@yahoo.com
11

12   For Defendant,              AARON B. LAUCHHEIMER, ESQ.
       Henoch Zaks:              Morrison Cohen LLP
13                                909 Third Avenue
                                  New York, New York 10022-4784
14                                (212) 735-8745; (212) 735-8708 fax
                                  alauchheimer@morrisoncohen.com
15

16   For Defendant              DANIEL N. ZINMAN, ESQ.
       Shem Olam LLC:            Kriss Feuerstein LLP
                                  360 Lexington Avenue
17                                New York, New York 10017
                                  (212) 661-2900; (212) 661-9397 fax
18                                dzinman@kandfllp.com

19   For the Defendant,          KEVIN J. NASH, ESQ.
       Rabbi Aryeh Zaks:         Goldberg Weprin Finkel Goldstein LLP
20                                1501 Broadway
                                  New York, New York 10038
21                                (212) 301-6944; (212) 221-6532 fax
                                  knash@gwfglaw.com
22

23   Defendant:                  RABBI ARYEH ZAKS
                                  18 Mountain Avenue
24                                Monsey, New York 10952
                                  (845) 538-7909
25                                yeshivacc@yahoo.com
```

```
 1     A P P E A R A N C E S :

 2         For the Defendants:          MICHAEL LEVINE, ESQ.
                                        Levine & Associates, P.C.
 2                                      15 Barclay Road
 3                                      Scarsdale, New York 10583-2707
                                        (914) 600-4288
 4                                      ml@LevLaw.org

 5         For Defendant,              TRACY LEE KLESTADT, ESQ.
             Congregation Radin        Klestadt Winters Jureller Southard
 6           Development, Inc.:           & Stevens, LLP
                                        200 West 41st Street, 17th Floor
 7                                      New York, New York 10036-7219
                                        (212) 972-3000; (212) 972-2245 fax
 8                                      tklestadt@klestadt.com

 9         For Defendant,              BRENDAN SCOTT, ESQ.
             Congregation Radin        Klestadt Winters Jureller Southard
10           Development, Inc.:          & Stevens, LLP
                                        200 West 41st Street, 17th Floor
11                                      New York, New York 10036-7219
                                        (212) 972-3000; (212) 972-2245 fax
12                                      bscott@klestadt.com

13         For Sterling Nat'l Bank:    MILAD BODDOOHI, ESQ.
14                                      Schwartz Sladkus Reich Greenberg
                                          Atlas LLP
15                                      444 Madison Avenue, 6th Floor
                                        New York, New York 10022
16                                      (212) 743-7039; (212) 743-7001 fax
                                        mboddoohi@ssrga.com
17

18         For Sterling Nat'l Bank:    SAMUEL WATKINS, ESQ.
                                        Schwartz Sladkus Reich Greenberg
19                                        Atlas LLP
                                        444 Madison Avenue, 6th Floor
20                                      New York, New York 10022
                                        (212) 743-7056; (212) 743-7001 fax
21                                      swatkins@ssrga.com

22         Transcriber:                AA EXPRESS TRANSCRIPTS
                                        195 Willoughby Avenue, Suite 1514
23                                      Brooklyn, New York 11205
                                        (888) 456-9716
24                                      aaexpress@court-transcripts.net

25             (Proceedings recorded by electronic sound recording)
```

1          THE COURT:  Good morning.  This is Judge Drain.  We're

2     here in *In re Mosdos Chofetz Chaim, Inc*. and the adversary

3     proceeding, Mosdos Chofetz Chaim, Inc., Rabbi Mayer Zaks, et al

4     against Mosdos Chofetz Chaim Inc., et al, including Rabbi Aryeh

5     Zaks.  We're here on oral argument on the Defendant's motion, or

6     the remaining portion of the Defendant's motion *in limine* a

7     judgment of default based on the alleged destruction of evidence

8     related to the underlying adversary proceeding issues.

9          I began a little late today to make sure there wasn't,

10    yet another email sent to chambers.  We'll go through, I guess,

11    at the beginning of this hearing, the state of play, as far as

12    filings with the Court; what parties agree should be part of the

13    record, what parties agree shouldn't be a part of the record,

14    and what parties disagree should be part of the record for this

15    hearing.

16          There is a background to this hearing.  It was

17    originally scheduled for the first week of September.  A reply

18    or an objection to the motion containing affidavits or

19    declarations under penalty of perjury were submitted shortly

20    before the hearing on the motion.  And it is clear from the

21    transcript of that hearing, I was uncomfortable with proceeding,

22    given those submissions and directed that there be 30 days of

23    additional discovery and an opportunity by the movants to

24    respond to the objection.  Discovery was taken, and a trial was

25    set in October.  However, because of a health emergency of a

1   close relative of one of the parties, it was adjourned, I

2   believe, with clear understandings about what, if anything,

3   would be submitted thereafter.  The matter then was rescheduled

4   a couple of times, and we're here now on the motion *in limine*.

5          As part of the resolution of hearing this matter and

6   tied into the fact that I did not grant the request by

7   Plaintiff's counsel to be relieved as counsel, that is the

8   Otterbourg firm, was the parties' agreement to have this hearing

9   not based on additional live witness testimony, but rather based

10  on the live testimony that was taken during the depositions

11  related to this matter during the discovery period.  As well as,

12  of course, the declarations that were submitted before the

13  scheduled trial in October.

14         So, I received additional pleadings, some by email,

15  some filed on the docket, some, I'm not sure whether they've

16  been filed on the docket or not.  I think it's clear to me that

17  the submission of any additional affidavits by people that were

18  not identified as witnesses for the October trial are not to be

19  considered based on the record and the agreements of counsel.

20  Perhaps with one exception, which I want to discuss, which is

21  the additional declaration submitted by Mr. Henoch and the

22  original Henoch declaration submitted as part of the movants'

23  proposed proof for the *in limine* motion.

24         So, why don't I take the parties appearances, and then

25  we'll move to what is properly before the Court in terms of

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                    8

1   pleadings and other evidence?

2          MR. LEVINE:  Your Honor, do you want it by Plaintiff

3   and then Defendant, or do you want it by movant and then,

4   objectant?

5          THE COURT:  Let's go by movant, and then I think that

6   will cover it.  You can identify which side you're on, as well

7   as whether you're a movant or an objectant to the motion.

8          MR. LEVINE:  Yes.  Okay.  For the movant, Mos dos

9   Chofetz Chaim, Michael Levine of Levine & Associates, P.C.

10         MR. LANE:  Stan Lane, Otterbourg, P.C., for the

11   Objectant to the motion.

12         THE COURT:  Okay.  I have Mr. Nash on the hearing

13   dashboard too.  Do you want to state your appearance?

14         MR. NASH:  Yes, I was on mute.  I'm sorry.  Kevin Nash

15   on behalf of Rabbi Aryeh Zaks.

16         THE COURT:  Okay.  Does anybody else want to note

17   their appearance, any lawyer?

18         MR. KLESTADT:  Yes.  Good morning, Your Honor.  Tracy

19   Klestadt and Brendon Scott, Klestadt Winters Jureller Southard &

20   Stevens, for Congregation Radin Development, Inc.

21         THE COURT:  Okay.  Now, Congregation Radin

22   Development, Inc. is a Defendant in the adversary proceeding.  I

23   don't believe it has filed any proceedings in connection with

24   the in limine motion.  Is that correct?

25         MR. KLESTADT:  No, Your Honor, we're relying on Mr.

1   Levin and Mr. Nash to carry the ball on that.

2            THE COURT:  Okay.  Very well.  Thank you.

3            MR. ZINMAN:  Good morning, Your Honor, Daniel Zinman,

4   Kriss Feuerstein, on behalf of Shem Olam, LLC.  I am also in the

5   same position as Mr. Klestadt, in that I represent a Defendant,

6   but I have not submitted in any pleadings in connection with

7   today's motion and I'm relying on Mr. Levine and Mr. Nash.

8            THE COURT:  Okay.

9            MR. LAUCHHEIMER:  Good morning, Your Honor, Aaron

10  Lauchheimer, on behalf of Henoch Zaks.  I'm in the same position

11  as other counsel in connection with this proceeding.  I'm

12  relying on Mr. Levine and Mr. Nash.

13           THE COURT:  Okay.  Well, I think there's one

14  difference.  I don't believe that Henoch -- oh, no, he is a

15  defendant.  He was obviously a deponent, he's also a Defendant.

16           MR. LAUCHHEIMER:  Yes, Your Honor.

17           THE COURT:  Okay.

18           RABBI MAYER ZAKS:  Your Honor, good morning.  This is

19  Rabbi Zaks, Rabbi Mayer Zaks.  In case there are issues here

20  with Sveka, he has no representation. I'll rely somewhat on Mr.

21  Lane, but given the limited scope, I just wanted to be available

22  if you feel it's okay and proper that I should speak for him.

23           THE COURT:  All right.  Let's get the spelling of his

24  name for the record.  It's Yosef, and then --

25           RABBI MAYER ZAKS:  Yosef, Y-O-S-E-F.

1      THE COURT:  Okay.  And then Sveka, how would you spell

2  that, sir?

3      RABBI MAYER ZAKS:  His name is Tzvi, really, T-Z-V-I.

4  The name that he's called by is Sveka.

5      THE COURT:  That's the nickname with the K-A at the

6  end.

7      RABBI MAYER ZAKS:  Yes.  That's right.

8      THE COURT:  Okay.  Now, my understanding is, no relief

9  is being sought from him in the motion.  He's not a party to the

10  adversary proceeding, he's not a plaintiff.  So, I don't believe

11  he will need to say anything because again, the parties against

12  whom relief is sought here by, the Plaintiffs in the adversary

13  proceeding, he's not one of them.  But I'll note your

14  appearance.

15      RABBI MAYER ZAKS:  Thank you.  Thank you, Your Honor.

16      THE COURT:  Okay.

17      RABBI ARYEH ZAKS:  Your Honor, Rabbi Aryeh Zaks.  I

18  don't know if I'm needed specifically for anything, but if there

19  are any questions that the Court has, I am here.

20      THE COURT:  Okay.  That's fine.  And, again, this is

21  not an evidentiary hearing today, this is oral argument based on

22  the evidence that's before me and agreed to be considered on

23  that basis.  So, again, I appreciate that you've noted you're on

24  the phone, just like Rabbi Mayer Zaks, your brother, but I don't

25  think there will be a need for you to speak.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          11

1          RABBI ARYEH ZAKS:  Thank you, Your Honor.

2          THE COURT:  Okay.  All right.  So, let me just state

3   for the record, this is a completely telephonic hearing.

4   Although, I've taken everyone's appearance, it's a good idea to

5   identify yourself if there's a gap between you speaking one

6   time, and then when you speak again, so that the court reporter

7   and I can be sure to put voice together with your name.  There's

8   one authorized recording of this hearing.  It's taken by Court

9   Solutions.  It provides a copy to our clerk's office on a daily

10  basis.  If you want a transcript of this hearing, you should

11  contact the clerk's office to arrange for the production of one.

12          Finally, because this hearing is telephonic, you

13  should keep your phone on mute, unless you're speaking.  At

14  which point, of course, you should unmute yourself.  So, with

15  that introduction, why don't we go back to the point that I

16  started at which is, I want to make sure I am clear as to what

17  is properly before me for this motion *in limine*.  I have the

18  motion and the supporting declarations that were originally

19  filed.  I also have from the movants' side a declaration by a

20  gentleman by the name of Ron Henig, H-E-N-I-G.  And I have both

21  deposition transcripts, and the hardcopy exhibits that were used

22  in those depositions.  As well as visual recordings of the

23  deposition and the video exhibits that were used in those

24  depositions of Henig Zaks, Yosef Tzvi Zaks, Aaron Yehuda Zaks,

25  sometimes called Aryeh, and Aaron Gewirtzman, G-E-W-I-R-T-Z-M-A-

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          12

1  N.  I also have trial declaration that were submitted by those

2  people with the exception of Mr. Henig, who has simply his

3  declaration.  I also have a more recent declaration by Mr. Henig

4  that was submitted a few days ago by the objectors.  I will

5  reserve for a moment on the Henig declaration, and I believe

6  that is all the evidence before me.

7          I know that chambers was emailed declarations by other

8  people connected with the Debtor or the Kiryas Radin property,

9  but I don't believe those are properly before me given the

10 agreements and my determinations in September and October, and I

11 have not considered them.  Why don't we stop there?  Is there

12 any other evidence that anyone believes should be properly

13 before me on this issue?  And then we'll come back to Mr.

14 Henig's declarations.

15         MR. LEVINE:  Your Honor, this is Michael Levine.  I

16 just wanted to make sure you're including in the definition of

17 the motion documents the most recent declaration of Henig Zaks

18 as well.

19         THE COURT:  Which is?

20         MR. LEVINE:  The one to which the H-E-N-I-G

21 declaration was affixed.

22         THE COURT:  Well, I want to discuss that, that

23 supplemental declaration.

24         MR. LEVINE:  Okay.

25         THE COURT:  And I understand that the movants want

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          13

1   that declaration to be considered as part of this hearing.  I'm

2   not sure it should, I just want to know whether both sides

3   agreed to that.  If they don't, then I'll consider what the

4   right result should be, but it wasn't in the list that I think

5   clearly should be considered.

6          MR. LANE:  Your Honor, there's one other item.  I

7   think you included it, but I wanted to clarify it.  There were

8   also video exhibits that were submitted in support of the motion

9   originally.  One of them was a one-minute clip that was part of

10  the original motion exhibits.  We wanted to make sure that that

11  was also included.  That was the one --

12         THE COURT:  Let me interrupt you there, Mr. Lane.  I

13  don't want to talk over you.  That's the problem with doing this

14  by telephone.  I am including everything that was submitted in

15  connection with the original motion and the original reply.

16         MR. LANE:  I was pretty sure that that was the case,

17  but since it wasn't mentioned, I wanted to clarify.  It's very

18  important to us that that clip be included as well.

19         THE COURT:  Okay.  So, is there anything else, Mr.

20  Lane, that you believe I should be considering?

21         MR. LANE:  Well, I think that your statement included

22  all of the briefing that was submitted, which includes the

23  declaration of Tzvi Zaks.  But I think we're complete.

24         THE COURT:  Well, that's not really briefing,

25  that's --

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                14

1          MR. LANE:  Well, no, I understand.  I'm not clear as

2     to whether Tzvi Zaks --

3          THE COURT:  I did not believe that that should be

4     included because it was post his deposition, I believe.  And

5     again, my emails to the parties when the issue of additional

6     submissions was first raised was that as far as any additional

7     legal briefing at that time that was being offered by the

8     objectors, I would consider it, unless it raised a new issue

9     that could have been raised before the September hearing.  And

10    as far as factual submissions, I did not believe, other than the

11    discovery that I was permitted, that I would take anything else.

12         MR. LANE:  I think that what occurred there is that

13    that would have been submitted.  As you know, his grandfather

14    was in the hospital that day, and the hearing ended up being put

15    off.  But it's clear that that's entirely within Your Honor's

16    purview.

17         THE COURT:  I mean, he would have come to testify, so

18    we would have had his testimony.

19         MR. LANE:  And the substance of that declaration is

20    covered by his testimony at deposition, so --

21         THE COURT:  Right.  I think that's probably fair too.

22    I just don't want there to be another document, which you say is

23    not redundant, but that I think is not really what the ground

24    rules here were.  Which is, as far as evidence is concerned, it

25    would be developed during the 30-day discovery period, and that

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          15

1   was it.  So, I'm not going to consider his declaration that was

2   submitted.  I am considering his deposition testimony by the

3   parties' agreement to be his testimony here.  So, he has gotten

4   a chance to testify under oath.  He actually said under oath.

5   I'm not sure he understood the difference between affirmation

6   and oath, but he did understand it was under penalty of perjury.

7   So --

8            MR. LANE:  The denials and his discussion of what of

9   what occurred, obviously, was covered in far greater detail int

10  eh deposition.  So, we have no problem.

11           THE COURT:  Okay.  So, then I think we're just dealing

12  with, and I want to be crystal clear now, I think the only area

13  where there's any possible dispute, and I'm not sure there is,

14  is with respect to three documents.  First, Mr. Henig's first

15  declaration from September 6 or 9.  Early September.  His more

16  recent declaration that was submitted a few days ago and Henig

17  Zaks' supplemental declaration.  Do the parties have a position

18  in agreement on any of those?  If I should consider any of

19  those?

20           MR. LEVINE:  Your Honor, this is Michael Levine.

21  First, I just want to make clear that Your Honor has excluded

22  the Tzvi Zaks declaration.  However, it was referred to in the

23  legal brief that was filed by --

24           THE COURT:  Well, any fact that's not in the record is

25  not going to be part of my analysis.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          16

1          MR. LEVINE:  All right.  Our position then, with

2     respect to the question Your Honor just posed is, we believe

3     that at least the Henig declaration, that is the first and

4     second one, the one that was submitted earlier and the one we

5     submitted, we believe those should be considered.

6          THE COURT:  Okay.

7          MR. LEVINE:  The reason for that is --

8          THE COURT:  No, that's fine.  I understand.  I'm just

9     trying to figure out if there's agreement on that.  And Mr.

10    Lane, is there agreement that I should consider both Mr. Henig's

11    declarations?

12         MR. LANE:  It's either both or neither and we prefer

13    both.

14         THE COURT:  All right.  I agree with both of you.  I

15    think it probably makes since with him to consider both.  He

16    does fall into somewhat of a different category than the two

17    sons of the two ultimate principals here, Rabbi Mayer and Rabbi

18    Aryeh.  He is a third party.  He was identified to testify.

19    There was a decision not to have him be deposed that I think

20    both sides were aware of, at least based on the correspondence.

21    And he would have testified at the hearing in September if it

22    had not been put off by me.  And I think rather than just have

23    one witness testify live, I can assume that what he would have

24    testified to would have been what's in both of his declarations.

25    I think the movants would have called him on direct and the

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          17

1   objectors would have gotten out on cross essentially what he's

2   put in in his declaration.  And both sides have agreed that they

3   don't need any live testimony from him beyond that.  So, I will

4   consider both of his declarations.

5          And I think that just leaves the supplemental filing

6   by Henoch Zaks.  And I guess my inclination is not to include

7   that.  And I gather, Mr. Lane, you don't want that included?

8          MR. LANE:  We think that he had more than ample

9   opportunity to testify under cross examination, and we think

10  that it should not be included.

11         THE COURT:  Right.  Okay.  And Mr. Levine, any strong

12  opposition to my not including it?

13         MR. LEVINE:  No, Your Honor, our position would have

14  been that if you were going to consider the supplemental

15  declaration of Tzvi Zaks, this is a response to that.  But if

16  you're not going to consider that, or any reference to it in the

17  objector's brief, then we have no strong objection to that.

18         THE COURT:  Okay, fine.  So, I will not consider the

19  supplemental declaration submitted by Henoch Zaks.  And as I

20  said, nor will I consider the declaration submitted by Tzvi

21  Zaks. Instead, I'll just consider both of those people's

22  deposition testimony.

23         Now, the last point I want to raise is the additional

24  briefing submitted by the objectors.  As I've already noted, to

25  the extent that it includes facts that are not in evidence, I

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          18

1   will not consider those facts.  I gather from Mr. Levine's most

2   recent letter, that he is concerned that that most recent

3   briefing refers to depositions taken in connection, not with the

4   motion *in limine*, but with other matters in the case.  In the

5   adversary proceeding or in the case.  And that he objects to

6   their consideration as well.  On its face, that seems like a

7   logical point.  I don't believe there was any agreement that we

8   would have deposition designations from other matters as being

9   part of the record on the motion *in limine*.  And obviously, we

10  also did agree that this would not be a live hearing.  So, I

11  think it does put the movants at a disadvantage to refer to

12  deposition testimony that is not part of the record, and I've

13  already said I'll consider.  But I'll hear you briefly on that,

14  Mr. Lane if you think there's some reason why I should consider

15  it.

16          (No response.)

17          THE COURT:  I think you're trying to speak, but I

18  can't hear you.  Can you just check to see if you're muted?

19          MR. LANE:  You're right.  I forgot to turn off the

20  mute.  I'm sorry.

21          THE COURT:  That's fine.

22          MR. LANE:  Hello?

23          THE COURT:  Yes, yes.  I can hear you now.  That's

24  fine.

25          MR. LANE:  I'm sorry, Your Honor.  We understand the

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          19

1   objection.  There were two limited references, and it was mainly

2   because that's sworn testimony by witnesses who are before the

3   Court, and they were added for context.  For example, one of the

4   issues here is testimony that's given by Henoch Zaks concerning

5   events that occurred in 2007 and 2009.  It started when he was

6   11 years old.  If I say he was 24 years old, that's a lawyer

7   testifying.  Your Honor has been very careful --

8         THE COURT:  Well, I think his age is clear from a lot

9   of different places.

10        MR. LANE:  Okay, then fine.  The other issue goes to a

11  credibility issue with respect to Henoch Zaks.  And that was a

12  reference to documents since the spoliation issue relates board

13  composition, and it has to do with the tax exemption application

14  that was filed, which he signed as a Vice President, when he has

15  testified that he was neither an officer nor director.  And in

16  fact, in deposition, the main case, testified that he never

17  represented himself as such to any government agency.  So, we

18  put that in, and I understand why it was objected to.  And if

19  Your Honor feels that that should be excluded, so be it.

20        THE COURT:  I think it should be excluded.  I mean,

21  again, that information could have been asked of him during his

22  deposition.  I don't want to get into further combing of the

23  records in this case and in other cases involving Mosdos Chofetz

24  Chaim or the parties.  I think it's proper to confine the record

25  as we've said.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          20

1         So, I appreciate the parties spending the time on

2    that.  I think I'm clear now on what is before me.  I think this

3    is the case, but I'm getting these things by email, and I don't

4    have a problem, but I want to make sure all of the pleadings,

5    the briefing has been filed on the docket in the adversary

6    proceeding.  That's a question for the lawyers.  As opposed to

7    just having been emailed to me.

8         MR. LEVINE:  Your Honor, this is Michael Levine.  I'm

9    sorry.  Your Honor, anything that we sent to the Court,

10   pleading-wise, has been filed on the docket by us.  On the

11   adversary proceeding docket.

12        THE COURT:  And Mr. Lane?

13        MR. LANE:  And for us too.

14        THE COURT:  That's true for your side too.  All right,

15   good.  Well, I think we needed to go through that over the last

16   half hour, but I think the record is clear now.  So, I have at

17   times, while we've been conducting hearings telephonically,

18   varied my normal practice, which is to let the parties talk in

19   oral argument before I start interrupting them, and then give

20   you my preliminary views on the merits.  I'm not going to do

21   that here.  I would like to get a sense from both sides in oral

22   argument first as to what they believe are their key points and

23   then I'll be asking you questions.  So, the movants here have

24   the burden of proof by a preponderance of the evidence.  So, Mr.

25   Levine, you should go first.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          21

1     MR. LEVINE:  Thank you, Your Honor.  First of all, I

2    just wanted to say that, although, there has been what appears

3    to be some animosity among counsel, sometimes in the videos I'm

4    sure Your Honor saw that there was perhaps less than completely

5    civil discourse between us.  I apologize for that to the extent

6    that I was involved in that.  I think that Mr Lane,

7    Otterbourg's, citation of the law was fair.  I think that they

8    put forth what it was.  This has been a very hard-fought motion,

9    obviously.  But I do appreciate the efforts of Otterbourg.  I

10    think that it's a well-fought motion.

11         Having said that, Your Honor, I think that you said it

12    correctly when you said that there were basically three issues

13    involved, and those were what was taken, whether what was taken

14    constituted relevant evidence, and what the motive was for the

15    taking of the materials.  Indeed, Otterbourg cites in its

16    memoranda that dismissal sanctions are appropriate regardless of

17    prejudice where the party acted with intent to deprive another

18    party of the information used in the litigation.  And obviously,

19    there's diametrically opposed testimony regarding what was

20    taken.  So, I think we need to start with, and I think this is

21    the key factor here, the credibility of Tzvi Zaks.  Whether his

22    story on its face makes sense.  In order to do that, I think you

23    have to look at the history of how this situation developed.

24    This is all in the original motion papers and in the deposition

25    transcript.  I'm not citing anything outside of them.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21            22

1          Originally, when the incident first happened, we

2   served a subpoena on Tzvi Zaks to get his testimony regarding

3   what happened.  At that point in time, his counsel, Mr. Lane,

4   said in emails, which are in the record, what you're seeking to

5   subpoena him for, never happened.  So, the original defense was,

6   this never happened.  And I said, fine, just give me an

7   affirmation from Tzvi Zaks that it didn't happen, and we'll move

8   on.  Of course, that was never forthcoming.

9          When it became clear that there were videos of Tzvi

10  Zaks, at least cutting the wires, the story changed.  At that

11  point in time, the story became, and this is what we think is

12  completely implausible, Your Honor.  The story at that point

13  became that Tzvi Zaks cut the wires because he had some issue

14  regarding the video cameras remaining on during Shabbat.  Now,

15  if you look at the story on its face, separate and apart from

16  assessing his credibility, which I'm sure Your Honor has done in

17  connection with the video itself, look at the story on its face.

18  It is absolutely implausible.

19         What he says is, he believed that the videos remained

20  on, on Shabbat because of some incident that he couldn't really

21  recall exactly what it was, some telephone conversation.  And

22  that he decided on his own at that point to go and disable the

23  video system.  He says he never spoke to his father about that

24  issue.  That is the issue of whether or not video cameras

25  remaining on during Shabbat was somehow violative of his

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          23

1   religious principles.  His father, who he testified, is the main

2   rabbi, the one who is the final arbiter of all things religious.

3   He never goes to his father and says to his father, am I right

4   that video cameras shouldn't be on during shabbat?  It is

5   implausible that he would have made a decision on his own to cut

6   wires to a video camera, to vandalize property on the campus

7   without having consulted his father.  It's an impossibility in

8   my opinion.

9          And now, remember, originally when we first deposed --

10  and these excerpts are in our original papers.  When we first

11  deposed his mother and his father, first of all, they denied

12  that they had a son named Yosef.  Notwithstanding the fact that

13  Mr. Lane used that name in emails for Tzvi.  They denied they

14  had a son by that name.  And then when I showed them videos,

15  they denied that they could recognize their son from the videos.

16  Sveka, himself, when he was shown videos of himself, said that

17  he couldn't recognize himself.  Even though it depicted events

18  that he personally was involved in, he still refused to identify

19  himself.  Even when I showed him a picture of himself at a

20  grocery store just for the purpose of identification, where his

21  face is clearly apparent, he refused to identify himself.

22          So, his story that, without asking his father, he went

23  to cut the wires.  Then, he cuts the wires, goes into the

24  basement office, and he couldn't remember whether he ever broke

25  the lock or not, which in itself is implausible.  If somebody

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          24

1  breaks into an office to cut wires, you would think that they'd

2  remember how they did it.  But in any event, he says he then

3  goes into the basement, cuts wires inside the basement, and then

4  takes a camera, which is laying on the floor, that he recognizes

5  to be his father's camera, he says, and takes nothing else.

6  Goes outside, and takes the camera, and throws it into a

7  dumpster without asking his father whether his father wants to

8  keep the camera, or whether it really is his father's or not.

9         Why just take a camera?  The whole story that he did

10 all of this without his father's knowledge, especially, when

11 there's a video showing what was identified as his father's car.

12 Of course, they refused to identify it as his car.  And shows

13 his mother walking to the car, which shows him outside of the

14 car, which also they refused to identify.  It is impossible and

15 implausible, Your Honor, to believe that this happened the way

16 he says.  It just doesn't make any sense.

17         There hasn't been a scintilla of evidence as to the

18 supposed religious reason for doing it.  Not even Rabbi Mayer

19 Zaks testified that yes, in fact, cameras shouldn't be on, on

20 Shabbat.  It's an after-the-fact creation.  When they found out

21 that we had videos, they had to justify it.

22         And I asked the Court this question in my letter this

23 morning, if we didn't have those videos, is there any

24 possibility that Tzvi Zaks admitted that he cut those wires?

25 Not in a million years.  He had to admit it because there were

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                25

1   videos of it.  He had to admit that he went into the office

2   because there was testimony that the lock was broken.  So, it

3   came down to the one thing that we didn't have video evidence

4   of, and that is, what did he take?  Although you have Henoch

5   Zaks' testimony as to what was there and what was missing.  And

6   again, Your Honor can assess Henoch Zaks' credibility from the

7   video's as well.  But his father had previously testified that

8   he took a camera.  That's what he testified to, and that is also

9   in the original motion.  So, he was stuck with this creation

10  that all he took was a camera.

11          So, what we now know after all of this, and it's been

12  a painstaking and lengthy to get to having this record before

13  the Court, what we know for sure now is, wires to the building

14  where the video surveillance system existed were cut, so as to

15  disable the system.  We know that Tzvi Zaks entered the office.

16  We know that Tzvi Zaks took something from the office.  All of

17  that evidence, we believe, makes it clear that they had to come

18  up with some kind of a story as to why he entered.  Why would he

19  enter after he disabled the system on the outside?

20          He testified in his deposition that he went to every

21  building and cut the wires in every building.  Of course,

22  there's no evidence of that, and it never happened.  But why

23  would have to go into the office itself after he cut all of

24  those wires?  What would be the point?  And when I asked him,

25  why did you go into the office to disable the system, he wasn't

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          26

1  clear on that.  And I said to him, after you cut the wires on

2  the outside, did you check in the office to see whether or not

3  the video monitor was still working; he said, no.  The story,

4  Your Honor, from our perspective, is completely implausible.

5  And if you've reached that conclusion yourself, then I think you

6  have to reach the conclusion that what Henoch Zaks says was in

7  the office and was taken, in fact, is what was taken.

8          There's other inconsistencies to Tzvi Zaks' story.

9  For example, he said that he cut the wire sometime in October,

10 right after the Jewish holiday.  Yet, we have Mr. Gewirtzman's

11 testimony that he was there in November of 2019 and everything

12 was intact.  There were no cut wires; there was no nothing.  We

13 have Tzvi Zaks' testimony that he pulled the wires from the only

14 place they were going which was the monitor.  We have Mr.

15 Gewirtzman's testimony that wires don't go into the monitor, the

16 wires go into a hard drive.  He didn't call it a hard drive, he

17 called it a black box, but the wires went to the hard drive, and

18 the monitor is attached to that.

19         So, it's easy to make up a general story.  Oh, I did

20 it because it was against my religious beliefs.  But then when

21 you start talking about the details of what happened, that's

22 where the lies become apparent, and I think that it's very clear

23 here that that's where they become apparent.  So, from our

24 perspective, Your Honor, we believe that the only conclusion

25 that can be drawn here is that Tzvi Zaks, with the knowledge and

In re Mosdos Chofetz Chaim, Inc. - 1/14/21         27

1   consent of his father, disabled the security system, so that he

2   couldn't be seen entering into the office, entered into the

3   office, and removed from the office the first time, the hard

4   drive, and some other materials.

5         He admits then, he came back a second time, and

6   there's a video of him lurking about, looking around, making

7   sure he wouldn't be seen.  If he was doing this because he was

8   following his religious beliefs, why the secrecy?  Why is the

9   video so clear that he's looking around to make sure nobody sees

10  what he's doing?  Why isn't he posting signs saying, this is

11  wrong, and I'm going to take care of this myself?  It just

12  doesn't make any sense.

13        And then after he cut the wires the second time, why

14  does he then go back into the office again?  For what purpose?

15  He claims he didn't take anything the second time.  Why did he

16  go in?  What he took the second time was hardcopy documents.

17  And there's really no contrary evidence other than his

18  implausible story that he didn't take those.  So, factually, by

19  a preponderance of the evidence this happened.  And what was

20  taken, and what the motive was, we believe it is crystal clear

21  from the evidence.  Which leads to the only other issue --

22        THE COURT:  Well, can I interrupt you before we get to

23  the other issue?

24        MR. LEVINE:  Of course.

25        THE COURT:  There are pictures of someone who appears

1  to look like Tzvi Zaks, although he says it could be his cousin,

2  not only interacting with the wire on a couple of different

3  occasions, but also getting into a car or a minivan that's being

4  driven by someone else, and/or talking to someone else.  He

5  denies that he discussed any of the cutting of the wires or

6  entrance into the basement at the 18 units with anyone,

7  including his father.  You assert that he was actually dropped

8  off there from where he was coming from.  Other than the videos

9  what evidence is there that he was working on behalf of, or for,

10 or in the interest of his father?

11         MR. LEVINE:  I think there's no other physical

12 evidence of that.  There's no taped conversation between him and

13 his father, for example, but I think that it's the only

14 reasonable conclusion that can be drawn from the evidence.

15 There's no way that the 16-year-old kid, who thinks his father

16 is the closest thing to God, there's no way that this kid is

17 going to go to a location and commit acts of vandalism without

18 his father's knowledge.  There's no way that this kid is going

19 to reach a conclusion about what his supposed religious

20 obligations were without speaking to his father.  There's no way

21 that this kid is going to take a camera that believes belongs to

22 his father and throw it away without consulting his father.

23 This kid didn't do anything without his father.

24         And I think that you can see from the father's

25 testimony even, that he was the final authority on everything.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          29

1  You said he was supposedly unhappy when he heard about this, but

2  he didn't do anything about it.  So, do I have any direct

3  evidence that he spoke to his father about this?  No.  I have

4  evidence from Henoch that he saw the father's car drive in.

5  that that car is his father's.  That he had some conversation

6  with the person in the car before he went to cut the wires, and

7  I think it's very clear from the evidence that this is not

8  something that this kid would have done on his own under any

9  circumstances.  So, is there direct evidence?  No.  Does the

10  circumstantial evidence mandate that conclusion?  Yes.  I

11  believe that it does.  Does that answer Your Honor's question,

12  or do you want me to go further on that?

13          THE COURT:  No, that's fine.  And then I interrupted

14  you.  You were about to go to the second issue.

15          MR. LEVINE:  Yes.  And I think you also take into

16  account the shifting nature of the story too, to assess whether

17  or not his claim that he didn't talk to his father is credible.

18          The second issue, Your Honor, is that assuming that

19  you find that there was an act intended to deprive another party

20  of information for use in the litigation.  The next issue is,

21  what was the material and was it prejudicial even though

22  Otterbourg correctly cites the fact that if you do make that

23  finding, the prejudice is not really that important an issue.

24          Rabbi Mayer Zaks' position here is that what you say

25  was taken is of no consequence to the evidentiary hearing on the

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          30

1    contested issues.  And I completely disagree with that.  If you

2    believe that what was taken was a hard drive that contained

3    videos of two significant meetings that took place, the issue is

4    not so much whether the meetings took place, as the contention

5    in many of the certifications that were submitted in the

6    underlying case, was Rabbi Aryeh Zaks actually at those

7    meetings?  And they went to painstaking lengths to put in

8    declarations from people that say, I was there for the entire

9    time period, or I was here from 7:00 to 10:00, or whatever, and

10   I never saw Rabbi Aryeh Zaks enter the building for any

11   purposes.  Implying that this is a totally fabricated meeting;

12   it never took place.

13          So, number one, the videos, if you believe they were

14   there, would establish that Rabbi Mayer Zaks, in fact, was in

15   the building at that point in time.

16          THE COURT:  I'm sorry. Rabbi Aryeh, right?  I think

17   you said Rabbi Mayer.

18          MR. LEVINE:  You know I have this dyslexia problem

19   where I keep, in papers and in argument, mixing up the names.

20   You're correct.  I meant Rabbi Aryeh.  The video would show that

21   Rabbi Aryeh actually was present there on that day when their

22   witnesses say they never saw him.  That's number one.  Number

23   two, they're claiming that three extremely important documents,

24   the minutes of those two minutes, and the bylaws of the entity

25   which define what a member of Mosdos is.  They say that those

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          31

1  three documents are recent fabrications.  They say that the

2  meeting never took place; you were never there; you made up

3  these minutes afterwards to support your contention regarding

4  who is on the boards of directors.

5          What was also on hard drive was metadata that would

6  have established the creation date of the supposedly recently

7  fabricated documents.  That's gone.  There were several

8  applications for loans that were made over the years in which

9  these minutes were attached.  Or at least that's what Henoch

10  Zaks says.  I, of course, don't know personally.  But if his

11  testimony is to be believed, these minutes were attached to

12  applications made for financing over the years.  Those are gone.

13          We tried to recreate that by going to the attorney

14  that handled the -- and this is in Henoch Zaks' affirmation.

15  I'm not speaking outside of that.  We tried to go to the

16  attorney, Mr. Thorson, who handled at least one of those

17  closings to see if he still had a file that would show that

18  these bylaws were attached to these applications to establish

19  their bona fides.  He does not have that.  He told us that

20  they're gone.  He kept them for a little while and now they're

21  destroyed.  So, the documents, if you believe that they were

22  there.  If you don't, obviously you deny the motion.  But if you

23  believe that those documents were there, then they are of

24  critical importance to the factual issues at least that Rabbi

25  Mayer says exists before the Court.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          32

1        We don't necessarily agree with his recitation of the

2    issues, but if you take his position as being accurate, what's

3    missing are years of minutes, submissions to various banks,

4    evidence of the existence and frequent change in the board of

5    directors at the whim, basically, of either Rabbi Mayer or Rabbi

6    Aryeh.  They both testified that we would put people on or off

7    the board while laying down on the couch at one of our houses.

8    So, all of that is gone.  All of the evidence establishing that

9    is gone.  And if you believe, Your Honor, that that evidence was

10   there, and I know Rabbi Mayer's counsel argues that it wasn't

11   there for whatever reason; but if you believe that the evidence

12   was there, if you have to get to the prejudice issue, there's no

13   way you can conclude that it's not relevant and critical to the

14   underlying issues.

15       Just in conclusion, Your Honor, thank you for bearing

16   with me for so long.  We have a very unique situation here.  In

17   all the cases that were cited in both briefs, ours and theirs,

18   the _Microsoft_ case, and others, where materials were obtained

19   improperly from someone else's office, the _Electronic Data_

20   _Systems_, and the (inaudible) case; in those cases, always the

21   issue was copies were made of the documents and the issue was,

22   can they properly be admitted into evidence.  We don't have that

23   case here.  We have a case here where if you believe that it was

24   intentional, we have a case here where on party intentionally

25   removes evidence from the other parties' possession and then

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          33

1   destroys it.

2          So, it's not a question of, can you impose a sanction

3   that they can't use the evidence, or I'm precluding you from

4   doing X, Y and Z; the evidence was necessary to the movants'

5   case, the defendants in the underlying adversary proceeding.  It

6   was necessary and material to their case.  The egregiousness of

7   the acts here mandate dismissal as far as we're concerned, Your

8   Honor.  And we think that in any conspiracy, as Your Honor

9   knows, there's never any direct evidence that party-A talked to

10  party-B.  They don't use emails, the rabbi and his sons, amongst

11  each other, so there's no physical evidence I can get.  And if I

12  could, I'm sure that it would be difficult to obtain.

13         So, we think that from the totality of the evidence

14  before this Court, the only conclusion that can be drawn is that

15  this was an intentional act, the intent was to remove materials

16  from the possession of the movants that were necessary for it to

17  adequately try the underlying issues in the adversary

18  proceeding, contested issue, hearing.  And unless Your Honor has

19  any additional questions, I think that we'll rely on the Court's

20  own conclusions regarding veracity and credibility from his view

21  of the deposition transcripts and videos.

22         THE COURT:  Okay.  I just want to pick up on the point

23  that the information that was allegedly on the hard drive was

24  necessary to adequately try the underlying issues, namely the

25  composition of the board at the confirmation date and

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          34

1   thereafter.  And if it changed, whether it was properly changed.

2   I think the caselaw is clear that you don't have to prove that.

3   That I can draw inferences unfavorable to the party responsible

4   for thew destruction.  That such evidence would be unfavorable,

5   particularly if I find a culpable state of mind.  The moving

6   party in a motion *in limine* doesn't necessarily have to prove a

7   negative.  On the other hand, the courts are clear, including at

8   the 2nd Circuit level that the sanction of dismissal of a lawsuit

9   is really the last resort.  And if there are lesser sanctions

10  that will suffice, the Court should impose the lesser sanction

11  rather than dismissal.

12          I want to make sure I understand why the information

13  asserted to be on the hard drive is necessary to adequately try

14  the underlying issues if, for example, instead of requiring a

15  dismissal, I simply preclude the Plaintiffs from introducing

16  evidence as to whether Rabbi Aryeh Zaks was at the key board

17  meetings, which everyone acknowledges, I think, took place.

18          MR. LEVINE:  No, Your Honor, they're denying that the

19  meetings took place at all.

20          THE COURT:  At all.  Okay.

21          MR. LEVINE:  Yes.

22          THE COURT:  All right.  So, I can understand why a

23  record of those meetings is important.  But if I preclude that

24  evidence that they're asserting, which frankly, is fairly

25  sketchy anyway, particularly, given the testimony as to what

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          35

1  could and could not be seen in the main building and on

2  videotape, if it was videotape evidence as opposed to just

3  eyewitness evidence, and just put the burden on the Defendants

4  to testify as to whether the meetings happen or not, which can

5  be subject to cross examination, why wouldn't that sanction be

6  sufficient?

7          MR. LEVINE:  Well, I think it basically would result

8  in a dismissal if that was your ruling.  But I think it should

9  go beyond that for the following reason.  The position of Rabbi

10 Mayer Zaks in the underlying contested issue hearing is, whoever

11 the board was when this company was formed in 2005 or whatever

12 the date was never changed.  So, therefore, you couldn't have

13 had a meeting of the board in 2018 or 2019 if it wasn't the

14 original board members.  Aside from the videos, the documents

15 over the years show that the board constantly changed.  That it

16 wasn't as their position is now, you had no right to change the

17 board ever.  So, if that really is an issue in the underlying

18 case and were going to argue differently to some extent if it

19 goes that far, but if that really is the issue, what was the

20 composition of the board, their position is that it's whatever

21 it was in the beginning and it never changed.  And if you

22 remember at one point, I know Your Honor denied this part of the

23 in limine motion, the issue as to whether Mr. Blisko was a

24 member of the board when Rabbi Zaks originally put in affidavit

25 saying Blisko was a member of the Board, and then we raised the

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                36

1   issue, well, then, how did he become a member?  How did it

2   change if your position is that it never changed from day one?

3   All of sudden, it was, oh, no, no, no. That was a mistake.  He

4   mistakenly thought he was a member, but he wasn't.

5          And then further, after we argued that later, it was,

6   well, maybe he was a member.  So, we think that the evidence

7   that was taken and we're in a position difficult position here

8   because we don't have it, so we can't show it to you.  But we

9   think the evidence that was taken would have gone to that issue

10  as well.  That is the issue of the frequent change in the board

11  with no member vote, at least who they claim members were.  We

12  profess that the only members of Mosdos were its board of

13  directors, and that the members you're talking about, are

14  members of the Yeshiva, a different entity.  But if that's

15  important, if they're position is, it never changed, we think

16  that these documents will show that membership of the board of

17  trustee frequently changed to accommodate the circumstance.

18  Never what they're saying now that it's illegal because there

19  was no vote of the congregants as to this board, we think this

20  will show that there was never a vote of congregants to change

21  the board of directors, and that's gone.  We can't establish

22  that that in fact is the case over all of the years that boards

23  changed dependent upon whatever was necessary.  So, we don't

24  think that the sanction --

25          THE COURT:  I'm sorry to interrupt you.

1          MR. LEVINE:  Yes, Your Honor.

2          THE COURT:  There are documents attached to the motion

3  in the record for this hearing that show different board members

4  at different times.

5          MR. LEVINE:  Agreed.  I agree.

6          THE COURT:  And I don't believe that those documents

7  show, however, what steps were taken to change the board.

8          MR. LEVINE:  Agreed.

9          THE COURT:  I'll ask Mr. Lane, but I don't believe the

10  bylaws require or even identify a process that would include

11  more than the board itself --

12          MR. LEVINE:  Right.  Your Honor, if might interrupt

13  for one second?

14          THE COURT:  -- and change of the board.

15          MR. LEVINE:  I'm sorry, Your Honor.  Those documents

16  or at least some of them are now being disputed by Rabbi Mayer

17  Zaks.

18          THE COURT:  No, I'm getting to that point.

19          MR. LEVINE:  Okay.

20          THE COURT:  One could say that you're precluded from

21  disputing them.

22          MR. LEVINE:  I see.  Mm-hmm.

23          THE COURT:  You're precluded from saying that they're

24  after-the-fact creations, which frankly is somewhat hard to

25  believe anyway.  But that would be a lesser sanction than

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          38

1  dismissal.  And would still enable me to evaluate Rabbi Aryeh's

2  credibility on the stand as to steps taken to change the board,

3  including at the critical time, if there was a change, from the

4  confirmation date through the date of the transactions that are

5  really being complained of here, which is the transfers and the

6  $50 million loan.

7          MR. LEVINE:  Right.  I don't think they're contending

8  that, Your Honor.  I know that's what your order said was the

9  issue.  I don't think they're claiming that there was a change

10 in the board between the date of the confirmation and the date

11 of the sale.  I think what they're saying is --

12         THE COURT:  All right.  Well, let me just ask Mr. Lane

13 that.  Is that not an issue anymore?

14         MR. LANE:  No.  Your Honor, I don't really think that

15 there should be a discussion about the composition of the board

16 that's set for today.  But I think the composition of the board

17 on three important dates is really what's at issue.  Those dates

18 are September 1, 2019, when the board allegedly approved the

19 sale without disclosure to the Court in the plan or without

20 changing (inaudible) was being sold to an insider.  But

21 September 1 when it was approved, October 2 when the plan was

22 confirmed, a plan and a disclosure statement that said that it

23 could be sold to a non-insider, and October 25, the date that

24 the sale closed.  And the minutes that were submitted reflect

25 that members of the board on September 1 as being Rabbi Aryeh

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          39

1   and five of his children.  Our contention with respect to the

2   board at that time is that there's no evidence that (A) that

3   Rabbi Mayer was on the board, (B) that Sima Weintraub, who had

4   always been the board was on the board and was never removed,

5   and there were documents that reflected her removal, and we can

6   put how Blisko was being considered.  But the fact is that if

7   Rabbi Mayer, Sima, or Blisko were on the board, then the actions

8   taken on September 1 to approve the sale was invalid as a matter

9   of law because the statute requires two-thirds of the board, and

10  by their own minutes, they only have four members who voted at

11  that time.

12        THE COURT:  So, that's just focusing on September, not

13  at any later time.

14        MR. LANE:  But that's when they approved it.  The

15  board has to approve the sale, the board approved the sale on

16  September 1, 2019.  And at that time, Rabb Aryeh, according to

17  the minutes, and we don't know when they were prepared.  But

18  assuming a meeting was held between Rabbi Aryeh and the other

19  members that he claimed were members of the board on September

20  1, those minutes reflected four of the six people that he claims

21  were on the board, who voted to go ahead with the sale and

22  authorized him to close that sale.  So, if any other member was

23  a board member on September 1, the sale is illegal,

24  unauthorized, under Religious Corporations Law, and that doesn't

25  even get to the point of the congregational approval.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                40

1        THE COURT:  Someone has their phone, and maybe it's

2    one of the two people who I've been speaking with, but if it's

3    anyone else, they should put it on mute, so we don't get the

4    feedback.

5        It appears to me that Mr. Levine is right, that at

6    this point the composition of the board on September 1 is the

7    only issue really pertaining to board composition.  Not for

8    October 2 or October 25, it's just really September 1 when the

9    sale was authorized.

10        MR. LANE:  That was me, not Mr. Levine.  That's Mr.

11    Lane, who's saying that.

12        THE COURT:  No, I know, but Mr. Levine said time one

13    and time two isn't important anyway, and I think you disagreed

14    with him on that point.  It's really September 1 that's the key

15    date.

16        MR. LANE:  Correct.  Correct.

17        THE COURT:  All right.  Now, on that point though,

18    there is an allegation that the minutes are not contemporaneous

19    and that the bylaws are not contemporaneous.  But that they're

20    after-the-fact creations.  And I think there's also a contention

21    that there actually were other people on the board before then,

22    which I think minutes in writing and board meetings would

23    reflect one way or the other as to whether they would

24    corroborate that contention either by the Plaintiff or refute it

25    by the Defendant.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          41

1          MR LEVINE:  Your Honor, is that question directed to

2     me or Mr. Lane?

3          THE COURT:  To Mr. Lane.

4          MR. LANE:  Your Honor, if there were minutes that

5     would show the history from time to time, presumably that would

6     be the case.  I think what's been developed in the evidence in

7     this case is that corporate formalities were never followed.

8     And as Mr. Levine stated, there were decisions that were made

9     concerning board membership that were made on the couch in Rabbi

10    Zaks' home.  I believe there's a documentary record of the

11    alleged September 1, 2018 meeting.  And I'm not debating that

12    there may have been a meeting.  The certificate of incorporation

13    sets the time for the annual meeting.  They needed to justify

14    who the board was, and they created a document.  We're not

15    saying that there weren't discussions, the question is whether

16    the evidentiary record of that meeting, the formal record

17    existed, and when that was prepared.

18          So, I don't think anybody is debating this.  I think

19    Mr. Levine completely mischaracterizes the argument when he says

20    that it's our claim that the board was never changed; that the

21    only remaining board members at any time were the four of the

22    original five surviving members.  One of the original members

23    was deceased.  He died in the first year after the corporation

24    was formed.

25          There are plenty of documents that have been presented

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          42

1  that reflect at different times, different people who were

2  claiming to be on the board, who were represented.  The banks

3  and governmental agencies as being on the board by different

4  parties.  And the reality is that in this nonprofit religious

5  corporation, the religious formalities and niceties were not

6  observed, and I don't believe that there are minutes of prior

7  meetings, I don't believe that there was a secretary who

8  prepared them, there was a person designated secretary, we can

9  get into that with the depositions in the other case.  We've

10  talked about that.  Their claim is that --

11       THE COURT:  Well, could I interrupt you?  The point

12  here is, if I believe there's a reasonable inference that there

13  were such documents on the hard drive, and I believe that there

14  was culpability in that not being there at this point, then the

15  Defendants are precluded from introducing any and such evidence,

16  right?  I mean that's a given.

17       MR. LANE:  Well, there are many documents that have

18  been submitted.  The authenticity of those documents can be

19  challenged.  I don't know what other documents there are.  I

20  think we would be precluded from submitting other documents that

21  are contrary to that.  And that's in the nature of the sanction

22  that would be imposed.  We'll get to this whole question about

23  intent.  I'd like to respond to a number of things that Mr.

24  Levine said, which I think are misdirected and also

25  mischaracterized some of the testimony with respect,

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          43

1   specifically, to this motion.  But if you're saying that we

2   would be precluded form challenging that the sole members of the

3   board on September 1 were Rabbi Aryeh and his five children, I

4   don't believe that we'd be precluded from challenging that.  I

5   don't believe that that would be correct.

6        THE COURT:  Well, but if I conclude that I can draw a

7   reasonable inference that the documents were on the hard drive

8   and that they were destroyed improperly, and I haven't heard you

9   on that, and I will.  But if I conclude those two things, then

10  you're basically saying that the Plaintiffs should be permitted

11  to make those arguments with the Defendants having at least one

12  hand tied behind their back.

13        MR. LANE:  Well, it depends upon the timeframe of

14  those documents.  Are they claiming that there are documents

15  that exist after September 1, 2018 that contradict other court

16  submissions and filings?  If for example there's a settlement

17  that occurs shortly before confirmation, in which they submit

18  documents that indicate there was a draft that was circulated

19  that Rabbi Aryeh approved that listed Rabbi Mayer as the

20  president, is that something that we're precluded from arguing

21  in the case that he was on the board?  They submitted that to a

22  court.

23        So, I understand exactly the plight of going back, and

24  nobody is arguing that the board didn't change from time to

25  time.  They haven't identified a single document that would

                    In re Mosdos Chofetz Chaim, Inc. - 1/14/21          44

1    confirm the appointment between September 1, 2018, when the

2    additional children were added at that meeting, and afterwards

3    that some other document that evidences that.   I'm perfectly

4    happy to start --

5            THE COURT:  But they're saying that such documents

6    were on the hard drive.

7            MS. LANE:  But they haven' identified any such

8    documents.  What is the document?  They have all the annual

9    minutes supposedly from September 1, 2018 forward.  What's the

10   nature of the document?  It's not a bank application for

11   Crossland Bank in 2005, which is what Mr. Levine points to.

12           THE COURT:  Right.  Again, I'm focusing on a proper

13   sanction here.  And again, I'll let you deal with the merits in

14   a second.  But as far as a sanction is concerned, it seems to me

15   that it is at least conceivable to me that short of dismissal, I

16   can preclude evidence being submitted by you or your side, but

17   that you should be permitted to cross examine Aryeh and whoever

18   else would be on the board as to the appointment.

19           MR. LANE:  We understand that.  And Your Honor will

20   make whatever ruling Your Honor makes after hearing the piece of

21   argument on the underlying issue, which deals with intent.  But

22   I would respectfully, Your Honor, indicate that they haven't

23   described in general terms or specific terms any single document

24   after September 1, 2018.  I understand about the history and I

25   fully understand that if we go back to limiting arguments and

1   evidence that contradicts the composition of the board as

2   claimed by Rabbi Aryeh prior to that date, that's fine.  But to

3   say that there are documents, all Mr. Levine referred to were

4   documents that were submitted to banks.

5         THE COURT:  Well, no.  I've read Henoch's deposition.

6   He talks about any important documents being put on the hard

7   drive.

8         MR. LANE:  It's fine to say there were lots of

9   important documents.  He, by the way, in his deposition, could

10  not explain how documents were actually downloaded onto that

11  hard drive.

12        THE COURT:  You and he had been joking about that,

13  about converting them to PDF.

14        MR. LANE:  Nobody knows how that was done, but we'll

15  get into that.

16        THE COURT:  Those are questions you can ask on cross.

17  All right?

18        MR. LANE:  As long as we can go there at the hearing,

19  that's fine.  Or whomever is representing Mayer Zaks at that

20  point if we're not still in the case.  Or the other Plaintiffs.

21  Oh, by the way, Your Honor, since we went through it at the

22  beginning today and the relief was a total dismissal, there are

23  four Plaintiffs who are not represented here today at all

24  because their counsel has withdrawn.  So, that it's clear, we're

25  representing only Rabbi Zaks.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          46

1       THE COURT:  Okay.

2       MR. LANE:  But that's fine, I understand the sanction

3  you're suggesting.  I think there's past history and I think the

4  starting point, and to say that we have minutes of other board

5  meetings, all of the minutes of the meetings since September 1,

6  2018, when the children were supposedly appointed have not been

7  destroyed, they exist.

8       THE COURT:  So, how do we know that?  How do I know

9  that today?

10      MR. LANE:  They have not identified as much as a

11  single board meeting.

12      THE COURT:  No, but how do I know those minutes exist?

13      MR. LANE:  Because the September 1, 2018 minutes have

14  been provided and the September 1, 2019 minutes have been

15  provided.

16      THE COURT:  Okay.

17      MR. LANE:  Those minutes are in existence.

18      THE COURT:  Right.  And they list the board members?

19      MR. LANE:  They list four board members on September

20  1, '18, Rabbi Aryeh and three of his children.  And at that

21  meeting they alleged appointed two additional children, thereby

22  making a board of six.  Those minutes are in existence.  They

23  haven't been destroyed; they haven't been removed.

24      THE COURT:  Okay.  I guess that's kind of a red

25  herring then.  The issue is how did that board get formed with

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          47

1   the four?

2          MS. LANE:  And there's testimony about that.  And

3   there's testimony that reflects that none of that was done in

4   writing.

5          THE COURT:  But again, that's the earlier period, and

6   the fact that those writings were destroyed.

7          MR. LANE:  Well, no, no.  At the time they weren't

8   created in writing, but how that process occurred, you're right,

9   Your Honor.  I agree.  That's subject to cross examination.  How

10  did that come about?

11         THE COURT:  Right.

12         MR. LANE:  It doesn't matter whether the --

13         THE COURT:  Maybe we're not arguing about anything.

14  It seems to me --

15         MR. LANE:  I don't think we are.

16         THE COURT:  Let me finish on this point because I

17  think it's an important one.  I could envision a sanction less

18  than dismissal that allows the Plaintiff's counsel to cross

19  examine whoever is put up for the proposition that the board was

20  properly constituted and voted in the proper percentage in

21  September for the sale.  What I'm having a problem with

22  understanding is how the Plaintiffs could introduce evidence in

23  the form of, I guess, anecdotal evidence, or testimony that

24  there were no documents when, I believe, if I find this, I can

25  draw an inference that indeed there were documents as to the

1   proper functioning of the board.  The distinction I'm making is

2   the following one.  I don't see any real issue, depending on the

3   degree of culpability I find, with cross examining Defendant's

4   witnesses on the board composition.  I do see a problem in

5   separately introducing evidence, whether it's anecdotal or in

6   writing as to the board's composition if I do conclude this,

7   when the Defendants are precluded by the destruction or theft

8   from submitting their own written evidence on that point.  So, I

9   guess that's the distinction I'm making.

10         MR. LANE:  We understand, Your Honor.  And I agree

11  with you, I really don't think there is a dispute here.

12         THE COURT:  Okay.  All right, good.  Well, I know that

13  took a while, but I can see why it's confusing.  It's worth

14  clarifying that point.  Mr. Levine, I know that you will

15  probably argue that where it appears that someone with intent

16  purposely destroyed evidence, that the other facts are

17  prejudiced and are really not that important.  But offsetting

18  that is the 2nd Circuit's I think clear direction that dismissal

19  shouldn't be imposed if there's a lesser sanction that works.

20  And I think if you preclude cross examination as to the

21  composition of the board, you really are preventing a

22  credibility assessment as opposed to using the documents

23  themselves.

24         MR. LEVINE:  Your Honor, I understand what you're

25  saying.  But I think the 2nd Circuit case, I'm not sure which one

In re Mosdos Chofetz Chaim, Inc. - 1/14/21        49

1  you're exactly referring to, but preclusion in those cases was

2  because evidence was improperly obtained.  So, the other side is

3  precluded from using the evidence.

4        THE COURT:  That's fine.

5        MS. LEVINE:  Here --

6        THE COURT:  No, but it's not just preclusion, it's

7  dismissal that I'm focusing on.  And the circuit basically, I

8  think, says if dismissal is not the only adequate sanction, you

9  should use a lesser sanction.

10       MR. LEVINE:  I agree that that's the law, Your Honor.

11       THE COURT:  Okay.  All right.  And I've been exploring

12 all this time whether it would be the only proper sanction and

13 that's why I've been inquiring into the relevance of this

14 information to the board issues and how they would ultimately

15 get litigated.

16       MR. LEVINE:  Right.  I know Mr. Lane --

17       THE COURT:  So, all of this has bene helpful to me.

18       MR. LEVINE:  I know Mr. Lane is going to argue about

19 the underlying facts.  I just want to make clear, then I'm going

20 to go on mute, that we do believe that dismissal is the only

21 realistic sanction given the egregiousness of the conduct.

22       THE COURT:  Okay.  All right.  So, Mr. Lane, I'm happy

23 to hear from you on your oral argument.

24       MR. LANE:  Thank you, Your Honor.  There's been a lot

25 of misdirection, I think.  And I'd like to say that Mr. Levine

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          50

1   compressed and altered the time of a number of events.  We don't

2   disagree about the standard.  We think that it requires a

3   showing of intent.  And the intent really hinges --

4          THE COURT:  Well, actually it doesn't require a

5   showing of intent.  Negligence might be enough too, but here

6   we're not really talking about negligence, I think.  At least

7   the movants aren't.

8          MR. LANE:  That's correct, Your Honor.  And so, the

9   issue is, this is not about vandalism, this is about the purpose

10  of the vandalism, and then what occurred afterwards.  Just so

11  that the record is clear, I want to review and make sure we have

12  on the record the sequence of events.  There were two alleged

13  acts of vandalism.  And nobody is disputing that.  I say alleged

14  wire-cutting events.  There were two acts of vandalism.  One

15  that occurred earlier and then one that occurred in May.  Let's

16  deal first with the one that occurred earlier.

17          Henoch Zaks in his declaration, original moving

18  declaration, and in his deposition contended that it happened

19  sometime early in 2020.  There was some debate as to whether it

20  was January, whether it was the beginning of February, but it

21  was early in 2020.  Sveka testified that in fact he cut the

22  wires shortly after Sukkot which ended at the end of October.  I

23  think October 29 was the last day of Sukkot in 2019.  I' doing

24  this to set the timing.

25          THE COURT:  Okay.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          51

1          MR. LANE:  The video, Exhibit 1, is a one-minute

2    videoclip that shows him arriving, leaving a black van, walking

3    towards the camera.  From the camera, you can see him reach into

4    his coat pocket.  Henock Zaks testified that he was on the steps

5    of the synagogue building.  Seeing it from the back, I don't

6    think you can see him reach into his coat pocket.  And he takes

7    out some tool and then the screen goes blank at some point.

8          First of all, Mr. Levine stated that he was driven

9    that day to the location by Rabbi Zaks in Rabbi Zaks' car.

10   That's not what Henoch Zaks testified to.  Henoch Zaks testified

11   that in the first incident, the one that Henoch Zaks claimed

12   occurred the beginning of 2020, and Sveka claims occurred

13   basically at the beginning of November, that he was driven by

14   Leia Brody, who is his sister.  And the car is not Rabbi Zaks'

15   car.  He testifies they could see that it was Leia Brody.  You

16   can't see her in the video, but that's not Rabbi Mayer's car and

17   that's not Rabbi Mayer driving it.  What Henoch Zaks testified

18   to was that it was Rabbi Mayer who drove him in May.  So, Mr.

19   Levine is incorrect about that.

20         He went and he cut the wires, and he testified he cut

21   other wires and the camera goes blank.  So, why did he go to cut

22   the wires?  And I should also say, 20 seconds into that video,

23   you can see children skateboarding in the background.  They are

24   not wearing winter clothing.  Sveka Zaks, at the time, is not

25   16, he was 15, is not wearing winter clothing.  And we submit,

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          52

1   Your Honor, that that alone indicates that Sveka Zaks' testimony

2   and the timing of that occurrence is more likely the truth than

3   what Henoch Zaks testified to.  I would also say that they

4   repaired the cameras afterwards.  There's testimony about coming

5   back.  Supposedly, there's an incident four days later.  Or

6   three days later, he learns of a break in.  I don't know that

7   it's three days later.  The testimony is that he went in, and he

8   disabled the cameras inside.

9          So, that would basically be the story about where he

10  was seen by Henoch Zaks, he ran, he came back a couple of days

11  later, but that again would be in November.  And that's very

12  significant; how it changes from November to January is very

13  significant, Your Honor.  Because what's going on in November is

14  that in November, nobody knows there's a board composition

15  issue.  At the beginning of November, in fact, it's not even

16  clear that Rabbi Zaks knows that the property has been sold.  It

17  doesn't become a board composition issue until Your Honor raises

18  the issue at the December 17 contempt hearing.

19          THE COURT:  I'm sorry, that's a different point.

20          MR. LANE:  No, no.  It goes to --

21          THE COURT:  Is there anything in the record showing

22  when Rabbi Mayer became aware of the sale of the property?  Or

23  the agreement to sell the property?

24          MR. LANE:  There's nothing in the record of this

25  hearing.  There was a proceeding commenced in Rockland County,

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          53

1    as Your Honor is aware.  There are three matters pending before

2    Judge Eisenpress.  One of them is a dispute about the propriety

3    of the Aronoff mortgage.  It's not in the record of this

4    sanctions motion.  But there's never any argument that was made

5    when they challenged the propriety of the Aronoff mortgage.  And

6    in connection with that litigation, which is not decided until

7    late in November.  That the board at that time, the first

8    response wasn't the board's only --

9            THE COURT:  Can I interrupt you?  Look, the

10   sophistication of the board composition is the key thing, I

11   think.  On the other hand, if Rabbi Mayer was aware in October

12   or November of the financing and the sale, one could certainly

13   infer that he would want to have those records destroyed.

14           MR. LANE:  Let me respond to that.

15           THE COURT:  Okay.

16           MR. LANE:  And none of this is in the evidentiary

17   record of this sanctions motion.

18           THE COURT:  Well, I have the underlying motion for an

19   injunction before me.  I don't know when that was made.  I can

20   certainly go look at that.  I can certainly take judicial notice

21   of when the Rockland County proceeding was started and look at

22   the facts that are alleged in it.

23           MR. LANE:  Okay.  Well, on that score and with respect

24   to evidence that would exist, and I don't think Mitch Green, who

25   was bankruptcy counsel, was on this.  There was a *lis pendens*

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          54

1    that was filed, and we can find the date of the *lis pendens*,

2    which was filed shortly after when they knew that the sale was

3    being contemplated.  You don't file a *lis pendens* after a sale,

4    you file a *lis pendens* before you believe that there's a sale.

5              THE COURT:  Okay.

6              MR. LANE:  And we can determine the exact date that

7    the *lis pendens* was filed in Rockland Count.  And my

8    recollection is that it was late November.

9              THE COURT:  Okay.

10             MR. LANE:  The other thing is, it would have been easy

11   to prove --

12             THE COURT:  Well, wasn't the sale October 25?

13             MR. LANE:  The sale was October 25, and the *lis*

14   *pendens* was filed after the fact.  When the *lis pendens* was

15   filed, they didn't know the sale had occurred.  And the truth,

16   Your Honor, is that there are conversations between Mitch Green,

17   bankruptcy counsel, and Rabbi Zaks where Mitch Green is

18   complaining he wants the *lis pendens* removed because he's afraid

19   that it's going to tie up funds.  They need the sale to go

20   forward in order to generate the money to pay fees that they'd

21   been awarded.  So, that *lis pendens* is filed after the sale.

22   Mitch Green didn't even know that the sale had taken place.  And

23   again, that's not for this hearing.  It would have been very

24   simple to prove when the break in occurred.  One of the things

25   we asked for in the discovery relating to the sanctions motion

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          55

1  was to provide the bills for the repairs.  That, they never

2  provided.  And in fact, Henoch Zaks at his deposition says, you

3  have to ask my brother.  I didn't handle that.

4          One of the points that Mr. Levine was that later in

5  November, we believe it was after the occurrence because we

6  believe the occurrence occurred in the beginning of November,

7  and I think the weather demonstrated in the video establishes

8  that, was that they came in and repaired it immediately.  So,

9  therefore, when Ron Henoch came back at the end of November, of

10 course, there were no wires cut.  It had been repaired.  Why did

11 they shift it from the beginning of November to January?

12 Because the claim is that there were board records; there were

13 records related to the composition on the hard drive; and they

14 have to put the burglary at a time that occurs after Your Honor

15 makes that an issue on December 17.  So, that's why that

16 occurred.  That's why it's presented that way.

17         Now, we go back to another issue.  How did they even

18 know that there were records on that hard drive?  The premise of

19 there being records on the hard drive, remember, originally,

20 it's to prevent us from seeing the videos of Aryeh Zaks in the

21 building in September 2018 and September 2019.  How did they

22 know that?  Well, if they knew that that was being used as an

23 office of Rabbi Aryeh Zaks, you could make that argument.  But

24 the fact is, Your Honor, there's no evidence that it was ever

25 used as an office of Rabbi Aryeh Zaks, other than Henoch's

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          56

1  statements to that effect.  And you can judge the credibility of

2  that as you want.

3       I will say, Your Honor, just as Sveka Zaks is an

4  interested witness, and Rabbi Mayer is interested witness, Rabbi

5  Aryeh is an interested witness, and Henoch Zaks is an interested

6  witness.  The only person that's been heard from in this issue,

7  who's not an interested witness is Ron Henig.  And Ron Henig has

8  explained to you exactly.  There's no question, Your Honor.

9  Henoch Zaks has testified lights were out in Rabbi Aryeh's

10 office.  There's not a scintilla of evidence that anybody else

11 ever saw Rabbi Aryeh in the basement using it as an office or

12 that any independent party ever saw anybody or believed that it

13 was an office after the construction was completed in 2009 and

14 the residences were occupied.

15       Ron Henig, as explained in his supplemental affidavit

16 from a few days ago, doesn't contradict anything that was said

17 back on September 9.  When the construction was underway, they

18 moved the office from a trailer into the basement of a unit.

19 The first unit that was completed.  And that he as construction

20 manager was there, and he has all of those documents and

21 everything that was there at the time presented, and it can make

22 it available for the Court.  And I didn't prepare that

23 declaration and it doesn't contradict the original September 9

24 declaration speaks to nothing about how that office was used;

25 that anybody used it after September 2009.  The project was

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                57

1   completed at the beginning of 2010, and it wasn't occupied until

2   well into 2010, and that's nine years ago.

3         So, while the residents were occupied by students and

4   it was functioning in that fashion, it was never an office.

5   Nobody believed it to be an office.  And in order to find

6   intent, you have to reach the conclusion that Sveka Zaks or if

7   somebody put him up to it, whoever it was, Rabbi Mayer or

8   anybody else, believed it to be Rabbi Aryeh's office where he

9   maintained his records.  And I submit, Your Honor, there is no

10  evidence of that in the record other than Henoch Zaks' say-so.

11  So, that's the first break in.

12        So, they come in, they repair it immediately, the

13  system is up.  And now, in May, there's a second break in,

14  because they're still taping, and Sveka Zaks goes, he goes to

15  cut the wires and he can't cut the wires.  Why can't he cut the

16  wires?  Because the pocketknife that he used the first time

17  isn't strong enough.  They've now encased them in PVC encasing.

18  And that's all in the record.  And so, he goes, and he

19  supposedly smashes the lock and breaks into the basement.

20        By the way, we have testimony in the case from Ron

21  Henig; we have testimony from David Gewirtzman that it was

22  mainly open.  Gewirtzman, who did plumbing work and was deposed

23  in this case, he was in and out of there all the time.  There

24  were people who were going in unsupervised.  Henig Zaks even

25  admitted that during the day, many times it was unlocked.  The

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                    58

1   second break in is during the day.  There's a video.  There's a

2   claim that it was smashed.  There's no evidence of anything

3   being smashed.  He claimed it was padlocked.  If you look at the

4   door, what's actually visible from the camera, it doesn't look

5   like something that had a padlock.  There's a difference between

6   a door being locked and being padlocked.  That's usually a

7   physical lock, a hook on one side and a hook on the other.

8   That's clearly not visible.  And he goes in.  And supposedly at

9   that time, he rifles the office, and he takes all the hardcopy

10  documents.  All the electronic documents were removed earlier,

11  he takes the hardcopy documents.

12          So, their testimony rests on the allegation that after

13  they had a break in and things had been stolen, and now that the

14  issues in the case had been crystalized, and there's been

15  argument about board composition and we've gotten into some

16  discovery back and forth, he went in and stole all of the

17  hardcopy documents that were left behind, which they decided,

18  after a break in, to leave in a building in a space in which

19  people were entering all the time unsupervised.  Your Honor, I

20  would submit that that's not credible.  It's just not credible.

21          So, what do we have here?  We have no evidence.  We

22  have no evidence for the underlying key point to intent that it

23  was Rabbi Aryeh's office where these documents would have been

24  stored.  And the main thing that's missing here is Rabbi Aryeh

25  has never submitted any declaration or testimony that he used it

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          59

1   as his office.  So, Mr. Levine says, well, that's your problem,

2   you didn't depose him.  Well, first of all, it's not our

3   obligation to create the record.  That's evidence they should

4   have put in that they didn't put in.  And second, we tried very

5   hard to get Rabbi Aryeh's deposition, in fact, we wanted to

6   depose Rabbi Aryeh first.  One of the things we wanted to depose

7   him about was the phone records relating to the meeting that was

8   going to be shown on this video.  And in fact, Rabbi Aryeh was

9   supposed to be deposed the day before the hearing and that

10  deposition didn't take place because of intervening events.  And

11  it was sort of a condition of adjourning the hearing that we

12  close the record at that point.  And so, we agreed not to go

13  ahead with that.  And we didn't have that deposition.  But that

14  doesn't change the fact that it was their motion, it was the

15  burden on him to establish the key fact on which the intent

16  standard rests.

17          Now, let's talk about what the video shows.  What they

18  claim, well, we've been able to prove that these meetings

19  occurred.  First of all, nobody knew at the beginning of

20  November that the meetings were even important.  Rabbi Mayer

21  certainly didn't know at the beginning of November, that Rabbi

22  Aryeh was going to claim that the only members of the board of

23  Mosdos was himself and his five children.  But the minutes of

24  those meetings, --

25          THE COURT:  You don't have any evidence of that,

1    right?  That statement?

2              MR. LANE:  Excuse me?

3              THE COURT:  You don't have any evidence of that

4    statement, right?

5              MR. LANE:  The only answer is the deposition testimony

6    in the main case.  But I want Your Honor to just bear in mind,

7    Your Honor, it wouldn't show what was going on inside the

8    building, but it would show people arriving for the meeting.

9    And I understand the claim that we have witnesses who were in

10   the building on September 1, 2018 who said they did not see

11   Rabbi Aryeh in the building at the time that the meeting

12   allegedly occurred based on the testimony.  The minutes don't

13   refer to time, it only refers to the day.  That was a religious

14   day.  There were services that night that began at midnight and

15   that is in the record of the deposition testimony.  There's

16   something called selichot, it's the sabbath before the high holy

17   days.  And they do services late night.  So, the issue is when

18   this meeting could possibly have occurred because the children,

19   two of the board members who participated in the meeting,

20   participated telephonically from Israel, which is seven hours

21   ahead of us.  So, if the meeting occurred at 10 o'clock in the

22   evening as they contend, it would have been that the call was

23   five in the morning that the two children were participating.

24   But in any event, all it would show is Rabbi Aryeh entering the

25   building for services where there were religious activities to

1   take place that evening.

2          September 2019 --

3          THE COURT:  But I'm sorry, that's all that's argued in

4   response is that he didn't enter the building.

5          MR. LANE:  No, no.  We haven't argued that he didn't

6   enter the building or entered the building.  What we've argued

7   is that we don't think that there was a call that was a board

8   meeting that took place, a formal board meeting, between him and

9   the other alleged board members on that date.

10          THE COURT:  But the assertions are, I think, correct

11   me if I'm wrong; that people say he didn't attend the meeting

12   because they say they didn't see him.  He wasn't there.

13          MR. LANE:  What they testified to is that in an

14   interval between -- the specifics are that between 9:45 p.m. and

15   10:15 p.m. or maybe it's 9:30 and 10:15, which is when Danny

16   Rosenblum had gone home and was coming back to set up for

17   selichot.  Selichot starts after midnight.  He didn't see him in

18   the building in that timeframe, and then Danny Rosenblum was in

19   the sanctuary for most of the time after that.  Danny Rosenblum

20   wasn't there.  He didn't see him after he came back at 10:15.

21   The minutes don't say when he was there, and Rabbi Aryeh then

22   testified to the meetings being a little bit later.  And

23   frankly, when we're talking about timing and whether it's 9:45

24   or 10:15, people are testifying two years later.

25          So, I understand that recollections may not be

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          62

1   perfect, but nobody is going to debate that there could be video

2   of Rabbi Aryeh entering the building on either of those two

3   dates, September 1, 2018 or September 1, 2019.  By the way,

4   there's no indication and there's no testimony concerning how

5   long the video recordings are stored.  When you have a security

6   system does it show all activities going back two years?  No

7   video system that I know does that.  Now, Ron Henig testified he

8   was in the basement being used as a construction office all the

9   time between 2007 and 2009.  He never saw any corporate

10  documents.  All he saw were the documents relating to the

11  construction of the project.  That's what his declaration shows.

12  Henoch Zaks' testimony was that from the beginning, it was

13  always his office going back to when I was 11 years old in 2007.

14        So, I think that we've been misled as to when it

15  occurred.  I think that they had an easy opportunity to confirm

16  when that break in occurred.  All they needed to do was produce

17  the records of the repairs, which we called for and which we

18  never received.  And I think they shifted the date.  I think the

19  inference that has to be accepted and there's visual evidence.

20  We went and looked, by the way.  In January there was one day

21  where it was more than 50 degrees.  Okay?

22        THE COURT:  I'm sorry, say that again.

23        MR. LANE:  I said we went and looked at the

24  temperature record in January, and we found one day where it was

25  more than 50 degrees.  So, all you have to do is look at the way

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          63

1   the children were dressed in the background, and I think it's 20

2   seconds into Exhibit V-1.  Including, Sveka Zaks is not wearing

3   an overcoat.

4          Mr. Levine took issue with Sveka Zaks' failure to

5   identify himself in the video.  Sveka Zaks didn't deny that he

6   went to the premises and cut the wires.  The question was, is

7   the depiction of the person in the video you?  I have two

8   religious rabbis on this call, and I hope I'm not offending

9   anybody by saying something that's not woke, but all of the

10  players here, all dress the same.  So, if you look at that

11  video, anybody with the same build, they're all going to wear

12  the same clothing.  And based upon the clarity of that video, at

13  least with the one where it goes to cut the wires, if you had

14  someone of the same build, you wouldn't be able to make a

15  positive identification.  It's a red herring because he doesn't

16  deny having gone to cut the wires.

17         So, in summary, Your Honor, the key point in finding

18  intent is a knowledge that it was an office where those records

19  would have been maintained.  And we submit, Your Honor, that the

20  documentary evidence and the video evidence tends to establish

21  (A) the independent testimony of Henig and others, and Mr.

22  Gewirtzman at deposition, as non-interested witnesses, refutes

23  the claim that it was ever used as Mosdos' office by Rabbi

24  Aryeh.  And (B) that the video evidence tends to establish that

25  the break in occurred before anybody knew that that was even an

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          64

1   issue in this case.  And if they didn't know it was an issue in

2   this case, and they didn't know that it was an office, there

3   can't be a finding of intent.

4           And as to the second break in which doesn't involve

5   any video equipment, doesn't involve any hard drives, it only

6   involves corporate records, it is inherently unbelievable that

7   crucial corporate records necessary to the litigation of this

8   action would have been left in that office, in that location, in

9   that storage room, storage basement after they knew there had

10  been a break in, after they knew that this was hotly contested,

11  and where that room was basically left unlocked most of the day.

12  That's not how Your Honor would have done it if Your Honor were

13  involved and there were crucial records to litigation records

14  that you were hotly contesting.  It's certainly not what I would

15  have done.  And it's not what Rabbi Aryeh or Henoch Zaks would

16  have done.  And nobody whose ever been in there afterwards ever

17  saw any such records.  So, that's inherently unbelievable on the

18  fact issue.

19          So, I don't believe that there are grounds for the

20  motion at all, other than if Your Honor wanted to punish Sveka

21  Zaks as to the vandalism, and I would submit, Your Honor, that

22  that's an issue to be taken up with the law enforcement

23  authorities and doesn't relate to the litigation of this motion.

24          The last point I would make is that Henoch Zaks said

25  in his declaration that he didn't call the police because there

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          65

1    are religious restrictions against getting the police involved

2    in these types of matters.  Your Honor is well aware from last

3    week that he had no hesitation in calling the police with

4    respect to the payment.  So, I don't believe that that's

5    truthful testimony either.

6          THE COURT:  You referenced anyone's whose been in

7    there afterwards didn't see papers.  I'm not sure I understand

8    what that means.  Maybe I misheard that.

9          MR. LANE:  My recollection of the Gewirtzman's

10   testimony is that he was asked as to its use.  And Gewirtzman

11   said he went in there, he saw junk on the floor, there were

12   plumbing supplies that were kept in there.  He never saw a desk,

13   and he certainly didn't see in this cabinet lying on the floor

14   that he described --

15         THE COURT:  So, it's the Gewirtzman deposition that

16   you're referring to?

17         MR. LANE:  That's correct.

18         THE COURT:  Okay.

19         MR. LANE:  And in fact, Mr. Gewirtzman testified to

20   the dimensions of the cabinet.  And I don't recall whether it's

21   one of the exhibits that was shown that there's a later

22   photograph that was provided by the other side.  And thar's a

23   cabinet that's not three and a half feet high, it's about six

24   feet high.  And the photographs don't show it in the space, they

25   show it outside some building, they're outdoor photographs.  So,

1    I think this entire story, Your Honor, about it being Rabbi

2    Aryeh's office is a fabrication.  And the element, of course,

3    that's missing is any testimony from the person who's office

4    it's supposedly was that it was in fact his office.  That's not

5    in the record.

6         THE COURT:  All right.  So, Mr. Levine, let me go to

7    the point Mr. Lane made, which is, given the break in to the

8    basement at Unit 18, regardless of whether it was in late

9    October or early in 2020, the next break in, I think, everyone

10   agrees was in May of 2020, why would anything of value have been

11   left in the basement after the first break in?

12        MR. LEVINE:  Your Honor can you hear me?  I'm sorry, I

13   was on mute.

14        THE COURT:  Yes.  I can hear you now.

15        MR. LEVINE:  Okay.  Let me address that.  And if you

16   will just bear with me, one of the issues I have in this case is

17   that there are constantly references to things outside of the

18   record by counsel.  And if you permit me --

19        THE COURT:  My question --

20        MR. LEVINE:  I just want to clarify this issue about

21   October versus January because Mr. Lane said that that was a key

22   issue.  How could the motive here have been to destroy

23   materials, evidence, when he broke in in October, late October.

24   He couldn't have known that there was any issue regarding a

25   sale.  And then he referred to the *lis pendens* action that was

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          67

1  filed in the state court, which of course is not in this record.

2  This is Rabbi Mayer Zaks' affidavit.  In there, where he says at

3  paragraph 23, and this was started on October 25, 2019.  That's

4  when the *lis pendens* was filed.  He says, "Rabbi Aryeh has

5  flagrantly boasted to other prominent rabbis in the community of

6  how he was able to transfer the TG Radin claim to himself.  Upon

7  this information getting back to Rabbi Zaks, out of an abundance

8  of caution, on October 25, 2019, a *lis pendens* was commenced in

9  Rockland County Supreme Court.  So, clearly Rabbi Mayer was

10  aware.  And interestingly, right around the time when the break

11  in took place, there was supposedly a transfer.  And there are

12  other things that Mr. Lane cited to that are not factually

13  accurate, but let me address Your Honor's question.

14       The main thrust here is that there were electronic

15  documents that were taken.  Also, it wasn't that the security

16  system was repaired immediately, it wasn't repaired until months

17  late. And so that when the break in took place in May of 2020,

18  there was an updated security system, plus a second lock on the

19  door.  So, that the thought was that it was now secure, and that

20  he wouldn't do it again because he'd been caught the first time,

21  I think was the motivation.  But there's no evidence of that,

22  and I'm really hesitant to cite things that outside of the

23  record.  So, the answer is, there's no evidence as to why that

24  was, other than there's evidence that the security was improved

25  for the office.

                   In re Mosdos Chofetz Chaim, Inc. - 1/14/21          68

1            THE COURT:  Okay.

2            MR. LEVINE:  Could I go into some other issues I had

3    with Mr. Lane's presentation?

4            THE COURT:  Sure.  That's fine.

5            MR. LEVINE:  Okay.  So, his main point about the

6    timeframe being off, I think is clearly inaccurate as to that.

7    Secondly, he said that the witnesses testified, especially

8    Henoch, that the door wasn't lock.  That is completely contrary

9    to Henoch's testimony.  Henoch testified that in fact when the

10   tenant moved in upstairs which was prior to the break in, when

11   the tenant moved in upstairs, the door was always lock, and the

12   only time that it wasn't lock was when the maintenance person

13   was coming in and out of the office.  I'm sorry, I didn't mean

14   Henock, I meant Gewirtzman.

15           THE COURT:  Yes.

16           MR. LEVINE:  Mr. Gewirtzman testified that that door

17   was always locked --

18           THE COURT:  No, no.  I read that declaration.

19           MR. LEVINE:  Okay.

20           THE COURT:  You don't need to go into that.

21           MR. LEVINE:  And then the other thing, and Mr. Nash is

22   on the phone here.  I'd like him to chime in on this if I'm

23   saying anything incorrect.  Mr. Lane's statement that there was

24   a condition to an adjournment that Rabbi Aryeh would not be

25   deposed is completely inaccurate.  Mr. Lane told us on the

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          69

1  record that they decided not to depose.  And I'm not going to

2  his point as to whether we have a burden to putting in the

3  affirmation, but in terms of his statement that there was a

4  condition to the adjournment, not to depose Rabbi Aryeh, is

5  completely inaccurate.  He told us on the record before any

6  request for adjournment for made that he's not going forward

7  with those depositions.

8          THE COURT:  Okay.  I think the main point he was

9  making is that the movant chose not to submit is declaration.

10         MR. LEVINE:  Right.  And I agree with that because we

11 thought that the declaration of Henoch, who personally observed

12 this material was sufficient.

13         THE COURT:  Okay.  Well, the one thing Henoch couldn't

14 really testify to is, what was on the hard drive and what was in

15 the documents.  That wasn't within his knowledge.  He just

16 testified that we, meaning I guess he and his father, put

17 important documents in there.  And he did testify as to

18 financing related documents.

19         MR. LEVINE:  Right.  And he also gave, and I cited

20 this in my reply, he also did cite specifically documents.  He

21 noted minutes, corporate records, that kind of thing.  He did

22 delineate that to some extent.

23         THE COURT:  Right.

24         MR. LEVINE:  Okay.

25         THE COURT:  Okay.

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          70

1          MR. LEVINE:  Two more points, Your Honor.  I know you

2     have this well in hand.  I know you've seen everything.  I don't

3     want to belabor this.  I just want to raise two more points

4     about Mr. Lane's statement.  He indicated that the video showing

5     Tzvi Zaks walking towards the wires that he cut the first time,

6     and Mr. Lane is conflating the first and the second time.  He

7     said that it shows Tzvi Zaks walking towards the wires, but that

8     it wasn't unreasonable for Tzvi not to recognize himself because

9     everybody wears the same kind of clothes, etcetera.  I think

10    that's ludicrous.  I'm glad Mr. Lane is admitting that in was in

11    fact Tzvi at this point.  But I think it's ludicrous to think

12    that he couldn't identify himself.  And Your Honor saw his

13    girth, his walk, him reaching into his pocket.  Which is kind of

14    interesting because when I asked him, how did you break into the

15    office, he said to me, oh, you know it's easy, you can just use

16    a credit card.  You just put a credit card into the lock.  And

17    said, well, do you carry credit cards?  And then on the video he

18    reaches into his jacket, in just exactly the same manner in

19    which you see him reaching into his jacket on the video, and

20    says, yeah, here they are.  And he pulls them out.

21          And then, finally I just want to say one more thing,

22    Your Honor.  The claim that this basement space was never an

23    office, the first testimony about that was Rabbi Mayer Zaks, who

24    said, "Office, are you kidding me?  This was a smelly, dirty,

25    filthy, unfinished place that no one would even walk into."

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          71

1   Then when the pictures came out showing that in fact it had

2   finished walls and everything and it was basically a useable

3   space then it became, okay, maybe.  But it wasn't an office

4   where you would store materials.  And it was never an office.

5   And that's the key here.

6           Henoch's declaration is not to establish what was

7   there, although he said that he doesn't think anything was ever

8   moved as far as he knows.  Henoch's declaration establishes that

9   it was in fact used as an office. And that's the salient point

10  here.  The testimony was, not only by Yosef Zaks, but also by

11  his brother, that this room was never used as an office period.

12  And that is direct evidence before the Court showing that in

13  fact that's not the case.  It was used as an office.  And it's

14  not this dirty sewer filled space, but that they painted it

15  before then, and we have the pictures.

16          So, I thank Your Honor for all of that.  I thank Mr.

17  Lane has made a very honorable argument.  I think he's done a

18  very good job, especially given that he's not getting paid.  But

19  I think that the bottom line here -- and I commend him for it.

20  But I think that the bottom line here is that the evidence is

21  quite clear as to what happened, who has the credible story.

22  And I think Your Honor should, at this point, dismiss with

23  prejudice.

24          MR. LANE:  Your Honor, if I could respond?  Clearly,

25  he didn't use a credit card to cut the wires.  So, Mr. Levine is

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          72

1   conflating testimony with how you enter the basement with the

2   cutting of the wires --

3           THE COURT:  No, no.  I think why he's bringing this up

4   is just on the evasiveness that Tzvi showed over identifying the

5   videos and how he reached for his credit cards show how he used

6   the credit card.  Frankly, I found his testimony extremely

7   evasive and annoying.  And I'll talk to the parties separately

8   about how I found, not just referring to Mr. Levine here, but

9   the lawyers behavior at that deposition annoying as well.  But

10  Tzvi is not a good witness.  Let's leave it at that.

11          MR. LANE:  The second thing --

12          RABBI MAYER ZAKS:  Your Honor?  Your Honor?

13          THE COURT:  No, sir,

14          (Crosstalk.)

15          THE COURT:  I don't want to hear this now, Rabbi

16  Mayer.  I just don't.  I'm sorry.

17          RABBI MAYER ZAKS:  This is about some other issue.

18          THE COURT:  No, Mr. Lane was speaking.  Let's hear him

19  speak.

20          MR. LANE:  The second point with respect to the

21  testimony and the padlock and I think it's at 328 to 330 of the

22  deposition.  If you go back and look through it, there are two

23  entries into the basement.  One is from the apartment and one is

24  from the outside.

25          THE COURT:  Yes.  I understand.  I understand.  The

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          73

1   major lock seemed to be the interior lock.  I understand that.

2          MR. LANE:  Correct.  Correct.

3          THE COURT:  I got that.

4          MR. LANE:  And then the last point that I would make

5   again is, I really feel compelled to emphasize that the

6   witnesses here are all interested parties with two exceptions.

7   One is Mr. Henig, and one is Mr. Gewirtzman.  Now, Mr.

8   Gewirtzman is dismissed by Mr. Levine in one of his letters to

9   Your Honor as Rabbi Mayer's disciple.  That's a religious term

10  and I don't know what's implied by that.  I guess it's implied

11  that he's under the thumb of Rabbi Mayer.  There's no indication

12  of that.  I guess anybody who takes a position on one side

13  against the other is under a thumb in Mr. Levine's mind.  I

14  don't think that's the case.

15          There were two independent parties who have nothing to

16  gain here.  One is Mr. Henig, and one is Mr. Gewirtzman.

17  Neither one can support the claim that it was used as an office

18  at any time after the construction was completed.  And when Mr.

19  Levine says that Henig flatly refutes the claim there was never

20  an office, we're talking about once the complex was

21  functioning/operating.  Okay?  And when he says, it's smelly, I

22  don't remember the words "smelly", but the photographs clearly

23  depict the storage room.  There's no sink, there's no bathroom,

24  there's no way to use it as an office.  There's no witness who

25  they can produce who will show that they ever saw Aryeh Zaks

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          74

1   enter that basement other than Henoch Zaks.

2          THE COURT:  Yeah, other than Henoch.  Right.

3          MR. LANE:  Right.  But there's no independent --

4          THE COURT:  No, I've read Mr. Henig's declarations.

5   They're very short.  He does say that the computer stuff was

6   there after he left.  And I've read Mr. Gewirtzman's declaration

7   and they are generally incredible, they only say so much, but I

8   got it.

9          MR. LANE:  There are lots of disinterested parties,

10  parties with nothing to gain from this that could have testified

11  to these events.  And when you make the application and you

12  allege these things, nobody prevented them from doing that, and

13  they didn't.

14         THE COURT:  Look, you all debate repeatedly,

15  notwithstanding stipulations that are made at the beginning of

16  the depositions, as to what an office means.  But ultimately

17  here, what's asserted is that information was destroyed.  You

18  can keep information in a lot of places that you're not always

19  working in or even often working in.  So, that's what I'm

20  focusing on.

21         MR. LANE:  Yeah, but, Your Honor, that goes to, why

22  would anyone assume that the tool shed where miscellaneous

23  plumbing supplies are kept and where various tools needed to

24  maintain the property are kept is where records and documents

25  would be?  Now, the video is a different --

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          75

1      THE COURT:  Why would a 15-year-old boy go into it

2  after cutting out wires and keep pulling out wires?

3      MR. LANE:  Well, okay.

4      THE COURT:  You know, enough of this.  Honestly.  This

5  is the problem with the deposition.  Too much casuistry.  I get

6  it, all right?  I've reviewed them.  I will make my decision.

7  But at this point we're really getting into how many angels fit

8  on the head of a pin  And I've had enough of it.  All right?  I

9  can say that.  I'm not quite sure why the lawyers didn't say it

10 during the deposition, and keep the witness under control, which

11 his lawyer never did.  And I'm not sure why Mr. Levine didn't

12 cool it during the deposition, but I'm telling you both, I've

13 heard enough speculation.  I get your argument.  I'm cutting it

14 off at this point.  I think we're getting beyond the evidence,

15 which I've reviewed.  Okay?

16     MR. LEVINE:  Your Honor, all I want to say is I didn't

17 send that deposition.

18     THE COURT:  Well, you defended Aryeh's.  And Aryeh's

19 was outright out of control.  So, I agree, you didn't.  Mr.

20 Twersky defended Tzvi's deposition.  But it was an embarrassment

21 all around, and not confined to Mr. Levine by any means.  There

22 was a clear intention to disrupt that deposition and no control

23 of the witness in both cases.  He started out as a properly

24 respectful young person, one adult, one 16.  Then, who was egged

25 on by counsel in large respect, his own counsel in both

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          76

1   respects, did not do themselves any service by the insulting and

2   counterproductive answers or not answers that they gave.  Now, I

3   have to sort through how much of that was just evasion or lack

4   of credibility and how much was just a young person who wasn't

5   brough into line by his counsel reacting to provocation.  And I

6   think I know the answer to that.

7          RABBI MAYER ZAKS:  Your Honor?  Your Honor?

8          THE COURT:  No, let me just finish.  I can tell when

9   people start to react, and I can tell when they might overreact.

10  So, I have assessed the credibility here and that will go into

11  my ruling of all the witnesses, including Henoch.

12         MR. LANE:  Your Honor, the only point I would make

13  with respect to the last point about roping in your witnesses

14  and I agree 100 percent with Your Honor, the problem is, it

15  becomes difficult when the lawyers are not in the room with the

16  witness and everybody is participating by Zoom.  So, that's the

17  situation.  Your Honor is 100 percent correct; 100 percent

18  correct.  But it becomes very difficult to do that, and the

19  reason no one was in the room with him were COVID restrictions.

20  And I'm not excusing anybody's conduct.  But that is in this

21  case one factor that made it difficult under those

22  circumstances.

23         THE COURT:  Okay.  Well, I'll take that into account.

24  All right.  I am not going to rule today on this.  I want to

25  review something, including what the weather was like in October

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          77

1    of 2019 and the motion of the defendant --

2            MR. LANE:  It's actually the beginning of November.

3    Sukkot ended October 29.

4            THE COURT:  Well, fine.

5            MR. LEVINE:  No, that's not accurate.  That's not

6    accurate.

7            MR. LANE:  I' pretty sure it is.

8            MR. LEVINE:  I'm pretty sure it's not.

9            THE COURT:  The parties basically put a ring around

10   it.  And again, we're really talking about three events here,

11   not two.  You guys can correct me if I'm wrong.  First event

12   one.  And there's a dispute as to when that occurred.  Whether

13   it was in early in 2020, which I understood means probably

14   January, but it could be a little later.  But I think it's early

15   2020.  Or instead, in late October of 2019, during Sukkot which

16   is the cutting of the wires.

17           Event number two is the entry into the basement and

18   the ripping out of wires and the taking of something which was

19   testified to as a camera, although there's contradictory

20   testimony, including from Mr. Gewirtzman.  We're not entirely

21   sur when that happened, but I believe the evidence shows at

22   least that it was after, although fairly shortly after, event

23   number one.  And then even number three, it's agreed, occurred

24   in May with more cutting of the new wires and again entry into

25   the basement.  And I believe that it's three because I just

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          78

1  think that's what the record shows.  But you guys tell me if I'm

2  wrong on that point.

3       MR. LEVINE:  No, you're correct Your Honor on that

4  point.  And the testimony was that after the cutting the first,

5  that weekend, that ensuing weekend is when the break in took

6  place.

7       THE COURT:  Right.  Because Tzvi, it is alleged, ran

8  away when Henoch made himself know.

9       MR. LEVINE:  Correct.

10      MR. LANE:  He said in his declaration, the ensuing

11  weekend.  I just want to point out during the second time,

12  remember, he couldn't cut the wires.  Since that was the tool

13  shed and it's a different location, he went to get a tool that

14  he could cut the wires with.  That's why he went in a second

15  time.

16      MR. LEVINE:  Right.  Except he didn't testify to that.

17      THE COURT:  I know.  I ready that, but that's not what

18  I'm talking about.  I just want to confirm we have three events

19  and I think the only dispute is whether the first two occurred

20  in October/the following weekend for event number two or was it

21  first to occur in early 2020.

22      MR. LEVINE:  Correct.

23      THE COURT:  Right.  Okay.

24      RABBI MAYER ZAKS:  Your Honor, if I may on a different

25  issue --

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          79

1        MR. LEVINE:  Judge, I object to their being any

2    statement by the rabbi.  It's not fair.

3        RABBI MAYER ZAKS:  Let the judge decide.

4        MR. LEVINE:  It's not fair.

5        THE COURT:  Rabbi Mayer, this is not an evidentiary

6    hearing and --

7        RABBI MAYER ZAKS:  I know that.  I know.

8        THE COURT:  And you have counsel, right?  In fact --

9        RABBI MAYER ZAKS:  No, no.  But Sveka.  Sveka --

10       MR. LEVINE:  He keeps talking, Judge.  He won't listen

11   to you.

12       THE COURT:  Rabbi Mayer, I'm sorry.  I'm not --

13       RABBI MAYER ZAKS:  No, you don't listen to the judge,

14   Levine.

15       THE COURT:  No, I'm saying, Rabbi Mayer, I don't think

16   it's appropriate for you to address me here.  You're just going

17   to put out facts and it's not an evidentiary hearing.

18       RABBI MAYER ZAKS:  Thank you.  Thank you, Your Honor.

19       THE COURT:  Okay.  All right.  So, I do want to review

20   a few things.  So, one should turn their phone off, put it on

21   mute again, so we're not getting the feedback from me.

22   Including the weather during these two periods, although I'm not

23   quite sure it's that relevant at least based on the

24   representation of when the *lis pendens* was filed and the

25   pleadings related to it, which I certainly can take judicial

1   notice of, if they're Rabbi Mayer's pleadings.  And I'll give

2   you a ruling, I assume, probably Monday afternoon.  Whoever is

3   not on mute, put your phone on mute, so I don't hear myself a

4   partial second after I'm speaking.  All right.

5        I am doing it in part also to give Rabbi Mayer and

6   Rabbi Aryeh one last chance to resolve their differences.  I

7   have already noted that my review of the deposition transcripts,

8   with the exception of Mr. Gewirtzman's deposition, and frankly,

9   Henoch's deposition, he deposition of Rabbi Mayer's two sons,

10   although frankly, Henoch's deposition, it comes in too.

11        The relationship here between the two families and

12   ultimately that's because of the two fathers is poisonous right

13   now.  That is entirely clear to me.  And that's just not right.

14   It shouldn't be.  You should either reconcile or have a clear

15   divorce and get over it.  The rabbis are both elder and have

16   been respected religious leaders following in an important,

17   dignified and really illustrious tradition.  This has gone on

18   long enough.

19        I will make a ruling, and probably I'll do it Monday

20   afternoon.  But it will be a legal ruling based on evidence and

21   I will pull no punches because clearly someone here is lying.

22   And I have to address that.  And if you have any doubts that I

23   won't, you should read my most recent written opinion in the

24   *Blue Beverage* adversary proceeding, where I pull no punches as

25   to who I find is lying based on the evidence.  I don't want to

In re Mosdos Chofetz Chaim, Inc. - 1/14/21          81

1   do that.  And neither should either of the principals here want

2   that to happen.

3        I believe that Rabbi Mayer and Rabbi Aryeh, both have

4   been well represented in this case by the Otterbourg firm, and

5   by Mr Levine and Mr Nash.  In particular, well represented in

6   the efforts made to resolve these differences ultimately by a

7   divorce.  You basically, have four days to conclude those

8   efforts.  They were very close to being concluded.  And

9   reasonable men, knowing the consequences of not concluding them,

10  and having a ruling by me that, again, pulls no punches as to

11  who was lying and who wasn't, is not something you should want,

12  and it's not something that the community that you represent

13  should want.  Grown men, spiritual leaders, should get over

14  this.

15       So, you have that deadline. I'm not going any further.

16  I'm not going to delay this anymore, but you still have time.

17  Particularly, given my belief that you were incredibly close to

18  reaching a resolution that might have left both sides internally

19  unhappy or bitter, but would have let both sides then move on

20  with your ultimate mission in life.  That's not going to happen

21  with my ruling.  My ruling most decide things, and you will be

22  bound by it, but it will be out of your control.  You have it in

23  your control, and you should exercise that control as the people

24  that I believe, notwithstanding all the rancor, you are.

25       So someone from my chambers will notify the lawyers as

In re Mosdos Chofetz Chaim, Inc. - 1/14/21                82

1   to the time of my bench ruling.  It will be on the record; it

2   will be a lengthy ruling.  It will assess the testimony, and the

3   evidence that I have and deal with this issue.  As you can

4   probably tell from my questions, I find a lot of merit in the

5   motion, the motion *in limine*.  On the other hand, I need to

6   think carefully as to whether the ultimate sanction of dismissal

7   of this adversary proceeding is warranted.  As opposed to giving

8   the Plaintiffs the opportunity, and ultimately, me the

9   opportunity to hear cross examination of whatever witness the

10  Defendants want to put on as to certain issues.

11         And I'm not saying anything that I think both sides,

12  good lawyers would already deduce from how this argument has

13  gone, but again, the law is the law, and I will give you my

14  ruling, I'm assuming, on Monday afternoon, and you have time

15  before then to deal with this as you want to deal with it by

16  resolving it in the interests of your community.  And so, that

17  it will not lead to the type of acrimony that I see clearly in

18  the deposition transcripts infecting the families any community

19  potentially going forward.  All right.  Anything else from

20  anybody?

21         (No response.)

22         THE COURT:  Okay.  So, again, someone from my chambers

23  will contact both counsels as to the time when I'll give my

24  bench ruling.  And again, it will be on Court Solutions, so

25  you'll be dialing in at that point.  Okay.  Thank you.

83

1                                CERTIFICATION

2

3          I, Rochelle V. Grant, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6    Dated:  February 1, 2021

7

8                            _____

9                            Signature of Approved Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25