UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

| | |
|---|---|
| *In re:* | Case No. 12-23616 (RDD) |
| MOSDOS CHOFETZ CHAIM INC., | Chapter 11 |
| *Debtor.* | |

-----------------------------------------------------------------

| | |
|---|---|
| MOSDOS CHOFETZ CHAIM INC., RABBI MAYER ZAKS, derivatively on behalf of MOSDOS CHOFETZ CHAIM INC., DANIEL ROSENBLUM, derivatively on behalf Of MOSDOS CHOFETZ CHAIM INC., JOSEPH GRUNWALD, derivatively on behalf of MOSDOS CHOFETZ CHAIM INC., and YISROEL HOCHMAN, derivatively on behalf of MOSDOS CHOFETZ CHAIM INC., | Adv. Pro. No. 20-08949 |

                        Plaintiffs,

            -against-

MOSDOS CHOFETZ CHAIM INC., CHOFETZ
CHAIM INC., TBG RADIN LLC, SHEM OLAM
LLC, CONGREGATION RADIN DEVELOPMENT
INC., ARYEH ZAKS, BEATRICE WALDMAN
ZAKS, HENOCH ZAKS, MENDEL ZAKS,
GITTEL ZAKS LAYOSH, SAMUEL MARKOWITZ,
and STERLING NATIONAL BANK,

                        Defendants.
-----------------------------------

**MODIFIED BENCH RULING ON MOTION *IN LIMINE***

APPEARANCES:

| | |
|---|---|
| *For the Reorganized Debtor/Defendant, Mosdos Chofetz Chaim Inc.:* | LEVINE & ASSOCIATES, P.C., by Michael Levine, Esq. |
| *For Rabbi Aryeh Zaks:* | GOLDBERG WEPRIN FINKEL GOLDSTEIN, by Kevin J. Nash, Esq. |
| *For Congregation Radin Development, Inc.:* | KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP, by Tracy Lee Klestadt, Esq. and Brendan Scott, Esq. |

*For Shem Olam LLC:*        KRISS FEUERSTEIN LLP, by Daniel N.
                           Zinman, Esq.

*For Rabbi Mayer Zaks:*     Otterbourg, P.C., by Stanley L.
                           Lane, Jr., Esq.

Hon. Robert D. Drain, United States Bankruptcy Judge


     Before the Court is a motion *in limine* by certain
defendants seeking either to have a default judgment entered
against the plaintiffs in this adversary proceeding or such
other relief as the Court deems appropriate, including, for
example, taking an adverse inference against the plaintiffs
and/or the preclusion of the plaintiffs' submission of evidence.

     This matter has a fairly long history.  The underlying
dispute -- in which the plaintiffs seek relief based on the sale
shortly after confirmation of the chapter 11 plan in this case
(the "Plan") by the reorganized debtor herein (the "Debtor" or
"Reorganized Debtor") of the Debtor's primary asset, the real
property located at 50 Grandview Avenue, New Hempstead, New York
(the "Property") and a related mortgage loan, which plaintiffs
contend was unauthorized and improper under the Plan and
confirmation order -- began in state court in October 2019 and
was removed to this Court on February 11, 2020.

     The Court entered an order resolving various
procedural motions in this adversary proceeding on March 26,
2020, the second decretal paragraph of which directed that "The
parties to this adversary proceeding shall employ their best

efforts to engage in expedited discovery of all matters
necessary and relevant to the disposition of the Evidentiary
Hearing contemplated by this order to determine (1) whether the
corporate governance of the Reorganized Debtor and the identity
of the Reorganized Debtor's board of trustees on (a) the
confirmation date, and (b) the post-confirmation date transfer
of the Property by the Reorganized Debtor were in compliance
with the Plan and Confirmation Order, and (2) subject to any
right under New York's parol evidence rule, whether the
Confirmation Order approved the Reorganized Debtor's post-
confirmation date transfer of the Property without the
requirement of any additional approval under applicable New York
law, and if not, whether such approval was obtained (the
"Contested Issues")."  Those remain the underlying issues in the
adversary proceeding.

        The March 26, 2020 order specifically contemplated
that discovery related to the Contested Issues, as well as any
discovery under the terms of the order regarding the disposition
of the proceeds of the post-confirmation Sterling Bank loan
secured by the Property, would conclude no later than 60 days
after the lifting of the shelter-in-place directives then in
effect in New York and New Jersey, subject to the parties
requesting additional time if such restrictions remained.

        The plaintiffs professed that they wanted the
underlying issues resolved promptly based on their allegation

that the defendants improperly caused the transfer of the
Property and had financed it in a way that channeled a large
portion, if not all, of the loan proceeds to themselves.

The defendants also wanted a prompt resolution of the
Contested Issues, because the March 26, 2020 order also provided
that "This Court's prior direction to the parties to maintain
the status quo as it existed as of December 17, 2019, the date
of the last hearing before the Court in this chapter 11 case,
shall remain in force until the Evidentiary Hearing, as defined
below.  The injunctive provisions of this order are in
furtherance of and implement that direction," thus continuing a
status quo injunction that the defendants have sought to be
relieved of on the merits since December 2019.

Notwithstanding the foregoing, over a year later we
are here only on the present motion.  The parties' discovery
under the March 26 order was delayed though eventually
completed, and the parties scheduled a trial on the Contested
Issues, which was, however, adjourned twice.  The
defendants/movants then filed the present motion on September 2,
2020 based on the assertion that the plaintiffs destroyed
evidence critical to their case in late 2019 or early 2020 and
then again in May of 2020.

The motion *in limine* was at first only briefly
responded to, but it became clear at the first hearing on it
that the parties' disputed factual contentions required separate

discovery and probably an evidentiary hearing.  That discovery
having been completed, an evidentiary hearing was scheduled for
mid-October 2020 but then was adjourned because of the illness
of a close relative of one of the plaintiffs.  In adjourning the
hearing, the parties agreed, however, that there would be no
further discovery related to the motion *in limine* or, relatedly,
the identification of further witnesses than those who had
previously been identified.  The parties thereafter agreed that
rather than hold an evidentiary hearing on the motion, the Court
would consider the depositions of the identified witnesses,
which not only were transcribed, but also videotaped, and that
this evidence, in addition to any evidence whose admissibility
was agreed, including the witnesses' previously submitted direct
testimony declarations, would constitute the record on the
motion.

        In advance of last week's oral argument on the motion
*in limine*, the Court therefore reviewed the depositions -- both
the transcripts and the video recordings -- and the other items
agreed to be in evidence.

        Notwithstanding their agreement, the plaintiffs
nevertheless submitted various other declarations and identified
other possible witnesses on the eve of oral argument.  The Court
clarified, however, as accepted by both sides, that those
declarations would not be considered, those additional people
would not be permitted to testify, and the evidence would be

limited as stated on the record to the witness declarations, the deposition transcripts and videos, and the agreed admissible exhibits submitted before the adjourned evidentiary hearing in October, with one additional pair of declarations, namely the two declarations of Ron Henig, who was previously identified as a witness by the plaintiffs but was not deposed.

I have frequently stated on the record, including directly to the parties' principals, Rabbi Mayer Zaks and Rabbi Aryeh Zaks, that the underlying dispute should be settled amicably.  There have been efforts to settle it, including efforts in which I have been directly involved with the consent of both sides.  I reiterated that view at the close of oral argument and stated that if there was not a settlement, I would give the parties my ruling during the following week.

Shortly before the scheduled date of that bench ruling, however, purported new counsel for the plaintiffs -- or at least for Rabbi Mayer Zaks -- stated that based on his one-and-a-half days involvement with this matter he saw "certain things" apparently pertaining to the merits that should be brought to my attention and, therefore, that my ruling should be delayed.  Noting that I had previously expressly denied the request of the Otterbourg firm to be relieved as counsel for Rabbi Mayer Zaks at least through the date of a determination of the motion *in limine* and thus still viewed that firm as counsel of record, I stated that it appeared that the adjournment

request was another attempt either through raising new issues
with discovery or seeking to augment the record when it had been
closed, to keep the status quo in place, and I denied it.

This modified bench ruling therefore states my reasons
for granting in part the motion *in limine*. It is regrettable
that we have reached this point, because my ruling inevitably
involves an evaluation of the parties' primary witnesses'
credibility at the most telling level, i.e., whether they are
lying under oath, as their testimony directly contradicts each
other's, and the two primary witnesses are the children of the
two rabbi principals:  Henoch Zaks, a son of Rabbi Aryeh Zaks,
and Yosef Tzvi Zaks, the now 16-year-old son of Rabbi Mayer
Zaks.  Henoch is an adult, but not an elderly person by any
means.  Thus in a dispute fundamentally between two experienced,
elderly rabbis, who are brothers, their sons bear the brunt of
credibility findings, although, as will be clear from my ruling,
I conclude that each is and has been acting at the direction of
his father.  And so ultimately the rabbis bear some
responsibility, indeed more than some, for their son's
involvement here.

The motion *in limine* is premised upon the following
assertions:

Toward the end of 2019 or the beginning of 2020, the
movants allege that Tzvi Zaks, at that time 15 years old, on
behalf of and at the instruction of Rabbi Mayer Zaks not only

cut video cables outside the buildings on the Property that enabled a CCTV camera system to monitor the Property, but also, after the system ceased to record him, broke into the basement of one of the buildings on the Property, Unit 18, cut more wires leading to CCTV camera equipment located there, and took and destroyed the components of that system, as well as, importantly, an external hard drive and Wi-Fi router.

The motion further asserts that information in the form of downloads of documents, as well as videos downloaded onto the hard drive critical and at a minimum relevant to and supportive of the defendants' defense of the underlying Contested Issues was thus stolen or destroyed.

The motion further asserts that after the theft's discovery, Rabbi Aryeh Zaks with the assistance of Henoch Zaks and others had a new CCTV system installed at the Property, again running into the basement of Unit 18, and, notwithstanding their contention that they kept the basement locked, on May 24, 2020 Tzvi Zaks again broke in, having again cut the external CCTV wires, and this time took hard copy documents stored in a cabinet, credenza or armoire upon which the new CCTV equipment had been installed.

The movants offer the witness declaration of Henoch Zaks attesting to the foregoing facts, as well as (a) videotapes and still photos from those tapes that appear to show Tzvi Zaks cutting wires outside at the Property, including near Unit 18,

after having been dropped off by a close relative and (b) videos and still photos from them specifically dated to May 24, 2020, showing Tzvi Zaks again trying to cut video wires outside Unit 18, leaving and coming back with what appear to be more efficient or effective cutters, like garden shears, and successfully cutting them with those. Videos from that day and still images from them also show Tzvi Zaks being dropped off at the Property (of course he was not of an age to drive), apparently by Rabbi Mayer Zaks, his father.

When confronted with the allegation that the wires had been cut and key downloaded documents and videos destroyed, the record shows that Rabbi Mayer Zaks and the plaintiffs initially responded with a denial. This was before the video evidence was revealed. Thereafter, Rabbi Mayer Zaks acknowledged that the wires had been cut, that Tzvi Zaks had indeed broken into the basement of Unit 18, and that Tzvi had taken certain equipment -- a video camera -- from the basement. Rabbi Mayer Zaks denied, however, that his son's purpose in doing so was to destroy evidence regarding his dispute with Rabbi Aryeh Zaks. Instead, the rationale for his son's actions as stated in Rabbi Mayer's partial second denial was that Tzvi was offended by the operation of the security system during shabbat, the Jewish sabbath day, and therefore took it upon himself to disable it, that he did this unilaterally, and that he had no intention of destroying any evidence.

That partial second denial, as well as Tzvi Zak's
testimony, also denied that the first cutting of the wires and
taking or destruction of equipment in Unit 18 occurred at the
end of 2019 or the beginning of 2020, as alleged by the movants,
contending, rather, that it happened during the holiday of
Sukkot, which straddled the third and fourth weeks of October
2019.

The plaintiffs have also asserted, relying upon the
declarations of Tzvi, another son of Rabbi Mayer Zaks, Aron
Yehuda Zaks, and a third party, Aharon Gewirtzman, that the
basement where the defendants' information allegedly was kept
was a junk-filled storage room and not, as the movants contend,
an office with a desk and a storage unit that contained the CCTV
system, hard drive, Wi-Fi router, and hard copy documents.  The
plaintiffs contend that I should find as a factual matter,
therefore, that there was no relevant information, let alone
information relevant to the resolution of the Contested Issues,
destroyed by Tzvi.  The testimony largely covers those factual
disputes.

The legal source for the motion *in limine*'s request
for relief is found in two places: Fed. R. Civ. P. 37, more
specifically Rule 37(e), as incorporated by Fed. R. Bankr. P.
7037, which deals with spoliation of evidence stored in
electronic or digital form, and the Court's inherent power, even
when there is no discovery order in place or with respect to

other types of evidence, to impose sanctions for spoliation.
Both sources are well established, as the plaintiffs acknowledge
in their supplemental opposition to the motion. *See West v.
Goodyear Tire & Rubber Company*, 167 F.3d. 776, 779 (2d Cir.
1999).

Spoliation is defined as "the destruction or
significant alteration of evidence, or the failure to preserve
property for another's use as evidence in pending or reasonably
foreseeable litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D.
212, 216 (S.D.N.Y. 2003), *quoting Goodyear Tire & Rubber*, 167
F.3d at 779.

A claim for spoliation is made out by showing (1) the
party having control over the evidence had an obligation to
preserve it when it was altered or destroyed, (2) the evidence
was altered or destroyed with a culpable state of mind, and
(3) the evidence was relevant to a party's claim or defense such
that a reasonable trier of fact would find that it would support
that claim or defense. *Official Comm. of Unsecured Creditors of
Exeter Hldgs., Ltd. v. Haltman*, 2015 U.S. Dist. LEXIS 113701, at
*22-23 (E.D.N.Y. Aug. 25, 2015); *Centrifugal Force, Inc v.
Softnet Commun., Inc.*, 783 F. Supp. 2d 736, 741 (S.D.N.Y. 2011)
(internal quotations and citations omitted.)

A party seeking spoliation sanctions has the burden to
establish the elements of spoliation by a preponderance of the
evidence. *McIntosh v. United States*, 2016 U.S. Dist. LEXIS

44290, at *114-115 (S.D.N.Y., March 31, 2016), although the
difficulty of establishing "relevance" varies depending upon the
degree of the alleged spoliator's culpability, ranging from mere
negligence to willful intent and bad faith. *Official Comm. of
Unsecured Creditors of Exeter Hldgs. Ltd. v. Haltman*, 2015 U.S.
Dist. LEXIS 113071, at *26-29.

If I believe the movants, the first element of course
would be satisfied.  Obviously, a party has an obligation to
avoid stealing or destroying the other party's evidence.  Even
if I accepted Tzvi Zaks' contention that because he was Rabbi
Mayer's son he could enter any building on the Property at will,
including forcibly – which in fact I do not find credible -- he
did not have authority to destroy what he found there.

The obligation to preserve evidence (and hence not to
destroy the other party's evidence) arises when the alleged
spoliator has notice that the evidence is relevant to the
litigation or should have known that the evidence may be
relevant to future litigation.  *Fujitsu Ltd. v. Fed. Express
Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), *cert. den*. 534 U.S. 891
(2001). Litigants are generally under a duty to preserve, and
thus not to destroy, evidence that may reasonably be relevant to
future litigation.  *Official Committee of Unsecured Creditors of
Exeter Hldgs., Ltd. v. Haltman*, 2015 U.S. Dist. LEXIS 112071, at
*24.

The plaintiffs have argued that the first break-in

occurred before litigation over the Property commenced between
Rabbi Mayer and Rabbi Aryeh Zaks and, therefore, that Tzvi Zaks
could not have had the requisite culpable state of mind and,
perhaps, that he had no duty not to destroy anything.  Even if I
accept that the first break-in occurred as Tzvi has testified,
however, it was only days before Rabbi Mayer Zaks commenced the
state court action on October 25, 2019 regarding the disposition
and refinancing of the Property, thus giving rise to a duty to
preserve likely evidence, not destroy it.

As alleged by the movants, the destroyed records
included almost everything relevant to the Debtor's financing
and board actions, as well as records of other important
decisions pertaining to the Debtor or the Property.  As directed
by the Court's March 26, 2020 order, the composition and
authority of the board to transfer the Property under the Plan
is the first of the two Contested Issues underlying the
adversary complaint and pertains to some extent to the second
Contested Issue, as well.  Thus, the plaintiffs are not able to
defeat the motion based merely on the alleged timing of the
first break-in. Moreover, the second break-in occurred well
after the litigation commenced.

The focus of the parties, therefore, has been on the
second two elements of spoliation, i.e., that the evidence was
destroyed with a "culpable state of mind" and whether any
evidence relevant to support the movants' defense was actually

stolen or destroyed.

A "culpable state of mind" for purposes of spoliation ranges from simple negligence to bad faith and willful destruction. *Official Comm. of Unsecured Creditors of Exeter Hldgs., Ltd. v. Haltman*, 2015 Bankr. Lexis 113701, at *25; *First Am. Title Ins. Co. v. Moses* (*In re Moses*), 547 B.R. 21, 47 (E.D.N.Y. 2016). The Second Circuit, albeit interpreting a now superseded version of Fed. R. Civ. P. 37, has made it clear, however, that a "culpable state of mind" is not limited to bad faith or gross negligence and that based on the actual effect of the spoliation, i.e., if it truly destroys one's ability to mount a defense, even a negligent state of mind suffices to be "culpable." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002). *See also Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75-76 (S.D.N.Y. 1991).

Courts in the Second Circuit at times discuss the relationship of the alleged spoliator's state of mind to the inferences that a court may draw with respect to the third prong of the spoliation showing, namely that the destroyed evidence was relevant to support the other party's claim or defense, as well as the role that the spoliator's state of mind has on determining the proper sanction. It is fair to say that the Circuit has concluded that a case-by-case approach is appropriate with respect to how the degree of culpability relates to both the showing of the destroyed evidence's

relevance and to the proper sanction.  *See* *Zimmerman v. Poly*
*Prep Country Day Sch.*, 2011 U.S. Dist. LEXIS 40704, at *74-77
(E.D.N.Y. April 13, 2011), as well as the cases cited therein,
in particular, *Byrnie v. Town of Cromwell Bd. of Ed.*, 243 F.3d
93, 107-08 (2d Cir. 2001), and *Reilly v. NatWest Mkts. Group*
*Inc.*, 181 F.3d 253, 267 (2d Cir. 1999), *cert. den.* 528 U.S. 1119
(2000).

    As for establishing the third factor of a claim for
spoliation, i.e., whether the evidence destroyed was relevant to
and supportive of the party's claim or defense, "relevance"
means something more than a showing sufficiently probative to
satisfy Fed. R. Evid. 401.  Rather, "The party seeking an
adverse inference must adduce sufficient evidence from which a
reasonable trier of fact could infer that the destroyed or
unavailable evidence would have been of the nature alleged by
the party affected by its destruction.  Courts must take care
not to hold the prejudiced party to too strict a standard of
proof regarding the likely contents of the destroyed or
unavailable evidence, [however,] because doing so would subvert
the purposes of the adverse inference and would allow parties
who have destroyed evidence to profit from that destruction."
*Residential Funding*, 306 F.3d at 108-09 (internal quotations and
citations omitted).

    *Residential Funding* goes on to state, "Where a party
destroys evidence in bad faith, that bad faith alone is

sufficient circumstantial evidence from which a reasonable fact
finder could conclude that the missing evidence was unfavorable
to that party. _Id_. at 109.  That basic point runs through the
caselaw thereafter.  See, for example, _Official Comm. of_
_Unsecured Creditors of Exeter Hldgs. Ltd. v. Haltman_, 2015 U.S.
Dist. LEXIS 113701, at *27; _Zubulake v. UBS Warburg LLC_, 220
F.R.D. at 212.  A greater showing of relevance is required if
the spoliator's state of mind was merely negligent or at fault
to a lesser degree than in bad faith. _Id_.

        "Further, where the missing information has been [or
can be] obtained from other sources, courts have been reluctant
to find that the moving party has suffered prejudice." _Official_
_Comm. of Unsecured Creditors of Exeter Hldgs. Ltd. v. Haltman_,
2015 U.S. Dist. LEXIS 113071, at *29.

        Finally, if all three elements of spoliation are
satisfied by a preponderance of the evidence, the court has
considerable discretion in awarding an appropriate sanction.
_Fujitsu Ltd. v. Fed. Express Corp._, 247 F.3d at 436; _Reilly v._
_NatWest Mkts. Grp._, 181 F.3d at 267; _West v. Goodyear Tire &_
_Rubber_, 167 F.3d at 779.  However, it needs to be guided by the
underlying rationales for the spoliation doctrine, as stated by
the Second Circuit in _West v. Goodyear Tire & Rubber Co._: "The
sanction should be designed to: (1) deter parties from engaging
in spoliation; (2) place the risk of an erroneous judgment on
the party who wrongfully created the risk; and (3) restore the

prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." 167 F. 3d 779 (internal quotations and citations omitted).

*West v. Goodyear Tire & Rubber* then stated that while dismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party, "because dismissal is a drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Id.* (internal quotations and citations omitted).  In that case, although it appeared that evidence was in fact destroyed willfully, the court nevertheless disagreed with the lower court's conclusion that dismissal was the only adequate sanction.  Noting that it was not necessary to dismiss the complaint in order to vindicate the trifold aims of the spoliation doctrine, the court observed that the lower court "could have combined alternative sanctions in a way that would fully protect [the movants] from prejudice.  For example, the trial judge could: (1) instruct the jury to presume that the exemplar tire was overinflated, (2) instruct the jury to presume that the tire mounting machine and air compressor malfunctioned, and (3) preclude [the plaintiff] from offering evidence on these issues." *Id.* at 780. That reluctance to impose the most drastic sanction of dismissal, or sanctions tantamount to it, has continued through the caselaw, including at the Circuit level.

See *Dahoda v. John Deere Co.*, 216 Fed. App'x 124, 125 (2d Cir.,

Feb. 9, 2007); *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d

488, 501-02 (S.D.N.Y. 2016); *Johnson v. Summit Acquisitions LLC*,

2019 U.S. Dist. LEXIS 53954, at *37-38 (N.D.N.Y., March 29,

2019).

The rationale of such cases' sanctions rulings

requires review of the underlying issues to be resolved in the

adversary proceeding – here, the Contested Issues under the

March 26, 2020 order -- and the role that the destroyed evidence

would play in determining them, with the imposition of no

greater sanction than necessary to protect the movant for

prejudice with respect to those determinations.

After having reviewed all of the evidence and

considered the witnesses' credibility (and I note that unlike

most trials, an appellate court would have the same ability to

make such assessments since there has been no live, in-court

testimony but, rather, witness declarations and videotaped cross

examination), I find and conclude that the movants have

established each of the elements of spoliation by a

preponderance of the evidence.

I find and conclude that Tzvi Zaks destroyed relevant

and supportive evidence intentionally and in bad faith.  More

specifically, I find and conclude that the destruction that Tzvi

Zaks acknowledged -- twice cutting outside video wires at the

Property, twice breaking into the basement of Unit 18, cutting

the inside wires located there, and taking and destroying
electronic equipment there -- was not for the purpose of
disabling the use of the CCTV system to prevent a violation of
orthodox Jewish law during shabbat, but, rather, to destroy
evidence pertaining to the dispute between his father, Rabbi
Mayer Zaks, and his uncle, Rabbi Aryeh Zaks, the Debtor's
records stored in Unit 18.  I further find and conclude that the
equipment that Tzvi Zaks destroyed included not only CCTV video
equipment but also an external hard drive containing records of
the Debtor's board as well as hard copy records that the movants
have sufficiently established were relevant and supportive of
their defense in this adversary proceeding and that they cannot
obtain from another source.

    Further, I find and conclude that Tzvi Zaks acted as
an agent of his father, in which case his conduct can be
attributed to Rabbi Mayer Zaks as the plaintiff in this
adversary proceeding.  _Koch v. Greenberg_, 2011 U.S. Dist. LEXIS,
at *47 (S.D.N.Y. Aug. 16, 2011.); _Hawaiian Airlines v. Mesa Air
Grp._ (_In re Hawaiian Airlines Inc._) 2007 Bankr. LEXIS 3679, at
*17 (Bankr. D. Haw. Oct 30, 2007).

    I make those findings and conclusions for the
following reasons:

    I have evaluated the witness declarations and cross
examinations of Tzvi Zaks, Aron Yehuda Zaks, Aharon Gewirtzman,
and Henoch Zaks, including the videos of their testimony, as

well as the two declarations of Ron Henig, and, of course, the
other exhibits admitted into evidence.

Tzvi Zaks' testimony, except when he was pinned into a
corner based on prior statements by his father or pleadings on
behalf of his father, was evasive, logically and sometimes
factually inconsistent, and generally not credible.  Tzvi even
denied that the CCTV videos were of him, although they clearly
were and he later acknowledged that at least they might be of
him.

Fundamentally, Tzvi stuck to a story that simply
defies belief, namely his father's second version denying the
facts alleged in the motion: that he cut not only the wires to a
valuable closed circuit TV system at the Property, but also
broke into the basement of one of among roughly 50 buildings
there, Unit 18, and cut more wires and destroyed video equipment
with the sole purpose of preventing the CCTV system's operation
during shabbat.  Tzvi was adamant, moreover, that he did not
discuss any of these actions in advance with his father, whom he
reveres and who he did not hold responsible for what he said he
believed to be the improper use of the CCTV system on shabbat.

I did not perceive Tzvi to be an unguided missile; he
was neither weak of mind nor will.  He is intelligent, if in
over his head.  I cannot accept that he engaged in these highly
destructive actions -- clearly far exceeding the accomplishment
of his stated purpose, which, again, was only to disable the use

of the system for a portion of each week -- without discussing them with his father.  He went as far, according to Tzvi, as taking a video camera that he said was lying on the floor of the basement of Unit 18 and throwing it in a nearby dumpster, notwithstanding that he testified he believed the camera belonged to his father.  He knew the Property's other CCTV system, in the interior of the synagogue, was easily disabled on shabbat simply by flipping a switch, yet by his own admission he did not do that here.  It also was clear that he knew, although he tried to play down, that the CCTV system was for the safety of the community, his father's community.  Yet he acknowledged that he destroyed it.  This is not the type of thing that this then 15-year-old boy would do on his own. It is much more reasonable to infer that he cut the outside wires and inside wires in the basement to destroy the record of his actions in thereafter destroying the equipment in the basement because it was valuable to his uncle, Rabbi Aryeh.  It is reasonable to assume, moreover, that he would have not done even so on his own.

Nevertheless, Tzvi repeatedly testified when pressed about the implausibility of his version of events, that taking these actions was really "not a big deal" (Tr. p. 81), that "this is a very insignificant thing that happened here" (Tr. p. 352), and that first one takes action and then you talk about it (Tr. p. 97), although, he acknowledged (Tr. p. 324), he did not

tell anyone, after all, until accused, stating that "you don't
show off a mitzvah."  Shortly thereafter (Tr. P. 329), he did
acknowledge, when pressed, that he should have talked to his
father about it beforehand, although he was unable or refused to
explain why, an admission and then an evasion that I believe
reflected only that he was trapped in the implausibility of his
story.

     Tzvi's testimony was not credible in other ways, too.
He was adamant that he knew very little about the dispute
between his father and his uncle, although it is clear not only
from his own testimony, but also from the testimony of his
brother, Aron, that the case between Rabbi Mayer and Rabbi Aryeh
was a frequent topic of conversation in the Mayer Zaks'
household and indeed, from the testimony of Mr. Gewirtzman, a
frequent source of discussion throughout the community.

     Tzvi Zaks' testimony was also contradicted by other
testimony by Mr. Gewirtzman, who as the plaintiffs' witness was
at times hostile to the movants but credible when testifying
that when he was is the basement of Unit 18 shortly before
Tzvi's first break-in, there was never a camera on the floor, as
Tzvi had rather bizarrely alleged, and it was unlikely that
there ever would be.  Moreover, Mr. Gewirtzman testified that
the basement, while largely used for storing things, was not
full of mold or sewage or uninhabitable as Tzvi testified.

     Further, as discussed in more detail below, I

generally accept testimony by Henoch Zaks, Mr. Gewirtzman, and
Mr. Henig that the equipment located in the basement of Unit 18
comprised more than the components of a CCTV system and included
an exterior hard drive and Wi-Fi router, as well.

It is reasonable to infer, moreover, that Rabbi Mayer
Zaks or someone on his behalf put Tzvi Zaks up to targeting the
basement equipment, the logical rationale being to destroy
evidence, not to do a shabbat mitzvah.

In addition, not only Tzvi's testimony, but also that
of his brother, Aron, and Mr. Gewirtzman, seemed studiedly
rehearsed with regard to one point upon which the plaintiffs
have largely based their opposition to the motion, namely that
the basement of Unit 18 was not an "office."  This argument is
largely a red herring.  The point of the motion *in limine*'s
reference to an "office" and Henoch Zaks' testimony in its
support is that Rabbi Aryeh Zaks and Henoch Zaks used the
basement to work on the Debtor's business and, in particular, to
store records there, primarily downloads of documents and
videos.  They, too, acknowledged that the basement was not what
would normally be viewed as a commercial office in that it was
also used to store garden tools, including, it appears, the
clippers that, after much prodding, Tzvi acknowledged he took to
finish cutting the outside wires the second time on May 24,
2020, and other things like road salt and building supplies.

The basement of Unit 18 was, in my view, and I do not

believe anything more needs to be shown here, a storage place
that, among other things, stored a CCTV camera system and, I
believe it can be reasonably inferred, a hard drive upon which
important documents for the Debtors that would establish the
board's composition and actions, were downloaded and stored.

I find Henoch Zaks' testimony about this aspect of the
dispute, namely the storage of information on the hard drive,
credible.  I generally find his testimony more credible than
not.  It was detailed in ways that one could have tripped him up
over if it were not reasonably accurate.  He may have implied by
referring to a "computer storage unit" that the armoire or chest
holding the CCTV system's components, router, and hard drive was
fancier than the Mr. Gewirtzman's description of it, but I find
credible his testimony that such equipment in fact was stored
and used in Unit 18.  It is basically corroborated by Mr.
Gewirtzman, who notwithstanding obviously being primed to
testify about the dilapidated state of the basement, did
acknowledge, albeit somewhat grudgingly and disparagingly, that
there was an armoire or storage unit there upon which electronic
equipment was stored.

Mr. Gewirtzman further acknowledged that this system
was an electronic camera system and not simply "a camera."
After more probing, he also testified that there was, in
addition, a "box" on the armoire, which, after more probing, he
stated he really did not pay much attention to because he was

more focused on the camera system because he had not really
expected that it would be there, thus implying, at least, that
the "box" was not part of the camera system but some other
electronic device, such as a hard drive.

Mr. Gewirtzman also confirmed a fact that Tzvi Zaks
was quite evasive about, that the basement was locked or had a
lock.  He also clarified his declaration that when he went to
the basement of Unit 18 to help move belongings of another of
Rabbi Mayer Zaks' sons, the door was not simply open but,
rather, that he had called one of Rabbi Aryeh Zaks' children in
advance to arrange for the basement to be unlocked.

Aron Yehuda Zaks' testimony, other than showing a
remarkable degree of evasiveness, was largely irrelevant.  He
acknowledged that he took the photos that were the primary
purpose of his witness declaration in July 2020, several weeks
after the second break-in.  He further testified that he could
not really say how often he had been in the basement of Unit 18
before then, but only as much as two or three times during his
entire time at the Property.

Finally, Mr. Henig's first declaration largely
corroborates Henoch Zaks' testimony by confirming that at least
during Mr. Henig's primary period at the Property, from March
2006 through 2009, he worked out of an office in a townhouse
that contained a desk cabinet that held a computer, documents,
including contracts, files and a CCTV system, and that sometime

after 2007 that office was moved to the basement of Unit 18.
Moreover, Mr. Henig concludes this declaration by stating, at
paragraph 4, "I never became aware that these items, i.e.,
desks, chairs, files, plans, and records of the basement office
in addition to the computer desk cabinet and its contents, were
removed at any time thereafter."

Mr. Henig's second declaration importantly does not
address, let alone contradict, these statements about the
storage of electronic equipment in the basement of Unit 18 or
that contracts and files were stored in a cabinet there.

There is one inconsistency between the testimony of
Tzvi Zaks and Henoch Zaks that I cannot reconcile, although I
generally have found Tzvi not credible and Henoch credible.
That is whether the first break-in occurred in the third or
fourth week of October, or, instead, in the last week of
December 2019 or the first week of January 2020, as Henoch
testified he believed it occurred.

It was posited during oral argument that the videos of
Tzvi cutting wires the first time were taken when the weather
was fairly good and children were playing without wearing winter
coats, which would not be the case in late December or early
January.  Channeling Abraham Lincoln during his legal career, we
checked the weather for the two periods, however, and could not
conclude that the days in the October period all were much
milder than days during late December/early January.

In any event, I conclude that the difference between
the dates, other than going to the witnesses' credibility, which
I have assessed on far more telling grounds, is particularly
relevant here.  As previously stated, whether the first break-in
occurred in October during Sukkot or in December or early
January, Rabbi Mayer Zaks would have been focused on the
underlying Contested Issues given that he commenced the state
court litigation in late October, 2019 and asserted in it that
Rabbi Aryeh Zaks had been boasting that he had taken away
ownership of the Property under Rabbi Mayer's nose.

Thus, including in the light of my finding of the
plaintiffs' intent to destroy evidence, the movants have made
more than a sufficient showing that the destroyed material was
relevant to support their defense in this proceeding.

That leaves the issue of the appropriate sanction.  It
has been held that actual dismissal may be a proper sanction if
the court finds that relevant evidence was destroyed in bad
faith but does not, as here, know the full nature of that
evidence.  As stated by Judge Martin in _Miller v. Time Warner
Commun. Inc._, 1999 U.S. Dist. LEXIS 9689, at *14 (S.D.N.Y. June
29, 1999), it is hard to conceive of an adverse evidentiary
inference as a lesser sanction when one does not know the extent
of what was destroyed:  the inference would be that everything
was destroyed, which would lead to a directed verdict, which
would in practical terms be the same thing as a dismissal.

On the other hand, courts have held even after finding
or assuming willful misconduct that a lesser sanction than
dismissal is warranted if the information destroyed either
appeared unimportant to the merits or a greater sanction would
unreasonably hamper the other party in advancing what might be a
legitimate claim. For the former point, see *Johnson v. Summit
Acquisitions*, 2019 U.S. Dist. LEXIS 5394, at *37-38 (only "broad
statements that the alleged misconduct tainted most, if not all,
of Defendant's evidence"); *McIntosh v. United States*, 2016 U.S.
Dist. LEXIS 44290, at 124 (relevance of footage "very much in
doubt").  For the latter, see *Cat3, LLC v. Black Lineage, Inc.*,
164 F. Supp. 3d at 501-02.

In addition, while I clearly can infer that the
destroyed evidence was relevant to the first of the Contested
Issues, i.e., whether the corporate governance of the Debtor and
the identity of its board on the Plan's confirmation date
complied with the Plan and confirmation order, I find it hard to
see how the evidence destroyed goes to the second Contested
Issue, i.e., whether the confirmation order approved the
reorganized Debtor's transfer of the Property without the
requirement of any additional approval under applicable New York
law. (I note that the parties now agree that the Debtor's board
did not change between the Plan's confirmation date and the
transfer of the Property and that any subsequent approval of the
transfer of the Property under applicable New York law was not

obtained.)

       I am also troubled that Rabbi Aryeh Zaks did not testify on whether the destroyed evidence related to either Contested Issue, although ultimately, he is, as I found with regard to Rabbi Mayer Zaks, clearly in control of his family and their actions in respect of the Debtor and was the primary face of this chapter 11 case before confirmation of the Plan.

       Therefore, guided by *West v. Goodyear Tire & Rubber* and consistent with its discussion of the three rationales underlying the spoliation doctrine, I conclude that the movants' request for an order dismissing the complaint should not be granted, notwithstanding my findings and conclusions regarding the break-in.  Instead, I will preclude the plaintiffs from introducing evidence on the first of the Contested Issues.  I will not, however, draw an inference in favor of the defendants on that issue and will permit the plaintiffs to cross examine whatever witnesses the defendants wish to put on -- and I hope that will include Rabbi Aryeh Zaks -- in support of their defense.

       Secondly, I will not grant the motion *in limine* with respect to the second Contested Issue, with the exception that the plaintiffs shall not be permitted to introduce any evidence regarding the Debtor's board meetings, board composition, or corporate governance with respect to that issue.  I find it unlikely that such evidence would be particularly relevant to

that issue, given that its determination will primarily be

focused on the actions of the Debtor and its counsel in seeking,

in the context of confirmation of the Plan, this Court's

approval of the Plan's contemplated possible sale of the

Property to pay debt. However, to the extent that board

composition or authority to act is relevant to the second

Contested Issue, based on the spoliation that I have found and

the nature of the spoliators' culpable state of mind I will

preclude the plaintiffs' submission of evidence on it, as

opposed to what was sought from this Court with regard to

approval of the post-confirmation transfer of the Property and

any requirement of additional approval under New York law.

Dated:  White Plains, New York
        February 16, 2021

                              /s/Robert D. Drain
                              United States Bankruptcy Judge